No. 24-8084

# United States Court of Appeals for the Tenth Circuit

Dr. Frederick William "Eric" Cubin III,
*Plaintiff-Appellant*,

v.

Mark Gordon, Governor of Wyoming,
*Defendant-Appellee*

On Appeal from The United States District Court for the District of Wyoming
Case No. 1:24-cv-164 (Hon. Scott W. Skavdahl).

## APPELLANT'S PRINCIPAL BRIEF

Jacob Huebert
Bridget Conlan
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 481-4400
jhuebert@ljc.org
bconlan@ljc.org

D. Stephen Melchior
MELCHIOR LAW FIRM, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307) 637-2323
steve@melchlaw.com

*Attorneys for Plaintiff-Appellant*
*Oral argument requested

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF RELATED CASES.................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUE ........................................................... 2

STATEMENT OF THE CASE............................................................. 2

A.    Dr. Cubin and the Wyoming Board of Medicine ....................... 2

B.    Dr. Cubin's Support for "Chloe's Law" ...................................... 3

C.    Governor Gordon's Termination of Dr. Cubin for His Email
      Supporting Chloe's Law ............................................................ 6

D.    Procedural History ..................................................................... 9

STANDARD OF REVIEW................................................................. 9

SUMMARY OF THE ARGUMENT ...................................................11

ARGUMENT ......................................................................................15

I.    Dr. Cubin is likely to prevail on his First Amendment claims
      because Governor Gordon fired him in retaliation for protected
      speech. ......................................................................................15

i

II.    A preliminary injunction is necessary to prevent irreparable
       harm to Dr. Cubin. ....................................................................40

III.   A preliminary injunction will serve the public interest.............45

CONCLUSION ....................................................................................45

REQUEST FOR ORAL ARGUMENT ................................................46

CERTIFICATE OF COMPLIANCE ....................................................48

CERTIFICATE OF DIGITAL SUBMISSION ....................................49

CERTIFICATE OF SERVICE .............................................................50

ADDENDUM .......................................................................................51

   Order Denying Preliminary Injunction
   (Dkt. 25, November 14, 2024) ………..……….………… Add. 001

# TABLE OF AUTHORITIES

### Cases

*ACLU v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ..........................................................32

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*,
   562 F.3d 1067 (10th Cir. 2009) .......................................................... 9

*Bordelon v. Chicago School Reform Bd. of Trustees*,
   8 F. Supp. 2d 779 (N.D. Ill. 1998) ......................................................42

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
   492 F.3d 1192 (10th Cir. 2007) ....................................................19, 30

*Brown v. City of Tulsa*,
   124 F.4th 1251 (10th Cir. 2025)................................. 18, 19, 24, 30, 33

*Bruder v. Smith*,
   No. 05-74511, 2005 U.S. Dist. LEXIS 38246 (E.D. Mich. Dec. 22,
   2005)....................................................................................................43

*Cragg v. City of Osawatomie*,
   143 F.3d 1343 (10th Cir. 1998) .........................................................25

*Curtis v. Okla. City Pub. Sch. Bd. of Educ.*,
   147 F.3d 1200 (10th Cir. 1998) ...................................................30, 34

*Derma Pen, LLC v. 4EverYoung Ltd.*,
   773 F.3d 1117 (10th Cir. 2014) ......................................................9, 10

*Duda v. Elder,*
  7 F.4th 899 (10th Cir. 2021) ................................................... 18, 19, 20

*Elrod v. Burns,*
  427 U.S. 347 (1976) ............................................................................. 41

*Free the Nipple-Fort Collins v. City of Fort Collins,*
  916 F.3d 792 (10th Cir. 2019) .............................................................. 41

*Garcetti v. Ceballos,*
  547 U.S. 422 (2006) .................................................... 11, 15, 30, 34, 35

*Garcia v. Bd. of Educ.,*
  777 F.2d 1403 (10th Cir. 1985) ............................................................ 45

*Greater Yellowstone Coal. v. Flowers,*
  321 F.3d 1250 (10th Cir. 2003) ............................................................ 40

*Isler v. N.M. Activities Ass'n,*
  No. 10-00009 MV/WPL, 2010 U.S. Dist. LEXIS 144454 (D.N.M. Feb.
  19, 2010) .............................................................................................. 42

*Lane v. Franks,*
  573 U.S. 228 (2014) ............................................................................. 17

*Lighton v. Univ. of Utah,*
  209 F.3d 1213 (10th Cir. 2000) ............................................................ 17

*Meyer v. Grant,*
  486 U.S. 414 (1988) ............................................................................. 34

*Moore v. City of Wynnewood,*
  57 F.3d 924 (10th Cir. 1995) ............................................................... 26

iv

*Mueggenborg v. Nortek Air Sols., LLC*,
  No. 20-6147, 2021 U.S. App. LEXIS 30860 (10th Cir. Oct. 15, 2021)..24

*Nken v. Holder*,
  556 U.S. 418 (2009) ..............................................................................45

*Oldridge v. Layton*,
  Nos. 22-3284, 23-3070, 2024 U.S. App. LEXIS 10688 (10th Cir. May 2,
  2024) ......................................................................................................29

*Pickering v. Board of Education*,
  391 U.S. 563 (1968) .......................................................................15, 18

*Pryor v. Sch. Dist. No. 1*,
  99 F.4th 1243 (10th Cir. 2024) ............................... 10, 16, 31, 33, 41, 45

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ..............................................................................31

*Rankin v. McPherson*,
  483 U.S. 378 (1987) ..............................................................................34

*Robinson v. Barnhart*,
  366 F.3d 1078 (10th Cir. 2004) ............................................................24

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ............................................................40

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966) ................................................................................45

*Sable Commc'ns, Inc. v. FCC*,
  492 U.S. 115 (1989) ..............................................................................32

*Schrier v. University of Colorado,*
    427 F.3d 1253 (10th Cir. 2005) .....................................................43, 44

*Stengle v. Ofc. of Dispute Resolution,*
    631 F. Supp. 2d 564 (M.D. Pa. 2009) ...........................................36, 37

*Trant v. Oklahoma,*
    754 F.3d 1158 (10th Cir. 2014) ................................... 12, 15, 16, 19, 30

*Ware v. Unified Sch. Dist.,*
    881 F.2d 906 (10th Cir. 1989) ...........................................................30

*Wulf v. City of Wichita,*
    883 F.2d 842 (10th Cir. 1989) ...........................................................20

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiff-Appellant's claims present federal questions arising under the First Amendment of the U.S. Constitution. The district court also had jurisdiction under 28 U.S.C. § 1343 because Plaintiff-Appellant brought this action under 42 U.S.C. § 1983.

On November 14, 2024, the district court issued an opinion and order denying Plaintiff-Appellant's motion for preliminary injunction. App. Vol. 1 at 146. On December 9, 2024, Plaintiff-Appellant filed his appeal. App. Vol. 1 at 170. This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1) because it is an interlocutory appeal of the district court's interlocutory order.

## STATEMENT OF THE ISSUE

Wyoming Governor Mark Gordon terminated Plaintiff-Appellant Dr. Eric Cubin from his position on the Wyoming Board of Medicine in response to an email Dr. Cubin sent to the Wyoming House of Representatives expressing his personal support for legislation to ban certain "gender-affirming" procedures for minors. Is Dr. Cubin likely to prevail on his claim alleging that this violated his First Amendment rights and thus entitled to a preliminary injunction?

## STATEMENT OF THE CASE

This case is about Wyoming Governor Mark Gordon's termination of Plaintiff-Appellant Dr. Eric Cubin from the Wyoming Board of Medicine in retaliation for Dr. Cubin's support of legislation that would prohibit (and, having passed, now does prohibit) certain "gender-affirming" procedures for minors.

## A.    Dr. Cubin and the Wyoming Board of Medicine

Dr. Cubin is an experienced and accomplished Wyoming-licensed doctor specializing in radiology. App. Vol. 1 at 9, 81. Governor Gordon

appointed Dr. Cubin to the Wyoming Board of Medicine (the "Board") in 2023 and reappointed him for a four-year term in 2024. App. Vol. 1 at 12.

Governor Gordon is responsible for nominating individuals to serve on the Board with the advice and consent of the State Senate. App. Vol. 1 at 12. The Board is responsible for overseeing medical regulation, compliance and discipline, which includes ensuring that physicians adhere to state laws as well as issuing, renewing, and suspending licenses for physicians and other medical practitioners. App. Vol. 1 at 12, 82. Board members serve four-year terms and cannot be appointed to more than three consecutive terms. App. Vol. 1 at 12. Board members receive compensation for their service and are paid in the same manner and amount as members of the Wyoming Legislature. App. Vol. 1 at 82.

**B.    Dr. Cubin's Support for "Chloe's Law"**

In early 2024, the Wyoming legislature was considering Senate File 99, referred to as "Chloe's Law," which would prohibit certain gender-affirming procedures for minors in Wyoming. App. Vol. 1 at 12. Leaders

of the Wyoming Medical Society ("WMS")—a voluntary professional organization for Wyoming medical profession, of which Dr. Cubin has been a member for more than 15 years—and Dr. Michael Sanderson, president of the Wyoming Chapter of the American Academy of Pediatrics, publicly opposed Chloe's Law in testimony before the Wyoming legislature. App. Vol. 1 at 14, 83.

On February 21, 2024, Dr. Cubin emailed Sheila Bush, the Executive Director of WMS, to express his concerns about WMS's position on Chloe's Law and to request that WMS present views of physicians on both sides of the issue. *Id*. Dr. Cubin and WMS leadership exchanged emails over the next several days, but WMS failed to address Dr. Cubin's concerns to his satisfaction. App. Vol. 1 at 15.

Then, on February 28, 2024, Dr. Cubin sent all members of the Wyoming House of Representatives an email expressing his personal support for Chloe's Law and his criticism of WMS's position against it. *Id*. Dr. Cubin's email—sent from his personal email account—made clear that he was representing only himself as a "physician in Casper"

4

writing "from the perspective of a Wyoming doctor who actually

practices medicine at the very hospital where he was born." App. Vol. 1

at 15, 29, 30, 84. Dr. Cubin did not purport to speak on behalf of WMS

or the Board; indeed, his email did not even mention the Board nor his

position on the Board. Dr. Cubin's email stated that he had "no idea

why the WMS has elected to take this unnecessary position that is so

clearly contrary to the viewpoint of the majority of their members." App.

Vol. 1 at 30. Dr. Cubin's email also noted a suspected partnership

between WMS and Dr. Sanderson, due to their presentation of nearly

identical positions to the legislature. *Id.* Aside from Dr. Sanderson, Dr.

Cubin's email did not mention any other physicians by name, only

referencing "several very vocal, extremely liberal members of the

[WMS] Board." App. Vol. 1 at 29. Dr. Cubin's email went on to state

that he "fe[lt] the need to advocate on [his] own behalf by coming to [the

members of the House of Representatives] directly" to express his

concerns that WMS's position on Chloe's Law did not "faithfully

represent the physicians in [Wyoming]." App. Vol. 1 at 30. Chloe's Law

5

ultimately passed, and Governor Gordon signed it into law in March
2024. App. Vol. 2 at 309.

## C.    Governor Gordon's Termination of Dr. Cubin for His Email Supporting Chloe's Law

On April 22, 2024, Dr. Cubin received a phone call from the
Governor's Chief of Staff, Drew Perkins, informing him that, because of
the email he had sent to the House of Representatives and the positions
he had taken, the Governor had decided to remove him from the Board.
App. Vol. 1 at 84. Immediately after the phone call, Dr. Cubin received
a signed letter from Governor Gordon, by email attachment, notifying
him that the Governor was removing him from the Board. App. Vol. 1 at
32, 85.

Governor Gordon stated in the letter that he had "been made aware
of [Dr. Cubin's] email to the members of the House of Representatives
during this last legislative session regarding [Chloe's Law] in which
[Dr. Cubin] strongly encouraged the members to pass this legislation
and criticized the Wyoming Medical Society's opposition to the bill."

App. Vol. 1 at 32. The letter stated that Governor Gordon "believes" Dr.

Cubin's "personal comments" in his email to legislators regarding

Chloe's Law "could give doctors, who are licensed by the Board of

Medicine, a reason to be concerned that [Dr. Cubin] might use [his]

position to advocate for a particular position when considering matters

that should be considered absent an agenda," and that "medical

professionals should be confident that their licensure, which is their

livelihood, will be handled professionally and clinically examined on

merits alone." App. Vol. 1 at 32, 85. Governor Gordon stated that "even

the appearance of bias can be disquieting" and that individual members

of the Board are not "entitled to speak for the Board unilaterally." App.

Vol. 1 at 32. Governor Gordon's letter further stated that he was

terminating Dr. Cubin "as I have done before, when a member of a

board chooses to express personal beliefs in a way that can be construed

as speaking for the body." App. Vol. 1 at 32. Governor Gordon stated

that he "believe[s] it is best to remove [Dr. Cubin] from the Board of

Medicine" and "urge[d] [Dr. Cubin] to continue to advocate for [his] beliefs." *Id.*

As a member of the Board, Dr. Cubin always fulfilled his duties and obligations in a professional, unbiased, and clinical manner based on the merits alone. App. Vol. 1 at 18, 82. But for Dr. Cubin's email to the Wyoming House of Representatives expressing his personal views on Chloe's Law, he would not have been removed from the Board. App. Vol. 1 at 17.

To Dr. Cubin's knowledge, his email to the Wyoming House of Representatives did not result in any complaints from other members of the Board, nor did it impact the Board's functioning in any way. App. Vol. 1 at 84. Valerie Mockensturm, a fellow Board member, testified before the district court that she was not aware of Dr. Cubin's email until April 2024, and that in April 2024 "the only minor disruption [to Board official duties and activities] was Dr. Cubin was not at that Board meeting." App. Vol. 2 at 257-258. Ms. Mockensturm further testified that she "never" observed Dr. Cubin acting in a biased manner

8

regarding any of his official Board duties and that she would like to see him restored to the Board. App Vol. 2 at 258-259.

## D.     Procedural History

Dr. Cubin filed suit against Governor Gordon on August 29, 2024, alleging that his termination from the Board in retaliation for his email to House members violated his First Amendment rights of free speech and petition. App. Vol. 1 at 9, 16-20.

Dr. Cubin moved for a preliminary injunction to restore him to his position on the Board during this litigation. App. Vol. 1 at 45. The district court denied the motion on November 14, 2024. App. Vol. 1 at 146. Dr. Cubin filed a timely notice of appeal on December 9, 2024. App. Vol. 1 at 170.

## STANDARD OF REVIEW

This court ordinarily reviews a district court's denial of a preliminary injunction under the abuse-of-discretion standard. *Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119 (10th Cir. 2014). "A district court abuses its discretion when it commits an error of law or makes clearly

erroneous factual findings." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). The Court reviews "the district court's conclusions of law de novo and its factual findings for clear error." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1249 (10th Cir. 2024).

"To obtain a preliminary injunction, a movant must establish four factors: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the court denies the injunction; (3) the movant's harm without the injunction outweighs the other party's harm with the injunction; and (4) the injunction is not adverse to the public interest." *Pryor v. Sch. Dist. No. 1*, 99 F.4th at 1250 (citation omitted). Where the district court relied largely on likelihood of success on the merits, involving a question of law, the court conducts de novo review of the district court's conclusions on likelihood of success. *Derma Pen, LLC,* 773 R.3d at 1119.

10

## SUMMARY OF THE ARGUMENT

Plaintiff-Appellant Dr. Eric Cubin sent Wyoming legislators an email, in his personal capacity as a physician, expressing his support for legislation banning certain "gender-affirming" procedures for minors. In response, Wyoming Governor Mark Gordon fired Dr. Cubin from his position on the Wyoming Medical Board. The First Amendment protected Dr. Cubin's speech, and the district court erred in denying him a preliminary injunction to restore him to his position on the Board.

Dr. Cubin is likely to prevail on his First Amendment claim challenging his termination. Precedent prescribes a five-factor test— derived from *Garcetti v. Ceballos*, 547 U.S. 422 (2006)—to determine whether the First Amendment protects a government employee's speech against retaliation. Four of those factors are undisputed and favor Dr. Cubin. The only disputed factor—which weighs the government's interest in efficiency against the employee's free speech rights—favors Dr. Cubin as well.

11

To prevail on that factor, the government must show, with evidence, that the government's interest in "avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships" outweighs the employees right to free speech. *Trant v. Oklahoma*, 754 F.3d 1158, 1166 (10th Cir. 2014).

The district court erred in concluding that the government had met its burden. The district court wrongly concluded that Dr. Cubin's termination was based on the Governor's prediction that Dr. Cubin's email to legislators could create a perception of bias against certain individuals—specifically, one particular doctor and leaders of the Wyoming Medical Society, who opposed Chloe's Law, and whom Dr. Cubin criticized in his email. That was not the basis of Dr. Cubin's termination stated in Governor Gordon's letter. Rather, Governor Gordon cited Dr. Cubin's comments *on the legislation* and the supposed appearance that Dr. Cubin was speaking on behalf of the Board.

Further, the evidence does not support any prediction that Dr. Cubin would be biased (or perceived as biased) against any physicians who

appear before the Board. Dr. Cubin's letter advocated in favor of legislation that is now Wyoming law, which he is required to apply as a Board member. And nothing in his letter suggests he would lack impartiality with respect to the bill's opponents whom he criticized; he did not impugn their character or abilities as physicians. And there is no reason to believe that any perception of bias against those few individuals (however unwarranted) would interfere with the Board's work because there is no reason to believe those individuals will have a matter before the Board during the remainder of Dr. Cubin's four-year term.

Governor Gordon also lacked any evidentiary support for the other basis he stated for Dr. Cubin's termination: that Dr. Cubin's email could be construed as expressing the views of the Board. Nothing in Dr. Cubin's email—sent from his personal account, expressly on his own behalf, with no mention of the Board or his position on it—could give that impression.

The only record evidence about the effect on the Board comes from a member who testified that she had never seen Dr. Cubin act in a biased or prejudicial way, that the only disruption to the Board was his absence, and that she wanted him to be restored to the Board.

Also, the district court erred in concluding that other considerations outweighed Dr. Cubin's interest in free speech. Dr. Cubin engaged in speech to the legislature regarding pending legislation, which receives the First Amendment's strongest protection. And his speech was far less potentially disruptive than other speech that this Court has found to be protected against retaliation.

The district court also erred in not recognizing that any perception of bias (however baseless) could be sufficiently addressed by recusal. In fact, Dr. Cubin has stated that he would recuse himself in the unlikely event that any of the physicians he criticized in his email had a matter before the Board.

Thus, Dr. Cubin is likely to prevail on the merits of his First Amendment claim. And without a preliminary injunction, he will suffer

14

irreparable harm—from the violation of his First Amendment rights, from being excluded from his position, from reputational harm, and from the prospect that the Governor will fill his seat with someone else before this litigation concludes. A preliminary injunction would serve the public interest because it is always in the public interest to uphold First Amendment rights.

## ARGUMENT

### I.    Dr. Cubin is likely to prevail on his First Amendment claims because Governor Gordon fired him in retaliation for protected speech.

Dr. Cubin is likely to prevail on his First Amendment claim because the record shows that Governor Gordon removed Dr. Cubin in retaliation for speech that Dr. Cubin made as a private citizen on a matter of public concern, and that his speech has not interfered, and cannot reasonably be expected to interfere, with the Board's operations and functioning.

To determine whether the First Amendment protects a government employee's speech, this Court applies the five-step framework derived

15

from the Supreme Court's decisions in *Garcetti v. Ceballos*, 547 U.S. 422 (2006) and *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014). That framework analyzes whether (1) the speech at issue occurred within the scope of employment; (2) the speech was about a matter of public concern; (3) the government's interest in efficiency outweighs the employee's free speech rights; (4) the plaintiff's speech was a motivating factor in the adverse employment action; and (5) the same employment decision would have been reached absent the protected speech. *Id.* "The first three factors present questions of law that [this Court] review[s] de novo." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1250 (10th Cir. 2024).

### A.   Four of the five Garcetti factors are undisputed and favor protecting Dr. Cubin's speech.

In opposing Dr. Cubin's motion for preliminary injunction, Governor Gordon has not disputed that the first, second, fourth, and fifth *Garcetti* factors favor protecting Dr. Cubin's speech. App. Vol. 1 at 158.

16

The first factor favors Dr. Cubin because Dr. Cubin wrote and sent his email to the Wyoming House of Representatives in his personal capacity, not acting within the scope of his official duties. App. Vol. 1 at 97, 158. The email, sent from his personal account, explicitly stated that he was speaking "on his own behalf" and "from the perspective of a Wyoming Doctor." App. Vol. 1 at 30. It made no reference to his Board membership.

The second factor favors Dr. Cubin because his email involved a matter of public concern—that is, "it can be fairly considered as relating to [a] matter of political, social, or other concern to the community, or . . . a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014); *see also Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000) (defining matters of public concern as "those of interest to the community whether for social, political or other reasons"). Dr. Cubin's message to legislators addressed a matter of public concern because it directly advocated for Chloe's Law, a piece of

pending legislation, and brought to light concerns that an interest group had misrepresented the views of its members, including Dr. Cubin and other Wyoming physicians, in testimony before the Wyoming Legislature. App. Vol. 1 at 30, 97, 158.

The fourth and fifth *Garcetti* factors are undisputed and favor Dr. Cubin because the Governor's letter makes clear that Dr. Cubin's email to the Wyoming Legislature was the sole motivating factor for his removal. App. Vol. 1 at 32, 97, 158.

### B.    The third *Garcetti* factor favors Dr. Cubin.

The only *Garcetti* factor the Governor has disputed—the third— "requires the court to balance the employee's right to free speech against the government's interests as an employer." *Brown v. City of Tulsa*, 124 F.4th 1251, 1267 (10th Cir. 2025) (citing *Pickering*, 391 U.S. at 568). This factor favors protecting Dr. Cubin's speech because his email did not interfere with the Board's work or its ability to function efficiently, and the Governor has not presented sufficient evidence to support a reasonable prediction of such interference.

18

To prevail on this factor, the government bears the burden to show that its interest in promoting the efficiency of public service outweighs the plaintiff's free-speech interests. *Duda v. Elder*, 7 F.4th 899, 912 (10th Cir. 2021). And "[t]he only public employer interest that [can] outweigh[] the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'" *Trant*, 754 F.3d at 1166 (citing *Brammer-Hoelter v. Twin Peaks Charter Acad.,* 492 F.3d 1192, 1207 (10th Cir. 2007)). Additionally, "[t]he government bears the burden of proving—*with evidence*—both its specific interest in taking the adverse employment action against the plaintiff and that it acted based on that interest, rather than for another reason." *Brown*, 124 F.4th at 1268.

Thus, it is not enough for the Governor to demonstrate that a reasonable justification for terminating Dr. Cubin existed; he must show that he actually acted based on *that* interest, not for another reason, supported by sufficient evidence at the time of termination.

19

"In analyzing the employer's interest in avoiding disruption, different standards apply depending on whether the adverse employment action occurred 'long after' or 'soon after' the employee's protected speech." *Duda*, 7 F.4th at 912. The employer must "prove 'actual disruption' when the adverse employment action took place 'long after' the employee spoke on a matter of public concern." *Id*. For adverse actions taken "soon after" the speech, the employer need not show that actual disruption occurred but still must present specific evidence to support a reasonable prediction of disruption; "purely speculative allegations are insufficient." *Wulf v. City of Wichita*, 883 F.2d 842, 862 (10th Cir. 1989). Here, the parties have disputed whether Dr. Cubin's termination occurred "soon after" or "long after" his speech, and the district court deemed termination 54 days after his email to be "soon after." App. Vol. 1 at 160. It makes no difference, however, because the Governor has not satisfied his burden under either standard: that is, he has neither shown that Dr. Cubin's email to legislators caused actual

20

disruption, nor presented specific evidence that would support a

reasonable, non-speculative prediction of disruption.

> **1.    The district court erred in accepting post hoc justifications, substituted for the reasons actually stated in Governor Gordon's termination letter.**

The district court erred in concluding that Dr. Cubin's firing was

justified under the First Amendment because his email supposedly

could create a perception of bias against certain individuals—in

particular, against Dr. Sanderson and the Wyoming Medical Society

leadership. According to the district court, "the real issue" underlying

Dr. Cubin's termination was "that Dr. Cubin's comments to the

Wyoming House went beyond his support for SF0099 and into his

disputes with WMS and specific doctors[.]" App. Vol. 1 at 161.

That justification fails because it was not a justification articulated

in Governor Gordon's letter firing Dr. Cubin. Governor Gordon's letter

cited two justifications for Dr. Cubin's termination, neither of which

concerned "his disputes with WMS and specific doctors": his comments

21

*on the legislation* and the supposed perception that he was speaking on the Board's behalf.

First, the Governor's letter cites Dr. Cubin's "comments on this particular legislation"—not the "disputes with WMS and specific doctors" that the district court referenced—as the basis for his termination. App. Vol. 1 at 32. Governor Gordon's letter says that Dr. Cubin's comments could make doctors "concerned that [he] might use [his] position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice," App. Vol. 1 at 32—indicating concern about Dr. Cubin based on his *political or policy views*—i.e., a "particular position," as expressed in his letter.

The district court stated that "Governor Gordon reasonably predicted that Dr. Cubin's extraneous comments [about WMS board members and Dr. Sanderson] could disrupt the duties of the Board" (App. Vol. 1 at 166), but Governor Gordon's letter contained no such prediction. Again, in stating the basis for Dr. Cubin's termination, the Governor's letter

22

did not cite "extraneous comments" but instead referenced Dr. Cubin's "comments on this particular legislation." App. Vol. 1 at 32.

The district court stated that the Governor's supposed "prediction" was "supported by [an] email exchange between Dr. Sanderson and Dr. Cubin" (App. Vol. 1 at 166), but there is no evidence in the record that Governor Gordon was even aware of that exchange when he removed Dr. Cubin. In fact, Governor Gordon's letter terminating Dr. Cubin says that the Governor had "been made aware of [Dr. Cubin's] email to the members of the House of Representatives"—not that the Governor had been made aware of communications between Dr. Cubin and anyone else—making clear that the Governor's decision was based entirely on Dr. Cubin's email to legislators. App. Vol. 1 at 32.

Governor Gordon's letter also states that he was firing Dr. Cubin "as I have done before, when a member of a board chooses to express personal beliefs in a way that can be construed as speaking for the body"—suggesting that this is the real basis for Dr. Cubin's firing. App. Vol. 1 at 32. That reason (which, as discussed below, is baseless) has

23

nothing to do with supposed bias against particular individuals that the district court cited as the basis for Dr. Cubin's termination. App. Vol. 1 at 163, 164.

Governor Gordon cannot justify Dr. Cubin's termination—and the district court could not do so—with a post hoc rationalization that appears nowhere in his termination letter and is contradicted by the explanation in the termination letter. Again, "[t]he government bears the burden of proving—*with evidence*—both its specific interest in taking the adverse employment action against the plaintiff *and that it acted based on that interest, rather than for another reason*." *Brown*, 124 F.4th at 1268 (second emphasis added); *cf. Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 U.S. App. LEXIS 30860, at *23 (10th Cir. Oct. 15, 2021) ("post hoc justifications for termination constitute evidence of pretext," and pretext can be reasonably inferred from "an employer's shifting or inconsistent explanations for [a] challenged employment decision"); *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (agency decisions must be "evaluated based solely on

24

the reasons stated in the decision"). The Governor has not met that

burden here.

This Court should focus on the reasons Governor Gordon actually

stated in Dr. Cubin's termination letter to determine whether they

form—and whether the Governor has substantiated—a reasonable

prediction of disruption that outweighs Dr. Cubin's strong interest in

free speech.

> **2. The bases stated in Governor Gordon's letter are not reasonable predictions of disruption because they lack supporting evidence.**

The evidence does not support a reasonable prediction of disruption,

let alone an actual disruption, that could justify Governor Gordon's

termination of Dr. Cubin for his speech.

Although the standard is lower for terminations occurring "soon

after" the employee's speech occurs—before enough time has elapsed for

actual disruption to occur—an employer still must show specific

evidence to support its prediction of disruption. *Cragg v. City of*

*Osawatomie*, 143 F.3d 1343, 1347 (10th Cir. 1998) ("We will defer to a

public employer's reasonable predictions of disruption, but those predictions must be supported by the presentation of specific evidence."). A public employer "cannot satisfy its burden by making 'purely speculative allegations.'" *Id.* (citing *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995)).

Governor Gordon's position that Dr. Cubin's comments on the legislation could make doctors believe he is biased makes little sense. Dr. Cubin simply expressed support for a law governing the practice of medicine, which then became law. App. Vol. 1 at 154. So the only apparent arguable "bias" Dr. Cubin could have going forward, based on his advocacy, would be one in favor of applying current Wyoming law— which he must do anyway as a Board member. There is no reason to believe that this supposed "bias" would disrupt the Board's work or efficiency.

Even if Governor Gordon's termination of Dr. Cubin had been based on concerns about his criticisms of Dr. Sanderson and WMS leadership—which it was not—that could not justify the termination.

26

Nothing in Dr. Cubin's comments suggests he would lack impartiality in his capacity as a Board member. Although he criticized certain physicians' political advocacy, he did not impugn their character or abilities *as physicians*. And there is no basis for concluding that Dr. Cubin's comments would interfere with the Board's work or efficiency. To do so, one would have to assume—in the absence of any evidence—not only that Dr. Cubin would be biased (or that others would perceive him to be so), but also that one of a handful of physicians would have a matter before him during the remainder of his four-year term, and that recusal (discussed further below) would not suffice to address any concerns.

Governor Gordon also has failed to substantiate any basis for his letter's other proffered justification for firing Dr. Cubin: that his email to the Wyoming House of Representatives expressed his "personal beliefs in a way that can be construed as speaking for the [Board]." App. Vol. 1 at 32. Indeed, before the district court, Governor Gordon did not dispute that Dr. Cubin's letter was sent in his personal capacity, not

within the scope of his employment. App. Vol. 1 at 158. And nothing in Dr. Cubin's letter could give the impression that he was speaking on the Board's behalf. His letter came from his personal email account, identified him as "a physician in Casper," stated that it was providing "the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born," and made no explicit or implicit reference to the Wyoming Board of Medicine or his position on the Board. App. Vol. 1 at 29.

The testimony of Valerie Mockensturm, a fellow Board member, describing Dr. Cubin as "courteous," "morally and ethically perfect," and an "asset" on the Board further undermines the alleged reasonableness of the Governor's prediction of disruption. App. Vol. 2 at 258. Ms. Mockensturm testified that she never observed Dr. Cubin acting in a biased or prejudicial manner regarding any of his official duties, and that the only disruption to Board activities following Dr. Cubin's comment was that he was not present at a Board meeting. App. Vol. 2 at 257-258. Fellow Board members would seemingly be the best

28

predictors of future disruption to internal board functioning following
Dr. Cubin's statement. There is no evidence in the record that the
Governor ever asked Board members about the potential for disruption;
the only evidence on Board members' views on that question, Ms.
Mockensturm's testimony, demonstrates that, if the Governor had done
so, he would have had any such worries extinguished. Thus, the
Governor failed to perform a "factual analysis to support [his] naked
assertion that Plaintiff's statements . . . would disrupt efficiency,"
*Oldridge v. Layton*, Nos. 22-3284, 23-3070, 2024 U.S. App. LEXIS
10688, at *10 (10th Cir. May 2, 2024), and instead jumped to a
conclusion and misjudged the potential for disruption following Dr.
Cubin's comments to the legislature.

> **3.** **The district court erred in concluding that Dr.
> Cubin's strong interest in free speech was
> outweighed by lesser considerations.**

The district court erred in concluding that other considerations
outweighed Dr. Cubin's interest in free speech.

Again, in considering the third *Garcetti* factor, "[t]he only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'" *Trant*, 754 F.3d at 1166 (citing *Brammer-Hoelter,* 492 F.3d at 1207). This is a balancing test; speech restrictions cannot be justified by the existence of only minimal disruption. Public employees "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti,* 547 U.S. at 422. And "the more important the speech is to the public discourse, the greater the burden on the employer to justify responding adversely to it." *Brown*, 124 F.4th at 1268 (citing *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998)); *see also Ware v. Unified Sch. Dist.*, 881 F.2d 906, 910 (10th Cir. 1989) ("The employer's burden to justify its restriction on speech increases in proportion to the value of that speech in the public debate."). The Supreme Court has "long recognized that when government regulates political speech or the expression of editorial

30

opinion on matters of public importance, First Amendment protection is 'at its zenith.'" *See R.A.V. v. St. Paul*, 505 U.S. 377, 429 (1992) (cleaned up).

Dr. Cubin was engaged in this most important speech, entitled to the strongest First Amendment protection, when he gave his opinion on Chloe's Law and alerted legislators to an interest group's misrepresentations to the legislature about pending legislation.

Dr. Cubin does not believe his email was rude or inflammatory—but even if some perceived it that way, that would not overcome his strong interest in free speech on matters of public concern. In *Pryor*, this Court found that a coach's interest in making inflammatory statements related to matters of public concern outweighed a public school district's interest in efficiency. 99 F.4th at 1252. The coach had advocated for changes in district operations, called for the resignation or termination of district officials, and criticized district officials for operational missteps or decisions with which he disagreed, and his comments included derogatory statements directed at staff. *Id.* at 1249. For

example, the coach's statements included: "Watch out for the Black folks trying to Whitesplain this bullshit" and "Stay the fuck away from me." *Id.* The coach also called the principal "a disgrace to the entire community" and "derogatory names such as 'plantation builder[.]'" *Id.* at 1248. The Court nonetheless ruled in the coach's favor because "[t]he impoliteness, passion, or profanity of his speech [did] not overcome his free speech interests." *Id.* at 1253 (citing *ACLU v. Johnson*, 194 F.3d 1149, 1156 (10th Cir. 1999) (quoting *Sable Commc'ns, Inc. v. FCC*, 492 U.S. 115, 126 (1989) (the First Amendment protects even indecent expression))). "[T]he offensive, vulgar manner of Plaintiff's speech [did] not deprive him of constitutional protections—especially in the context of petitioning the government for redress for grievances." *Id.* The coach's interest in speech prevailed even though his inflammatory statements were directed at his own school's principal and staff.

Dr. Cubin's statements entailed far less potential for disruption than those of the coach in *Pryor*—and should receive at least as much protection. Dr. Cubin's comments were candid, but not profane or rude

32

like those of the coach in *Pryor*. And they were made about Dr.

Sanderson and WMS leadership—individuals who are not part of the

Board and who have no apparent imminent business before the Board.

Potential rifts between Dr. Cubin and doctors external to the Board

cannot satisfy the Governor's burden to demonstrate disruption to the

Board's *internal* operations. *See Brown*, 124 F.4th at 1270; *see also*

*Pryor,* 99 F.4th at 1252 ("Expected public reaction that impacts external

relationships does not constitute a detrimental impact and does not

weigh in the District's favor."). Likewise, the district court's concern

that physicians will "fear that Dr. Cubin might take their silence as

tacit agreement with the 'far left' WMS position" and put their medical

license at risk (App. Vol. 1 at 163) is speculative, unsupported by

evidence (or the bases for Dr. Cubin's termination stated in Governor

Gordon's letter), and insufficient to overcome Dr. Cubin's interest in

free speech.

33

### 4.    The district court erred by failing to recognize that the recusal process resolves any lingering concerns about Dr. Cubin's potential for bias.

The district court erred in concluding that the recusal process would not suffice to address any (speculative) concerns about a perception of bias. App. Vol. 1 at 163-164.

It is true that "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the role entails." *Rankin v. McPherson*, 483 U.S. 378, 390 (1987). Thus, employees serving in a "confidential, policymaking or public contact role" bear a greater burden of caution than those in a clerical role. *Curtis*, 147 F.3d at 1213 (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).

Still, all public employees "must face only those speech restrictions that are *necessary* for their employers to operate efficiently and effectively," and First Amendment protections are at their "zenith" for political speech. *Garcetti,* 547 U.S. at 422 (emphasis added); *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (explaining the importance of

34

respecting "core political speech"). Here, the recusal process threads

that needle to respect Dr. Cubin's right to speak on important political

matters without impacting the Board's efficient operation.

The record shows that Dr. Cubin will uphold the laws of Wyoming

and will recuse himself "without hesitation" in any case where there is a

question about his impartiality, including any case against Dr.

Sanderson or a WMS board member that would come before him. App.

Vol. 2 at 233. The recusal process and Dr. Cubin's commitment to abide

by it suffice to negate any concerns about an appearance of bias and is

the appropriately tailored response given that public employees "must

face only those speech restrictions that are necessary for their

employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at

422.

In concluding that recusal would not suffice to address any

perception of "bias," the district court cited a decision from the Middle

District of Pennsylvania that held that "an increased number of recusal

motions" resulting from an independent contractor's blog posts was

35

potentially disruptive enough to justify a state's decision not to renew her contract. App. Vol. 1 at 164 (citing *Stengle v. Ofc. of Dispute Resolution*, 631 F. Supp. 2d 564, 577 (M.D. Pa. 2009)). Regardless of whether that case was rightly decided, it is inapposite. There, the plaintiff was a "special education due process hearing officer" who heard disputes related to special education, and who also was appointed to a special panel established to implement a settlement agreement related to special education. *Stengle*, 631 F. Supp. 2d at 568-69. While in those positions, she began publishing a blog discussing special education issues, specifically for the purpose of "shar[ing] information about the inclusion and the implementation of the [settlement agreement] from the perspective of one parent of a class member and to provide a means to share information with other class members." *Id.* at 569-70. Her blog posts caused widespread belief that she could not be impartial as a hearing officer—because she was opining on issues that would come before her in that role—and resulted in requests for recusal and the filing of complaints "too numerous to recount in their totality" in the

36

court's decision. *Id.* at 570-71. The state then declined to renew her contract on three grounds: (1) her advocacy on her blog, "which ultimately compromised her ability to serve as an impartial hearing officer"; (2) refusal to recuse herself in one matter and "using intemperate langue in denying the recusal motion"; and (3) "fail[ure] to comply with timeliness requirements in rendering her opinions." *Id.* at 571-72. The district court concluded that *under those circumstances*, her speech created sufficient potential for disruption, through litigation of recusal motions, to justify the non-renewal of her contract. *Id.*

This case is not comparable. Dr. Cubin has not publicly commented on issues that come before the Board, let alone done so on an ongoing basis. He has not faced any recusal motions based on his letter supporting Chloe's Law. And he has committed to recusing himself in any matters in which anyone questions his impartiality (App. Vol. 2 at 204-205)— eliminating the prospect of disruptive litigation over refusals to recuse present in *Stengle*.

Moreover, the prospect of any occasions calling for recusal is speculative and appears unlikely. The district court inferred from the email of *one* doctor, Dr. Sanderson, who was "a subject of Dr. Cubin's comments" to legislators, that many more physicians will question Dr. Cubin's impartiality, and concluded that this inference was specific evidence supporting the Governor's "reasonable prediction of disruption." App. Vol. 1 at 165. But, again, the record does not show that Governor Gordon was even aware of Dr. Sanderson's email at the time he terminated Dr. Cubin. And Dr. Cubin did not mention any other physicians by name in his email to the Wyoming House of Representatives. App. Vol. 1 at 30. The only other statement in Dr. Cubin's email that could potentially imply specific physicians is his reference to "several very vocal, extremely liberal members of the [WMS] Board." *Id*. WMS has 27 Trustees, with one position held by a retired physician and one held by a medical student.[1] At most, then, Dr.

---

[1] https://www.wyomed.org/about/board-of-trustees/ (last visited Mar.

Cubin's comments implicate Dr. Sanderson plus some subset of the 25
WMS Trustees who are (presumably) active medical professionals, and
there is no reason to believe that the Medical Board will be asked to
rule on disciplinary issues for all, some, or any of those few individuals
during the remainder of Dr. Cubin's four-year term—let alone on an
issue that relates to the views expressed in Dr. Cubin's email to state
legislators.

Moreover, any member of the Board could face a recusal motion for a
variety of (more likely) reasons, such as the existence of a past working
or social relationship between the Board member and a physician with
a matter before the Board. Indeed, Dr. Cubin recused himself from
certain matters before he made his comments on Chloe's Law and
testified that he would recuse himself if any disciplinary matter related
to Chloe's Law came before the Board in the future. App. Vol. 1 at 82,

---

24, 2025).

150; App. Vol. 2 at 204, 272. There is no reason why Dr. Cubin should be uniquely penalized because someone *might* seek recusal because he chose to exercise his First Amendment rights on a matter of great concern to both medical professionals and the public, in support of a policy that is now the law of Wyoming.

Because the third *Garcetti* factor favors Dr. Cubin, and the Governor does not even dispute that the other factors favor protecting Dr. Cubin's speech, Dr. Cubin is likely to succeed on the merits of his First Amendment claim.

## II.    A preliminary injunction is necessary to prevent irreparable harm to Dr. Cubin.

"[A] plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir.

2003)). Dr. Cubin's removal from the Board and ongoing exclusion from his position constitutes irreparable harm in multiple ways.

Tenth Circuit and Supreme Court precedent make clear that a First Amendment violation constitutes irreparable injury. *Pryor*, 99 F.4th at 1254; *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("well-settled law supports the constitutional-violation-as-irreparable-injury principle"); *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Thus, in *Pryor*, the Court concluded that a school's removal of a coach from his position and exclusion from district facilities in retaliation for speech inflicted an irreparable harm, "even if the restrictions d[id] not directly silence [his] protected speech." 99 F.4th at 1249. Likewise, Dr. Cubin is suffering an impermissible chilling effect on his activities; Dr. Cubin was removed from his Board seat and continues to be restricted from attending meetings of the Board in retaliation for expressing his views.

41

Additionally, courts have held that an employee suffers irreparable harm when kept out of their former position during the pendency of litigation. In *Bordelon v. Chicago School Reform Bd. of Trustees*, 8 F. Supp. 2d 779 (N.D. Ill. 1998), the court granted a preliminary injunction requiring reinstatement of a school principal, stating that, for every day he was kept out of the position, he would be "denied the opportunity to perform his chosen profession" to which he had "dedicated significant time and energy" and that he would therefore "suffer[] when he is unable to perform in that capacity." *Id.* at 789. The district court further held that the school principal would be harmed by "[his] resume necessarily contain[ing] a reference to his removal from the position" and that no adequate legal remedy existed for those losses. *Id.* Other courts have similarly recognized that preventing an employee from returning to a position to finish out a term can create the assumption that allegations against the employee are true, causing irreparable injury to the employee's career. *See Isler v. N.M. Activities Ass'n*, No. 10-00009 MV/WPL, 2010 U.S. Dist. LEXIS 144454, at *33-34 (D.N.M. Feb.

42

19, 2010) (finding irreparable harm where a basketball coach would suffer reputational and career harm if prevented from coaching the remainder of the season); *Bruder v. Smith*, No. 05-74511, 2005 U.S. Dist. LEXIS 38246, at *15 (E.D. Mich. Dec. 22, 2005) (assistant prosecutor's termination would cause stigma, adversely affect her reputation as an effective lawyer within the legal community and thus "may cause, or is likely to cause, her to suffer irreparable harm if a preliminary injunction is not granted immediately"). Here, Dr. Cubin was appointed to a four-year term on the Board of Medicine set to run through 2028. App. Vol. 1 at 56. Abruptly cutting his term short, absent the remediation of a preliminary injunction to reinstate him, may harm his professional reputation as a medical doctor and member of the Wyoming medical community.

Also, Dr. Cubin's harm in the absence of a preliminary injunction will be irreparable because, if the Governor fills Dr. Cubin's seat on the Board with someone else, it will be difficult if not impossible to restore Dr. Cubin to his position. In *Schrier v. University of Colorado*, a

43

plaintiff alleged that he was unlawfully terminated from his university department chair position in retaliation for his speech, and the Court concluded that he failed to show irreparable harm because he had not shown that "his removal as Chair during the time it [would] take to litigate this case [would] have an irreparable effect in the sense of making it difficult or impossible for him to resume his chairmanship . . . in the event he prevails." 427 F.3d 1253, 1267 (10th Cir. 2005). Here, by contrast, it is obvious that it will be "difficult or impossible" for Dr. Cubin to retake his position on the Board if he does not receive a preliminary injunction but ultimately prevails. His seat has remained vacant since his removal, but the Governor could fill it "at any time" absent a preliminary injunction. App. Vol. 2 at 188.

Finally, Governor Gordon himself maintains that sovereign immunity and qualified immunity bar Dr. Cubin from recovering monetary damages in this case. App. Vol. 1 at 41-42. Thus, by the Governor's own account, Dr. Cubin has no adequate remedy at law, and injunctive relief is therefore the only relief available to him.

## III.   A preliminary injunction will serve the public interest.

The third and fourth factors for a preliminary injunction—the balance of equities and the public interest—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, a preliminary injunction restoring Dr. Cubin to the Board is in the public interest because the public interest always favors upholding First Amendment rights. *Pryor*, 99 F.4th at 1254.

Speech about public policy, such as Dr. Cubin's speech at issue here, is at the core of the First Amendment's protection. There is "a strong interest in debate on public issues," *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966), and "the law should encourage the private individual to become involved in and express his or her views on the conduct of government affairs." *Garcia v. Bd. of Educ.*, 777 F.2d 1403, 1410 (10th Cir. 1985).

## CONCLUSION

This Court should reverse the district court's denial of Dr. Cubin's motion for preliminary injunction.

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument because this case presents important and complex First Amendment issues.

Dated:  March 26, 2025                    Respectfully submitted,

                                        <u>/s/ Jacob Huebert</u>

                                        Jacob Huebert
Bridget Conlan
LIBERTY JUSTICE CENTER
750 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 481-4400
jhuebert@ljc.org
bconlan@ljc.org

D. Stephen Melchior
Melchior Law Firm, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307)637-2323
steve@melchlaw.com

*Attorneys for Plaintiff-Appellant*

47

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(g)(1) because it contains 7,778 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point proportionally spaced Century Schoolbook typeface using Microsoft Word for Mac.

Dated: March 26, 2025

<u>/s/ Jacob Huebert</u>

48

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Brief of Appellant and the Appendix that:

1. All required privacy redactions have been made per 10th Cir. R. 25.5;

2. Only if requested by the Court, within five days of the request, hard copies of this Brief of Appellant and a copy the Appendix will be submitted to the Court pursuant to 10th Cir. R. 31.5 and will be exact copies of the version of the documents submitted electronically via the Court's ECF system;

3. The Brief of Appellant and Appendix have been scanned for viruses with AVG Antivirus Free for Mac 20.3 and no virus was detected.

/s/ Jacob Huebert

49

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2025, I electronically filed the foregoing Brief of Appellant and Appendix using the Court's CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the Court's CM/ECF system.

/s/ Jacob Huebert

# ADDENDUM



**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2024 NOV 14  PM 12: 26

MARGARET BOTKINS, CLERK
CASPER

DR. FREDERICK WILLIAM "ERIC" CUBIN III,

       Plaintiff,

   v.                                                 Case No. 24-CV-164-SWS

MARK GORDON, in both his personal and
official capacities as Governor of Wyoming,

       Defendant.

---

### ORDER DENYING PRELIMINARY INJUNCTION

---

     The Wyoming Board of Medicine (Board) is a state agency responsible for licensing and disciplining medical practitioners. *See* Wyo. Stat. §§ 33-26-201 *et seq.* Members of the Board are appointed by the Wyoming Governor with the consent of the Wyoming Senate, and they "serve at the pleasure of the governor." Wyo. Stat. § 33-26-201(a).

     Wyoming Governor Mark Gordon nominated Dr. Eric Cubin to a position on the Board, and Dr. Cubin was unanimously confirmed to the position by the Wyoming Senate. Dr. Cubin is also a voluntary member of the Wyoming Medical Society (WMS), a professional organization for Wyoming doctors that advocates on behalf of Wyoming doctors through legislative lobbying, public outreach, and other methods. At the preliminary-injunction hearing, Dr. Cubin testified the WMS is the most influential and largest physician's organization in the state.

     In February 2024, Dr. Cubin sent an email to the entire Wyoming House of Representatives expressing his support for a bill then under consideration. Dr. Cubin's email was not limited to voicing his position on the bill, though. It also informed the Wyoming House of his personal dispute with WMS and its current leadership because WMS had expressed

Add.001

opposition to the same bill. Dr. Cubin asserted the WMS had "been essentially hijacked by the far left." Dr. Cubin continued by alleging a specific doctor, "presumably" in conjunction with WMS leadership, "ignored and suppressed" relevant information contrary to WMS' public position on the bill.

The bill eventually passed both chambers of the Wyoming Legislature and was signed into law by Governor Gordon. In late April 2024, though, Governor Gordon removed Dr. Cubin from the Board, informing Dr. Cubin that his comments in his email could cause certain doctors who may have to appear before the Board with their medical license and livelihood on the line to question the impartiality and fairness of the Board proceeding.

In late August 2024, Dr. Cubin filed this lawsuit, asserting Governor Gordon had unlawfully retaliated against him for exercising his First Amendment rights to free speech and to petition the government.[1] He seeks to be restored to his position on the Board and the recovery of monetary damages. In the instant motion, Dr. Cubin asks for a preliminary injunction ordering Governor Gordon to restore him to his position on the Board during the pendency of this proceeding. Having considered the parties' evidence and arguments on the matter, the Court finds and concludes Dr. Cubin has not carried his burden of establishing his right to the extraordinary relief of a preliminary injunction.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is intended to preserve the relative positions of the parties until their legal dispute can be resolved on its merits. *DTC Energy Group v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018). "A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916

---

[1] Dr. Cubin also asserted a cause of action alleging violation of the Wyoming State Constitution, but he does not rely on that claim to advance this motion for preliminary injunction. (*See* ECF 12 p. 17.)

F.3d 792, 797 (10th Cir. 2019) (quotations omitted).

> Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

*DTC Energy Group*, 912 F.3d at 1269–70 (internal citations and quotation marks omitted). "The first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The movant must "show a 'clear and unequivocal' right to the requested preliminary injunction." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 758 (10th Cir. 2024) (quoting *Shrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005)). Whether to issue a preliminary injunction rests within the Court's discretion. *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019).

In some cases, the movant seeks a "disfavored injunction." "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Free the Nipple-Fort Collins*, 916 F.3d at 797. "Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* A disfavored injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Schrier*, 427 F.3d at 1259 (quotations omitted). "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a 'strong showing' that these tilt in her favor." *Free the Nipple-Fort Collins*, 916 F.3d at 797.

In this case, the Court agrees with Governor Gordon that Dr. Cubin's request to reinstate him to the Board pending these legal proceedings constitutes a disfavored mandatory injunction

that is subject to the heightened "strong showing" standard. *See Schrier*, 427 F.3d at 1260-61 (concluding the request there was a disfavored mandatory injunction because it would affirmatively require the university to restore the plaintiff to his former position as Chair of the Department of Medicine from which he had been removed, and such reinstatement was likely to place the court in a supervisory role to ensure the mandated reinstatement was done). Regardless, though, the Court finds Dr. Cubin has not carried his burden of showing a preliminary injunction is warranted even under the non-heightened, normal standard.

## FACTUAL FINDINGS

The material facts are largely undisputed. Plaintiff Eric Cubin is a radiologist working and residing in Wyoming. (Cubin Decl. ¶¶ 1-2.[2]) Defendant Mark Gordon is the Governor of Wyoming. The Wyoming Board of Medicine is a statutorily-created state agency empowered with several duties, including two that are particularly relevant to this case: (1) determining whether an applicant is qualified and fit to practice medicine in Wyoming, and (2) overseeing the regulation, compliance, and disciplinary proceedings (including conducting contested case proceedings) of medical practitioners. Wyo. Stat. §§ 33-26-201 and -202. Board members are paid for their services in the same manner and amounts as members of the Wyoming Legislature. Wyo. Stat. § 33-26-203(c).

In early 2023, a vacancy occurred on the Board, and Governor Gordon nominated Dr. Cubin to complete the unexpired term. (Cubin Decl. ¶ 3.) Board members are appointed for four-year terms and may not serve more than three consecutive terms. Wyo. Stat. § 33-26-201(b). After completing that partial term, Governor Gordon appointed Dr. Cubin to the Board in February 2024 for a full four-year term. (Cubin Decl. ¶ 3.) Dr. Cubin was unanimously

---

[2] ECF 12-1.

confirmed to the Board by the Wyoming Senate both times he was appointed. (*Id.*)  During his time on the Board, Dr. Cubin received no complaints or disciplinary action concerning the performance of his Board duties, and he recused himself from hearing multiple cases based on conflicts of interest or perceived conflicts of interest. (*Id.* ¶ 4.)

Dr. Cubin is also a voluntary member of the Wyoming Medical Society (WMS), which is a professional organization for Wyoming doctors that advocates on behalf of Wyoming doctors through legislative lobbying, public outreach, and other methods. (Cubin Decl. ¶¶ 9-10.)

In February 2024, the Wyoming Legislature considered Senate File 0099, formerly known as "Chloe's Law"[3] (SF0099).  In sum, SF0099 prohibited healthcare providers from performing certain surgeries (e.g., sterilization or mastectomies) or offering certain treatments (e.g., puberty suppressors or high doses of hormones inconsistent with the child's biological sex) related to gender transitioning or gender reassignment.  SF0099 also created sanctions for violators that puts their respective healthcare provider license at risk of suspension or revocation.  SF0099 ultimately passed both chambers of the Wyoming Legislature and was signed into law by Governor Gordon. *See* Wyo. Stat. § 35-4-1001.

While under consideration by the Wyoming Legislature, WMS leadership debated the topics in SF0099 at a WMS board meeting, which all WMS members were welcome to attend. (Prelim. Injunct. Hrg. Ex. 13 p. 20.)  Dr. Cubin did not attend or provide input at this WMS board meeting.  In the end, WMS leadership instructed WMS Executive Director Sheila Bush to testify in opposition to SF0099.  (*Id.* pp. 19-20.)  WMS agreed that gender reassignment surgeries should not be done on minors, and were not being done in Wyoming even without the

---

[3] This refers to Chloe Cole, an activist from California who opposes gender transition surgeries and treatments after she received transgender surgeries and treatments as a minor and thereafter "detransitioned" because she later regretted her attempts to transition from being a girl to a boy. (*See* ECF 1 ¶¶ 22-26 and footnotes therein.)

law, but WMS felt SF0099 was government overreach that allowed the Wyoming Legislature to dictate certain medical practices and restrictions to too great of a degree. (*Id.* p. 20.) Executive Director Bush testified to this position before the Wyoming Senate Labor, Health & Social Services Committee on February 21, 2024.[4]

Immediately following Executive Director Bush's testimony, Dr. Michael Sanderson, a pediatrician from Sheridan and the President of the Wyoming Chapter of the American Academy of Pediatrics, testified similarly in opposition to SF0099, presenting largely the same position as WMS.[5]

That night, Dr. Cubin was emailed a link to the video recording of the committee hearing that had occurred earlier that day from a sender unknown to the Court. (Ex. 13 p. 21.) He then forwarded the email to Executive Director Bush and questioned whether a majority of WMS members agreed with Dr. Sanderson's comments and whether WMS should present physicians from both sides of the issue. (*Id.*) This email engendered responses from both Executive Director Bush and WMS President Dr. Kristopher Schamber, a reply from Dr. Cubin, and further debate on the topic over the next several days involving several other WMS leaders and Dr. Cubin. (*Id.* pp. 14-21.) The details of this spirited debate on WMS' position on SF0099 and certain gender-affirming care are largely immaterial to the issues raised in this lawsuit. Significant to this proceeding, after several days of back-and-forth emails, Dr. Cubin requested a statement from WMS leadership on WMS' position going forward:

What we all need to know right now is, specifically, what can we expect to see

---

[4]  Video recording available at https://www.youtube.com/watch?v=IztrjpvN-RI&t=2783s.  Executive Director Bush testified at 33:50-35:43. Executive Director Bush presented the same position of the Wyoming Chapter of the American Academy of Pediatrics at the time; thus she testified on behalf of both organizations.

[5]   Available at https://www.youtube.com/watch?v=IztrjpvN-RI&t=2783s, 35:43-45:35.  In short, Dr. Sanderson repeated that gender reassignment surgeries were opposed by the American Academy of Pediatrics and were not being performed in Wyoming, but felt SF0099 imposed inappropriate limitations on medical care and the doctor-patient relationship that would negatively affect doctors' abilities to treat other medical issues.

from WMS in regard to this bill over the next several days? Will WMS continue
to publicly oppose SF 99 or will you be presenting a neutral position?

(*Id.* p. 14.) Within a couple of hours of this email, a WMS leader responded, "We will make arrangements for the board members to discuss this issue further and determine our next best steps. Further details for board members to follow." (*Id.*) Unsatisfied with the speed of a response, Dr. Cubin, later that same day, sent an email to the entire Wyoming House of Representatives that is at the center of this lawsuit. (Ex. 3.)

In that email, Dr. Cubin set forth his personal support for SF0099. (*See id.*) He also said more than that, though. Much of his email to the Wyoming House reported his disagreements with WMS leadership and with Dr. Sanderson. Relevant portions of his email include the following:

> It saddens me very much to have to report that, under their current leadership, the Wyoming Medical Society has been essentially hijacked by the far left. It seems that they have decided to prioritize politics over their stated mission of physician advocacy. In my opinion, they have adopted and embraced "woke" positions that are not congruent with the thoughts and opinions of the majority of their physician members. In essence, I have lost all confidence in their ability or desire to faithfully represent the physicians in this state.
>
> Please allow me to give you an example. WMS seems to have teamed up with the American Association of Pediatricians in opposing SF 99. Quite frankly, I refuse to believe that the majority of physicians in this very conservative state agree with this position - and we were never polled. This position was established by several very vocal, extremely liberal members of the Board. The position was then made public as though it actually represents the thoughts and beliefs of physicians in Wyoming when, in fact, that is probably not true.
>
> In their opposition to Chloe's Law, the WMS has partnered with Dr. Sanderson, a pediatrician from Sheridan, who is the President of the WyAAP. Dr. Sanderson has effectively delivered the position of his organization but he has failed to tell you that there is another pediatric professional society that has taken an opposite position, the American College of Pediatricians (ACP).
>
> …
>
> You need to know that Dr. Sanderson (and presumably the WMS leadership)

Add.007

were aware of these ACP positions and yet they were ignored and suppressed when the WMS position was established. Further, I presume that you have only been provided with the WMS/AAP position and not the ACP position statements. As I have communicated to the entire WMS Board, it is not acceptable to only present one side of an issue in an effort to effect change in social policy.

…

It feels very much like the leadership at WMS has inserted their opinions in hopes that the WMS membership would not notice or speak up.

…

I think it is important for you to know that I have aggressively tried to address this situation with the WMS Board over the last couple days. I was given an assurance earlier today that the WMS Board will be holding an executive session of some kind to determine if they will be changing their position from opposing this bill to a neutral position. At this time, I have not been given any assurance that the WMS will be changing their position, so I feel the need to advocate on my own behalf by coming to you directly with this information. It is entirely possible that when this bill is considered in committee and on the floor that the WMS position may have been changed to neutral. Up to this point, however, they have not changed their position to neutral.

(Ex. 3 pp. 1-2.) The next morning, Dr. Sanderson sent the following email to Dr. Cubin, WMS

leadership, and others who had been involved in the email debate:

Dr. Cubin,

I have read the email you have sent to Wyoming lawmakers on this issue. The [WMS] board should see it as well. Your engagement on this issue has, in my opinion, moved from cooperative conversation to an attack. You have committed libel by stating that, first, I was actively involved in forming the WMS position on this, and second, that I myself and the WMS board, cooperatively and intentionally suppressed the position of a separate organization. Neither of these are true and they were shared in an effort to discredit and defame both myself and the WMS board. I cannot speak to why the American College of Pediatrician's position was or was not represented to the WMS board - I was never involved in the forming of the position for the WMS. I did not represent the American College of Pediatrician's position because I am neither a member of the ACP nor their representative.

I would recommend to the WMS board that all further communications regarding this matter move into a thread involving only the WMS board members and adjacent WMS staff. To be clear, Dr. Cubin, this would not involve me.

(ECF 20-4 p. 1.)

As noted, SF0099 was passed by both chambers of the Wyoming Legislature, and Governor Gordon signed the bill into law in March 2024. That is, the bill became law as Dr. Cubin desired. On April 22, 2024, Dr. Cubin received a phone call from the Governor's Chief of Staff, Drew Perkins, advising Dr. Cubin that his services on the Board were no longer needed and an emailed letter from the Governor would be sent to him shortly detailing the decision. In that removal letter, Governor Gordon wrote the following:

> I have been made aware of your email to the members of the House of Representatives during this last legislative session regarding SF0099 in which you strongly encouraged the members to pass this legislation and criticized the Wyoming Medical Society's opposition to the bill. I certainly appreciate your position on this issue and respect your right to impart it to the Legislature. Nonetheless, no matter what anyone's personal expressed beliefs may be, it is important that the professionals governed by the Board of Medicine have confidence that board members prosecute their responsibilities on the board in an objective and unbiased way. I believe your comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice. Medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone. Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality.

> I am certain you would understand that while you certainly are entitled to your First Amendment right to free speech, as an individual member of the Board, you would not be entitled to speak for the Board unilaterally. Nevertheless, some may not appreciate that your personal comments might not necessarily be those of the Board as a whole. It has never been my intention to inhibit your own ability to express your views unabashedly or to confuse anyone's personal opinions and beliefs with those of any of our boards. Therefore, as I have done before, when a member of a board chooses to express personal beliefs in a way that can be construed as speaking for the body, I have elected to relieve that member of the constraints board membership requires.

> Therefore, in this instance, sadly, I believe it is best to remove you from the Board of Medicine. I wish you all the best in your future endeavors and urge you to continue to advocate for your beliefs.

Add.009

(Ex. 9.)  It is unclear as to when the Governor became aware of Dr. Cubin's February 28, 2024 email to the Wyoming House.  At the preliminary-injunction hearing, Dr. Cubin testified he was stunned and shocked after receiving a call from the Governor's Chief of Staff and an email from the Governor.  However, in Dr. Cubin's April 22, 2024 e-mail in reply to the phone call and Governor Gordon's correspondence, he wrote in part:

> It was with some sadness that I received a phone call from Drew today explaining that my services are no longer needed on the Wyoming Board of medicine.  I have to say that this phone call was not totally unexpected.  However, before anything is made final, I would very much like to make sure that my voice is heard and that my side of the story is told.
>
> …
>
> In this particular case, however, there was a significant injustice and misrepresentation on behalf of the Wyoming medical Society.  Specifically, the Wyoming medical Society came out with a position that did not represent the majority of the physicians in the state – without polling the physicians.  They then reported to represent all of the physicians in the state.

(ECF 20-2 p. 1.)  Subsequently, Dr. Cubin requested he be permitted to instead resign from the Board, which Governor Gordon allowed and which occurred in late April 2024.  (Ex. 10, 11.)

Four months later, Dr. Cubin filed this lawsuit (ECF 1), and another month after that, he filed the instant motion for preliminary injunction (ECF 11).  He asks the Court to order Governor Gordon to restore him to the Board while this lawsuit is pending.

## DISCUSSION

Having considered the submissions from the parties (ECF 11, 12, 20) along with the evidence and testimony presented at the evidentiary hearing held on November 8, 2024 (ECF 24), the Court finds and concludes Dr. Cubin has not carried his burden of showing a likelihood of success on the merits or irreparable harm.

1.   **Substantial Likelihood of Success on the Merits**

"It is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434 (quotations omitted).  Dr. Cubin contends Governor Gordon unlawfully retaliated against his exercise of his First Amendment rights by removing him from the Board in response to his comments to the Wyoming House.  The First Amendment rights at issue are the right to free speech and right to petition the government.

Dr. Cubin's government service on the Board and government compensation rendered him a public employee.  "As applied to the states by the Fourteenth Amendment, the First Amendment prevents state and local governments from 'condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," but the First Amendment continues to protect "a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417, 418 (2006).  "The government employer, however, also has a 'countervailing interest in controlling the operation of its workplaces.'" *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014)).  "Thus, a public employer's legitimate needs and interests may justify some limitations on the speech of employees." *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 594 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1194-97 (10th Cir. 1998).

"The government has a substantial interest in ensuring that all of its operations are efficient and effective." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011).  When

public employees "speak out, they can express views that contravene governmental policies or impair the performance of governmental functions." *Garcetti*, 547 U.S. at 419. "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Knopf*, 884 F.3d at 944 (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). "To determine if an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment, we apply the *Garcetti/Pickering* test." *Id.* at 945. The *Garcetti/Pickering* test comprises five elements:

(1)     whether the speech was made pursuant to an employee's official duties;

(2)     whether the speech was on a matter of public concern;

(3)     whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;

(4)     whether the protected speech was a motivating factor in the adverse employment action; and

(5)     whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)). The *Garcetti/Pickering* test applies to Dr. Cubin's free-speech claim as well as his right-to-petition claim. *See Guarnieri*, 564 U.S. at 398 ("The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right."); *Morris v. City of Colorado Springs*, 666 F.3d 654, 660-61 (10th Cir. 2012) (noting the *Garcetti/Pickering* analysis applies to both free-speech and right-to-petition claims).

Add.012

For purposes of this preliminary-injunction motion, Governor Gordon disputes only the third element of the test, effectively conceding the remaining elements at this stage. (ECF 20 p. 11.) The third element of the *Garcetti/Pickering* test is a question of law to be decided by the court. *Duda*, 7 F.4th at 911 ("The first three elements concern whether the speech is protected and are 'issues of law for the court to decide.'") (quoting *Trant*, 754 F.3d at 1165). "Although the third element must weigh in favor of the plaintiff for the plaintiff to prevail on the First Amendment claim, the employer bears the [ultimate] burden on the third element." *Id.* at 912. The Court will thus focus the likelihood-of-success analysis on this disputed element.

The third element of the *Garcetti/Pickering* test asks whether the government employer's interests in promoting and ensuring efficient public service outweigh the public employee's First Amendment interests. "We have said the 'only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself,* of the public employer's internal operations and employment relationships.'" *Id.* (emphasis in original) (quoting *Trant*, 754 F.3d at 1166). "Relevant considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007)).

"In analyzing the employer's interest in avoiding disruption, different standards apply depending on whether the adverse employment action occurred 'long after' or 'soon after' the employee's protected speech." *Id.* If the adverse employment action occurs "long after" the public employee's speech, then the government employer must prove the speech actually

disrupted its operations in order to outweigh the employee's First Amendment interests. *Id.* at 912-13; *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1280 (10th Cir. 2007) ("once a sufficient time has passed, the government employer may satisfy its burden only by showing specific evidence of actual disruption"). In contrast, when the adverse employment action is taken "soon after" the subject speech, there is no requirement that the government employer show the employee's speech caused an actual disruption to government operations and instead can rely on a reasonable prediction of disruption. *Duda*, 7 F.4th at 913; *Deschenie*, 473 F.3d at 1279 (where the adverse employment action is taken "soon after" the speech, a court will generally defer to the employer's reasonable predictions of disruption that are supported by specific evidence).

Here, Governor Gordon removed Dr. Cubin from the Board slightly less than two months after Dr. Cubin's email to the Wyoming House. The parties in this case dispute whether Governor Gordon removed Dr. Cubin from the Board "soon after" or "long after" Dr. Cubin's email to the Wyoming House.

The Tenth Circuit has not fixed a time limitation for separating "soon after" from "long after." *Duda*, 7 F.4th at 913 n.10; *see Deschenie*, 473 F.3d at 1279 ("When the adverse employment action takes place several months after the employee's speech, however, it is no longer reasonable for the government to rely on predictions of disruption which did not materialize."). The Tenth Circuit has determined, though, that six months with no actual disruption is "long after" the subject speech, and such a length of time precludes any "prediction" of disruption weighing in the government employer's favor. *Id.* (citing *Kent v. Martin*, 252 F.3d 1141, 1146 (10th Cir. 2001)). Similarly, the Tenth Circuit has said that adverse employment action taken within one month of the subject speech falls on the "soon after" side of

the line, allowing the government employer to rely on its prediction of disruption. *Deschenie*, 473 F.3d at 1280-81. But where the line actually falls between "soon after" and "long after" remains undefined.

Based on the undisputed facts in the record, and specific to this case, the Court concludes Governor Gordon's action was "soon after" Dr. Cubin's email to the Wyoming House for two reasons. First, the slightly less than two months in this case is not anywhere near the timeframes, considered by the Tenth Circuit to be clearly "long after;" it is far closer to *Deschenie's* one month (which was "soon after") than to *Kent's* six months (which was "long after"); and it is less than the "several months" referenced in *Deschenie*. Second, particular to the circumstances here, the Court considers it significant that Dr. Cubin's work on the Board was not day-to-day but rather sporadic, thus making any opportunity for his email to disrupt the Board's work rather sporadic as well. For example, Dr. Cubin's exhibits introduced at the preliminary-injunction hearing establish his receipt of three emails concerning Board business from April 8, 2024, through April 16, 2024. (Ex. 6, 7, 8.) In a more traditional employment context, the opportunity for an employee's speech to disrupt the functioning of their employment is far more frequent, and likely more immediate, than the occasional work done by the Board members. Thus, the Court considers Dr. Cubin's removal from the Board to have occurred "soon after" his subject speech.[6,7] Consequently, "we do not require a government employer to allow the disruption to

---

[6] At the preliminary-injunction hearing, Dr. Cubin relied on *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584 (10th Cir. 1994), to suggest that while the timeframe between the speech and the employment action there (about 46 days) was less than that here (about 57 days), the Tenth Circuit did not consider it to be on the "soon after" side in *Ramirez*. While the timeframe played a role in *Ramirez*, it was only concerning whether an inference of retaliatory motive could be raised to withstand summary judgment. *Id.* at 596. The timeframe was not a consideration in the Tenth Circuit's balancing the plaintiff's First Amendment rights against the government's interest in efficient operations. *Id.* at 594-95. Thus, the Court finds *Ramirez* largely inapplicable to the "soon after" versus "long after" delineation at issue here.

[7] Additionally, at the preliminary-injunction hearing, Governor Gordon highlighted the fact that it's unclear when he first learned of Dr. Cubin's email, which might suggest Governor Gordon took swift action upon learning of the

manifest before acting." *Bailey v. Indep. Sch. Dist. No. 69 of Canadian Cnty. Oklahoma*, 896 F.3d 1176, 1183 (10th Cir. 2018). "Instead, when the employer's intent in taking an adverse action is to avoid actual disruption, we will generally defer to a public employer's reasonable predictions of disruption, as long as the predictions are supported by specific evidence." *Duda*, 7 F.4th at 913 (internal citations and quotations omitted).

The real issue here is not that Dr. Cubin expressed his personal support of SF0099 to the Wyoming House. Instead, the real issue is that Dr. Cubin's comments to the Wyoming House went beyond his support for SF0099 and into his disputes with WMS and specific doctors, the same doctors who may appear before the Board to answer a complaint with their medical licenses and livelihoods in jeopardy. The Board is statutorily authorized to "[g]rant, refuse to grant, suspend, restrict, revoke, reinstate or renew licenses to practice medicine." Wyo. Stat. § 33-26-202(b)(i). The Board has the power to investigate allegations that a licensee has violated the Wyoming Medical Practice Act and to take disciplinary action against the licensee upon finding such a violation. *Id.* § 33-26-202(b)(ii).

When a Board member sits in judgment of a licensee, they of course owe the licensee a fair and impartial consideration of the matter, but they also owe the appearance of fairness and impartiality. "Due process requires that an agency provide a fair trial without the appearance of bias or prejudice." *Painter v. Abels*, 998 P.2d 931, 938 (Wyo. 2000). In an agency's action in a licensing matter, "[f]undamental considerations require not just fairness in fact but also fairness in appearance." *Dorr v. Wyo. Bd. of Certified Public Accountants*, 21 P.3d 735, 745 (Wyo.

---

subject speech. In addition to being speculative, the Court finds this to be a red herring. The "soon after" versus "long after" determination is not dependent upon when the government employer learns of the speech. If an employer learned of the employee's speech long after the speech occurred and then took immediate action based on a "prediction" of disruption with no actual disruption in the interim, it's unlikely to be considered a reasonable prediction based on evidence. *Duda*, 7 F.4th at 913.

2001). "It is clearly established law that '[m]aintaining the appearance of impartiality of the judiciary is an interest of vital importance.'" *Stengle v. Office of Dispute Resolution*, 631 F. Supp. 2d 564, 575 (M.D. Pa. 2009) (quoting *Kirchgessner v. Wilentz*, 884 F. Supp. 901, 912 (D.N.J. 1995)); *see U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers*, 413 U.S. 548, 565 (1973) ("it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent"). "[T]he maintenance of [Dr. Cubin's] impartiality, and appearance thereof, was crucial to the effective operation of" the Board, particularly because one of the primary duties of Board members is to sit as arbiters over complaints against other medical providers. *See Stengle*, 631 F. Supp. 2d at 576.   Governor Gordon accurately stated in his removal letter to Dr. Cubin: "Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality." (ECF 1-2 p. 2.)  The Court has little difficulty concluding that Governor Gordon has a significant interest in assuring members of the Board can perform their Board functions without perceived or actual bias or prejudice.

Dr. Cubin's email to the Wyoming House went beyond offering his personal position and thoughts on SF0099.   He alleged "Dr. Sanderson (and presumably the WMS leadership)" "ignored and suppressed" the position of a different pediatric organization. (Ex. 3 p. 2.)  These are charged allegations leveled by Dr. Cubin against specific medical providers, providers who could appear before the Board and whose careers and livelihood are affected by his work on the Board.   Irrespective of the accuracy of the allegations, Dr. Sanderson and any of the WMS leadership appearing before Dr. Cubin in his role as a Board member could reasonably question whether they would receive fair consideration from him in light of Dr. Cubin's allegations to the

Wyoming House. Dr. Cubin testified that the WMS is the largest lobbying organization representing doctors in Wyoming and a significant percentage of Wyoming's doctors are members.

Beyond just Dr. Sanderson and WMS leadership, though, Dr. Cubin's email could also cause others, such as those on the "left" of the partisan divide, to also question whether Dr. Cubin would be a fair and impartial arbiter for them. Dr. Cubin's email expressed his sadness and lost confidence because WMS "has been essentially hijacked by the far left." (Ex. 3 p. 1.) A provider who falls in this "left" or "far left" camp could reasonably question whether they can get a fair examination should they have to appear before Dr. Cubin. And what of those many providers who remained silent and did not offer their opinion on WMS' position? It is reasonably possible they could fear that Dr. Cubin might take their silence as tacit agreement with the "far left" WMS position even if they personally disagreed. Employees in the Executive Branch of the Government or its agencies "are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof." *Nat'l Assoc. of Letter Carriers*, 413 U.S. at 564–65. Dr. Cubin's comments concerning his displeasure with WMS' position on SF0099 and WMS' "hijacking" by the "far left" draws into question his ability or willingness to execute his Board responsibilities "without bias or favoritism for or against any political party or group or the members thereof." *Id.*

To be sure, Dr. Cubin could be recused or recuse himself from particular cases or proceedings, and he recused himself from multiple cases during his time as a Board member. (Cubin Decl. ¶ 4.) However, the ability to recuse or be recused from particular proceedings does not avoid disruption of the Board's operations caused by Dr. Cubin's email comment; it in fact

would constitute such disruption. The Middle District of Pennsylvania considered the potential

use of recusal motions in *Stengle*:

> From these facts, one can readily infer that Plaintiff's [speech in question] had the
> potential to induce recusal motions from those who came before her in her
> hearing officer capacity. If such a motion were to be filed, either one of two
> things could happen. Plaintiff could recuse herself, or she could elect to deny the
> motion and hear the case to its conclusion. In either instance, governmental
> efficiency would be adversely affected.
>
> If Plaintiff denied the motion and retained the case, the losing party could appeal
> the decision on due process grounds, alleging that it was denied an impartial
> adjudication of its rights. This would entail additional governmental resources
> being dedicated to the appeal, which would clog dockets and ultimately reduce
> governmental efficiency. On the other hand, if Plaintiff chose to grant the motion
> and recuse herself, the case would be transferred to another hearing officer, which
> would not only serve to delay resolution of the case, but also to clog the docket of
> the newly assigned hearing officer, thereby reducing his or her ability to
> efficiently dispose of his or her load. Accordingly, it is easy to see that an
> increased number of recusal motions would severely hamper the government's
> ability to efficiently and effectively resolve special education issues.

*Stengle*, 631 F. Supp. 2d at 577 (internal citation omitted). The same problems exist concerning

Dr. Cubin's ability to recuse himself or be recused from particular Board proceedings. Increased

use of recusal is not the cure to increased fears of bias and partiality resulting from Dr. Cubin's

email; rather, it is a symptom of the potential governmental inefficiencies Governor Gordon

appropriately intended to prevent by removing Dr. Cubin from the Board.

Further, the emails exchanged between Dr. Cubin and Dr. Sanderson support Governor

Gordon's reasonable prediction of disruption to the Board's functions. Dr. Sanderson stated in

one of his responses to Dr. Cubin's emails:

> However, as a member of the Wyoming Board of Medicine, who finds himself
> responsible for penalizing physicians for malpractice and unprofessional
> behavior, I would hope that you would find yourself just as well versed on the
> science and rationale behind the support of GAC [gender affirming care] for
> minors from the American Academy of Pediatrics, The American Medical
> Association, The American Academy Of Child and Adolescent Psychiatry, and
> the other professional societies involved, as you are in the science and limited

professional opinion that opposes GAC for minors.  If the Wyoming Legislature passes this bill, it will, by necessity, force Wyoming physicians to break the ethical standard of treating patients according to the best science available at the risk of their license.  Please remember this if you find yourself sitting in judgement against Wyoming physicians who may come before your Board for being put into this position by the Wyoming Legislature.

(Ex. 13 p. 17 (emphasis in original).)  Dr. Cubin replied to Dr. Sanderson's statement as

follows:

> In regard to my position on the Board of Medicine… while it is true that I do sit on that Board, I want to make two things very clear.  First, all of the statements and communications that I have sent to this group represent my personal beliefs and do NOT represent the positions or views of the Board of Medicine.  Furthermore, these communications are solely intended to address my concerns with the WMS Board of Directors and select members of a professional organization of which I am a paid member in good standing.  Second, in more general terms with regard to the Board of Medicine, it is the role of the Board of Medicine to ensure patient safety in this State through an effective licensing program and to fairly and appropriately discipline holders of medical licenses when they are found to be in violation of the Wyoming Medical Practice Act.  I do not endeavor to make the rules which are to be enforced.  It is much better, particularly on politically charged issues such as this, for the legislature and Governor to make the rules that are to be enforced by the Board of Medicine.  If anyone has any concerns regarding the Board of Medicine I would encourage you to reach out to the Executive Director with these concerns.  His name is Kevin Bohnenblust and he does a fantastic job.

(*Id.* p. 16.)  Dr. Cubin's reply was perfectly appropriate, but the exchange shows that his role as a

Board member was a concern for at least one of the doctors who found himself a subject of Dr.

Cubin's comments, who Dr. Cubin specifically accused in his email to the Wyoming House of

suppressing counterinformation.  From this, Governor Gordon could reasonably predict that Dr.

Cubin's membership on the Board could cause the Board's impartiality to be questioned and

disrupt at least some of the Board's core functions.  And the Court must "generally defer to a

public employer's reasonable predictions of disruption, as long as the predictions are supported

by specific evidence."  *Duda*, 7 F. 4th at 913 (quoting *Deschenie v. Bd. of Educ. of Cent. Consol.

Sch. Dist. No. 22*, 473 F.3d 1271, 1279 (10th Cir. 2007)).  Governor Gordon's reasonable

Add.020

predictions of disruption are supported by specific evidence here.

While Dr. Cubin attempts to cast his removal from the Board to be a consequence of his support of SF0099, that is in reality not what the Court perceives to be the Governor's concern. Had Dr. Cubin cabined his comments to the Wyoming House to his support of SF0099 and the reasons for that support, he'd likely still be a member of the Board. However, that is not what happened. Dr. Cubin's comments to the Wyoming House went beyond SF0099, to include his dispute with WMS leadership and Dr. Sanderson, who he alleged to have colluded to suppress opposing medical viewpoints. Even still, Dr. Cubin testified at the preliminary-injunction hearing that he continues to have significant concerns about the leadership of the WMS misrepresenting its members, noting the organization still has not taken a poll as he implored. These castigating comments, extraneous to his personal support of SF0099, reasonably raised a concern about his ability or perceived ability to fairly and impartially perform his Board duties, which could directly and indirectly affect those he identified in his email to the Wyoming House as well as other providers. In the removal letter, Governor Gordon correctly noted the importance "that the professionals governed by the Board of Medicine have confidence that the board members prosecute their responsibilities on the board in an objective and unbiased way." (Ex. 9.) Governor Gordon reasonably predicted that Dr. Cubin's extraneous comments could disrupt the duties of the Board, a prediction supported by the email exchange between Dr. Sanderson and Dr. Cubin. Consequently, Governor Gordon took corrective action, by removing Dr. Cubin from the Board, to advance Wyoming's significant interest in assuring members of the Board can perform their Board functions without perceived or actual bias or prejudice.

In balancing Dr. Cubin's First Amendment interests in speaking and petitioning as a citizen on a matter of public concern against Wyoming's countervailing interests in the effective

and efficient management of its governmental affairs, the Court finds the balance favors the employer, and therefore Dr. Cubin's "First Amendment claim will fail even though the petition [and speech] is on a matter of public concern." *Guarnieri*, 564 U.S. at 398. As the matter currently stands at this early stage of the litigation, the Court finds "the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests" in this case. *Knopf*, 884 F.3d at 945. Consequently, the Court does not find Dr. Cubin has shown a substantial likelihood of success on the merits sufficient to warrant the entry of a preliminary injunction (let alone the requested mandatory injunction).

**2.     Irreparable Injury if the Injunction is Denied**

Dr. Cubin's request for a preliminary injunction also fails to establish irreparable harm. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Group*, 912 F.3d at 1270. "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 22 (2008) (emphasis in original). "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Economic loss generally will not constitute irreparable harm because it is compensable by money damages. *Schrier*, 427 F.3d at 1267.

Dr. Cubin asserts "his injury is irreparable without an injunction because '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (ECF 12 p. 28 (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)).) However, because Dr. Cubin "has failed to demonstrate the requisite

likelihood of success on his free speech and [right to petition] claims," "he is not entitled to a presumption of irreparable injury" based on his alleged loss of First Amendment freedoms. *Schrier*, 427 F.3d at 1266; *see Rocky Mountain Gun Owners v. Polis*, --- F.3d ---, 2024 WL 4677573, at *24 (10th Cir. 2024) (no irreparable injury where movant "point[ed] to no irreparable injury other than the violation of his Constitutional Second Amendment right, which we resolved against his position"). And "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *DTC Energy Group*, 912 F.3d at 1270 (quoting *Schrier*, 427 F.3d at 1267). Dr. Cubin has not established his First Amendment freedoms are currently being curtailed, and the Court does not find any reasonable threat of such during the pendency of this action. And any monetary loss can be recovered through an award of damages at the conclusion of this litigation. Dr. Cubin "has presented no evidence that his removal as [Board member] during the time it will take to litigate this case will have an irreparable effect in the sense of making it difficult or impossible for him to resume his [Board membership] or restore the status quo ante in the event he prevails." *Schrier*, 427 F.3d at 1267. Dr. Cubin has not shown that his removal from the Board is likely to cause him ongoing or future harm that can only be remedied by immediate injunctive relief.

## CONCLUSION AND ORDER

Dr. Cubin was required to—but did not—show that he is substantially likely to succeed on the merits and that he will suffer irreparable injury if a preliminary injunction is not issued. While the Court finds the requested injunction to be "disfavored" and therefore require a "strong showing" on the likelihood of success, Dr. Cubin has failed to carry his burden under even the normal, non-heightened standard. A preliminary injunction cannot issue due to Dr. Cubin's

inability to establish a substantial likelihood of success on the merits or irreparable harm, and the Court need not consider the remaining preliminary-injunction factors. *See High Plains Harvest Church v. Polis*, 835 F. App'x 372, 374 (10th Cir. 2020) (denying an injunction pending appeal for lack of likelihood of success on the merits without considering remaining factors); *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) (failure to show irreparable injury precluded a preliminary injunction without need to address remaining factors).

The Court notes the findings of fact and conclusions of law in this Order are necessarily preliminary and based on the incomplete record currently before the Court. These findings and conclusions are not binding on the parties as this matter proceeds through the later stages of litigation. *See Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981) (findings and conclusions at the preliminary-injunction stage "are not binding at trial on the merits").

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction (ECF 11) is **DENIED**.

**DATED:** November _14ᵗʰ_, 2024.

Scott W. Skavdahl
United States District Judge