No. 24-8084

## United States Court of Appeals for the Tenth Circuit

_____

DR. FREDERICK WILLIAM "ERIC" CUBIN III,
Plaintiff-Appellant,

v.

MARK GORDON, *in both his personal and official capacities as Governor of Wyoming,*
Defendant-Appellee.

_____

On Appeal from The United States District Court  for the District of Wyoming
No. 1:24-CV-00164, Hon. Scott Skavdahl, Presiding

**APPENDIX VOLUME I, Pages 1 to 171**

Jacob Huebert
   *Lead Counsel*
Bridget Conlan
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
(512) 481-4400
jhuebert@ljc.org
*Counsel for Appellant*

D. Steven Melchior
MELCHIOR LAW FIRM, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307) 637-2323
steve@melchlaw.com

*\*Oral Argument Requested*

## Appendix Volume I Table of Contents

Docket Report…………………………………………………………………... App. 3

Complaint (Dkt. 1, August 29, 2024)………………………….………… App. 9

Complaint Exhibit 1 (Dkt. 1-1, August 29, 2024)………………...... App. 28

Complaint Exhibit 2 (Dkt. 1-2, August 29, 2024)…………….…… App. 31

Complaint Exhibit 3 (Dkt. 1-3, August 29, 2024)……………….... App. 33

Answer (Dkt. 7, September, 19, 2024) …………………………… App. 35

Answer Exhibit A (Dkt. 7-1, September 19, 2024)…...…………… App. 44

Plaintiff's Motion for Preliminary Injunction
(Dkt. 11, October 1, 2024)………………………………………….. App. 45

Brief in Support of Plaintiff's Motion for
Preliminary Injunction (Dkt. 12, October 1, 2024)……………… App. 49

Declaration of Dr. Eric Cubin (Dkt. 12-1, October 1, 2024)…….. App. 81

Defendant's Brief in Response to Plaintiff's Motion
for Preliminary Injunction (Dkt. 20, October 25, 2024) …….….. App. 87

Affidavit of Valerie Mockensturm
(Dkt. 20-1, October 25, 2024)…………………………………… App. 113

Exhibit B (Dkt. 20-2, October 25, 2024) …………………….…… App. 133

Exhibit C (Dkt. 20-3, October 25, 2024)…………………….…… App. 136

Exhibit D (Dkt. 20-4, October 25, 2024) …………………….…… App. 145

Order Denying Preliminary Injunction
(Dkt. 25, November 14, 2024)…………………………………… App. 146

Notice of Appeal (Dkt. 34, December 9, 2024) …………………… App. 170

DISCSTAY,APPEAL,CASP

# U.S. District Court
## District of Wyoming (Casper)
## CIVIL DOCKET FOR CASE #: 1:24−cv−00164−SWS

Cubin v. Wyoming Governor et al
Assigned to: Honorable Scott W Skavdahl
Referred to: US Magistrate Judge Scott P Klosterman
Case in other court:  USCA 10th Circuit, 24−08084
Cause: 42:1983 Civil Rights Act

Date Filed: 08/29/2024
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Dr Frederick William Cubin, III**
*also known as*
Eric Cubin

represented by **Buck Dougherty**
Liberty Justice Center
7500 Rialto Blvd.
Suite 1−250
Austin, TX 78735
512−481−4400
Email: bdougherty@libertyjusticecenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**D Stephen Melchior**
MELCHIOR LAW FIRM
2010 Warren Avenue
Cheyenne, WY 82001
307/637−2323
Fax: 307/637−2313
Email: steve@melchlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Wyoming Governor**
*in his official capacity*
*also known as*
Mark Gordon

represented by **Brandi Lee Monger**
WYOMING ATTORNEY GENERAL
Civil Division
2424 Pioneer Avenue
3rd Floor
Cheyenne, WY 82002
307/777−7888
Email: brandi.monger@wyo.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Timothy W Miller**
Wyoming Attorney General's Office
Tort Litigation
109 State Capitol
Cheyenne, WY 82002
307−777−5820
Fax: 307−777−3858
Email: tim.miller@wyo.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark Gordon**
*individually*

represented by **Brandi Lee Monger**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Timothy W Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/29/2024 | 1 | COMPLAINT against All Defendants with Jury Demand. (Filing fee $ 405,Receipt Number AWYDC–2487830) Attorney D Stephen Melchior added to party Frederick William Cubin, III(pty:pla), filed by Frederick William Cubin, III. (Attachments: # 1 Exhibit 1. Dr. Cubin E–Mail to House, # 2 Exhibit 2. Gov. Gordon Letter to Dr. Cubin, # 3 Exhibit 3. Gov. Acknowledgment of Dr. Cubin Resignation, # 4 Proposed Summons, # 5 Civil Cover Sheet) (Melchior, D) (Attachment 4 replaced with flattened pdf on 8/29/2024) (Court Staff, smxb). (Main Document 1, Attachment 1, 2 & 3 replaced on 10/29/2024 to remove live links) (Court Staff, scat). (Flattened Attachment 5 replaced on 11/7/2024) (Court Staff, scat). (Entered: 08/29/2024) |
| 08/29/2024 | 2 | Notice of Judge Assignment and Consent to Proceed before a Magistrate Judge. The case was been assigned to the Honorable Scott W. Skavdahl and the Honorable Mark L. Carman as referral judge. (Court Staff, smxb) (Entered: 08/29/2024) |
| 08/29/2024 | 3 | Summons Issued (Court Staff, smxb) (Entered: 08/29/2024) |
| 09/05/2024 | 4 | SUMMONS Returned Executed by Frederick William Cubin, III on 8/30/2024 to Defendants Wyoming Governor and Mark Gordon. Answer due 9/20/2024 (Melchior, D) Modified text on 9/11/2024 (Court Staff, semt). (Entered: 09/05/2024) |
| 09/18/2024 | 5 | (TEXT–ONLY) ORDER REASSIGNING REFERRAL JUDGE. Case reassigned to Chief US Magistrate Judge Scott P Klosterman for all further non–dispositive matters; US Magistrate Judge Mark L Carman no longer assigned to case by the Honorable Scott W Skavdahl. (Court Staff, sjlg) (Entered: 09/18/2024) |
| 09/19/2024 | 6 | NOTICE of Attorney Appearance by Timothy W Miller on behalf of Mark Gordon, Wyoming Governor (Miller, Timothy) (Entered: 09/19/2024) |
| 09/19/2024 | 7 | ANSWER to Complaint with Affirmative Defenses, by Wyoming Governor, Mark Gordon. (Attachments: # 1 Exhibit A – Resignation Email) (Miller, Timothy) (Entered: 09/19/2024) |
| 09/19/2024 | 8 | DEMAND for Trial by Jury filed by Defendants Mark Gordon, Wyoming Governor. (Miller, Timothy) (Entered: 09/19/2024) |
| 09/20/2024 | 9 | NOTICE of Attorney Appearance by Brandi Lee Monger on behalf of Mark Gordon, Wyoming Governor (Monger, Brandi) (Entered: 09/20/2024) |
| 09/24/2024 | 10 | (TEXT–ONLY) NOTICE of Hearing: BY TELEPHONE – All parties shall appear by telephone through the Courts conference call system. Guests call: 307/735–3644, access code: 557993669#. **Initial Pretrial Conference set for 11/5/2024 01:30 PM before US Magistrate Judge Scott P Klosterman.** (Court Staff, sal) (Entered: 09/24/2024) |
| 10/01/2024 | 11 | MOTION for Preliminary Injunction filed by Plaintiff Frederick William Cubin, III. (Melchior, D) (Entered: 10/01/2024) |
| 10/01/2024 | 12 | BRIEF *in Support of* 11 Motion for Preliminary Injunction filed by Plaintiff Frederick William Cubin, III. (Attachments: # 1 Exhibit Declaration of Dr. Eric Cubin in Support of Plaintiff's Motion for Preliminary Injunction) (Melchior, D) Modified text on 10/8/2024 (Court Staff, sjlg). (Main Document 12 replaced on 10/29/2024 to remove live links) (Court Staff, scat). M (Entered: 10/01/2024) |
| 10/01/2024 | 13 | (TEXT–ONLY) NOTICE of Hearing on 11 MOTION for Preliminary Injunction IN–PERSON. **Motion Hearing set for 10/25/2024 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** (Court Staff, semt) (Entered: 10/01/2024) |

| | | |
|---|---|---|
| 10/04/2024 | 14 | ~~MOTION REFERRED TO Judge Scott P Klosterman.~~ Stipulated MOTION to Vacate October 25, 2024 Hearing on Plaintiff's Motion for Preliminary Injunction filed by Plaintiff Frederick William Cubin, III. (Attachments: # 1 Proposed Order)(Melchior, D) Struck referral text on 10/4/2024 (Court Staff, semt). (Entered: 10/04/2024) |
| 10/04/2024 | | Motions No Longer Referred: 14 Stipulated MOTION to Vacate October 25, 2024 Hearing on Plaintiff's Motion for Preliminary Injunction (Court Staff, semt) (Entered: 10/04/2024) |
| 10/07/2024 | 15 | ORDER by the Honorable Scott W Skavdahl granting 14 Motion to Vacate. The preliminary injunction hearing set for October 25, 2024, is hereby vacated and reset to November 8, 2024, commencing at 1:00 pm. This matter is stacked #3 on the Court's docket behind two criminal jury trials. IT IS FURTHER ORDERED that Defendant shall file his written response to Plaintiff's motion for preliminary injunction **on or before October 25, 2024**(Court Staff, scat) (Entered: 10/07/2024) |
| 10/07/2024 | 16 | (TEXT–ONLY) NOTICE of Hearing on 11 MOTION for Preliminary Injunction IN–PERSON. **Motion Hearing RESET for 11/8/2024 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** (Court Staff, scat) (Entered: 10/07/2024) |
| 10/18/2024 | 17 | NOTICE by Plaintiff Frederick William Cubin, III (Attachments: # 1 Exhibit) (Melchior, D) (Entered: 10/18/2024) |
| 10/18/2024 | 18 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION for M.E. Buck Dougherty III to appear pro hac vice; Check not tendered; filed by Plaintiff Frederick William Cubin, III. (Attachments: # 1 Exhibit)(Melchior, D) (Entered: 10/18/2024) |
| 10/18/2024 | 19 | ORDER by the US Magistrate Judge Scott P Klosterman granting 18 MOTION for M.E. Buck Dougherty III to appear pro hac vice; Check not tendered; filed by Frederick William Cubin, III (cc: counsel via email) (Court Staff, semt) (Entered: 10/18/2024) |
| 10/18/2024 | | FINANCIAL ENTRY: PAYMENT OF $100 RECEIVED FOR PRO HAC VICE FEE FOR M.E. Buck Dougherty III. RECEIPT 2–3752. (Court Staff, smek) (Entered: 10/21/2024) |
| 10/25/2024 | 20 | RESPONSE to 11 Motion for Preliminary Injunction filed by Defendants Mark Gordon, Wyoming Governor. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Monger, Brandi) (Attachments 2 and 4 replaced on 11/7/2024 to remove live links) (Court Staff, semt). (Entered: 10/25/2024) |
| 10/30/2024 | 21 | MOTION REFERRED TO Judge Scott P Klosterman. Stipulated MOTION to Continue (Non–Dispositive). Requesting continuance of Initial Pretrial Conference filed by Defendants Mark Gordon, Wyoming Governor. (Attachments: # 1 Proposed Order)(Monger, Brandi) (Entered: 10/30/2024) |
| 10/31/2024 | 22 | ORDER by the US Magistrate Judge Scott P Klosterman granting 21 Motion to Continue Initial Pretrial Conference. **Initial Pretrial Conference RESET from 11/5/24 to 12/3/2024 01:30 PM via telephone before US Magistrate Judge Scott P Klosterman.** Call–in information provided previously remains the same.(Court Staff, sal) (Entered: 10/31/2024) |
| 10/31/2024 | 23 | Notice of Pro Hac Vice Attorney Appearance by Buck Dougherty on behalf of Frederick William Cubin, III (Dougherty, Buck) (Entered: 10/31/2024) |
| 11/08/2024 | 24 | MINUTES for proceedings held before Honorable Scott W Skavdahl: Motion Hearing on 11 Motion for Preliminary Injunction held on 11/8/2024. Evidence entered. Witnesses: Dr. Frederick Cubin, Lacey Mockensturm. Motion taken under advisement. (Court Reporter Megan Strawn.) (Court Staff, semt) (Entered: 11/08/2024) |
| 11/14/2024 | 25 | ORDER by the Honorable Scott W Skavdahl denying 11 Motion for Preliminary Injunction. (Court Staff, scat) (Entered: 11/14/2024) |
| 11/25/2024 | 26 | MOTION for Judgment *on the Pleadings* filed by Defendants Wyoming Governor, Mark Gordon. (Monger, Brandi) (Entered: 11/25/2024) |
| 11/25/2024 | 27 | BRIEF *in Support* re 26 Motion for Judgment filed by Defendants Wyoming Governor, Mark Gordon. (Monger, Brandi) Modified text on 11/26/2024 (Court Staff, |

| | | sjlg). (Entered: 11/25/2024) |
|---|---|---|
| 11/25/2024 | 28 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction held on 11/08/24 before Judge Scott W. Skavdahl. To purchase a copy of this transcript, please contact Court Reporter Megan Strawn, phone (307) 232–2626 or email strawnreporting@yahoo.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 12/2/2024. Notice of Redaction Request due 12/16/2024. Redacted Transcript Deadline set for 12/26/2024. Release of Transcript Restriction set for 2/24/2025. (Strawn, Megan) (Entered: 11/25/2024) |
| 11/26/2024 | 29 | MOTION REFERRED TO Judge Scott P Klosterman. MOTION to Stay Discovery filed by Defendants Wyoming Governor, Mark Gordon. (Attachments: # 1 Proposed Order)(Miller, Timothy) (Entered: 11/26/2024) |
| 11/26/2024 | 30 | JOINT CASE MANAGEMENT PLAN re 22 Order on Motion to Continue (Non–Dispositive), by Frederick William Cubin, III. (Dougherty, Buck) (Entered: 11/26/2024) |
| 12/04/2024 | 31 | INITIAL PRETRIAL ORDER by the US Magistrate Judge Scott P Klosterman. Stipulation Deadline 8/18/2025. Motion in Limine deadline 8/18/2025. Motions in Limine Response Deadline 9/1/2025. **Final Pretrial Conference set for 9/9/2025 at 01:00 PM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl. Jury Trial (4 days/stacked #1) set for 10/6/2025 at 09:00 AM in Casper Courtroom No. 2 (Room No. 204) before Honorable Scott W Skavdahl.** (Court Staff, sbrr) (Entered: 12/04/2024) |
| 12/06/2024 | 32 | Stipulated MOTION for Extension of Time (Dispositive) requesting extension of Response Deadlines of Plaintiff filed by Plaintiff Frederick William Cubin, III. (Attachments: # 1 Proposed Order)(Dougherty, Buck) Terminated as of 12/6/24 per 33 , on 12/10/2024 (Court Staff, semt). (Entered: 12/06/2024) |
| 12/06/2024 | 33 | ORDER Granting 32 Stipulated MOTION for Extension of Time (Dispositive) filed by Frederick William Cubin, III by the Honorable Scott W Skavdahl. The time for Plaintiff to file a response to Defendant's Motions for 1) Judgment on the Pleadings (ECF No. 26 ) and 2) Stay of Discovery (ECF No. 29 ), is extended until December 20, 2024. The time for Defendant to file their replies in support of Defendant's aforementioned motions is extended until January 6, 2025. (Court Staff, stbd) Modified to add hyperlinks on 12/9/2024 (Court Staff, sjlg). (Entered: 12/06/2024) |
| 12/09/2024 | 34 | NOTICE OF APPEAL as to 25 Order on Motion for Preliminary Injunction filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 12/09/2024) |
| 12/10/2024 | 35 | Preliminary Record of appeal sent to USCA and counsel re 34 Notice of Appeal (Attorney) **The procedures and appeals forms may be obtained from the U.S. Court of Appeals website: www.ca10.uscourts.gov.** (Attachments: # 1 Preliminary Record on Appeal Including Notice of Appeal) (Court Staff, semt) (Entered: 12/10/2024) |
| 12/13/2024 | 36 | Appeal Number **24–8084** received from USCA for 34 Notice of Appeal (Attorney) filed by Frederick William Cubin, III. (Court Staff, semt) (Entered: 12/13/2024) |
| 12/20/2024 | 37 | USCA Appeal Fee received $605 receipt number 2–4030 re 34 Notice of Appeal filed by Frederick William Cubin, III (Court Staff, stmo) (Entered: 12/20/2024) |
| 12/20/2024 | 38 | RESPONSE in Opposition re 26 MOTION for Judgment *on the Pleadings* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 12/20/2024) |
| 12/20/2024 | 39 | RESPONSE in Opposition re 29 MOTION to Stay Discovery filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 12/20/2024) |
| 12/24/2024 | 40 | First TRANSCRIPT REQUEST (Transcripts Needed) by Plaintiff Frederick William Cubin, III re 34 Notice of Appeal (Attorney). (Melchior, D) Modified text and notified court reporter on 1/14/2025 (Court Staff, stbd). (Entered: 12/24/2024) |
| 12/26/2024 | 41 | (TEXT–ONLY) APPEAL ORDER from USCA as to 34 Notice of Appeal (Attorney) filed by Frederick William Cubin, III. Minute order filed – Transcript order form due |

| | | |
|---|---|---|
| | | 01/09/2025 for Megan Strawn.. (Text Only – No Attachment) [24–8084] (Preliminary Injunction hearing of 11/8/24) (Court Staff, semt) (Entered: 12/26/2024) |
| 01/06/2025 | 42 | REPLY to 38 Response in Opposition to Motion filed by Defendant Mark Gordon. (Monger, Brandi) (Entered: 01/06/2025) |
| 01/06/2025 | 43 | REPLY to 39 Response in Opposition to Motion *to Stay Discovery* filed by Defendants Wyoming Governor, Mark Gordon. (Miller, Timothy) (Entered: 01/06/2025) |
| 01/09/2025 | 44 | ORDER by the Honorable Scott P Klosterman granting 29 Motion to Stay Discovery. IT IS HEREBY ORDERED that all discovery in this matter is STAYED pending the resolution of Defendants Motion for Judgment on the Pleadings Pursuant to Rule 12(c) 26 . (Court Staff, sbrr) (Entered: 01/09/2025) |
| 01/15/2025 | 45 | TRANSCRIPT ORDER FORM by court reporter Megan Strawn. Transcripts due 11/25/24. (Strawn, Megan) (Entered: 01/15/2025) |
| 01/15/2025 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction held on 11/08/2024 before Judge Scott W. Skavdahl re 34 Notice of Appeal (Attorney). To purchase a copy of this transcript, please contact Court Reporter Megan Strawn, phone (307) 232–2626 or email strawnreporting@yahoo.com. A party must file a Notice of Intent to Request Redaction within 7 calendar days. If a party fails to request redaction, the unredacted transcript attached to this entry will be made available electronically without redaction. Notice of Intent to Redact due 1/22/2025. Notice of Redaction Request due 2/5/2025. Redacted Transcript Deadline set for 2/18/2025. Release of Transcript Restriction set for 4/15/2025. (Strawn, Megan) (Entered: 01/15/2025) |
| 01/15/2025 | 47 | Transcript Letter transmitted to USCA re 34 Notice of Appeal (Attorney). All transcripts that have been ordered from this reporter for this appeal are now filed with the United States District Court, District of Wyoming. (Strawn, Megan) (Entered: 01/15/2025) |
| 02/06/2025 | 48 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 1* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 49 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 2* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 50 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 3* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 51 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 4* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 52 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 5* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 53 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 6* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 54 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 7* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 55 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 8* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 56 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 9* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 57 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 10* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 58 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 11* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |
| 02/06/2025 | 59 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 12* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |

| 02/06/2025 | 60 | EXHIBIT in reference to 24 Motion Hearing, *Trial Exhibit 13* filed by Plaintiff Frederick William Cubin, III. (Dougherty, Buck) (Entered: 02/06/2025) |

### UNITED STATES DISTRICT COURT
### DISTRICT OF WYOMING
### CHEYENNE DIVISION

| | |
|---|---|
| DR. FREDERICK WILLIAM "ERIC" CUBIN III, | Case No. 1:24-cv-164 |
| *Plaintiff*, | |
| v. | **COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF AND MONETARY DAMAGES** |
| MARK GORDON, in both his personal and official capacities as Governor of Wyoming, | |
| *Defendant.* | **JURY TRIAL DEMANDED** |

### INTRODUCTION

1.  Plaintiff Dr. Eric Cubin is an experienced and accomplished Wyoming-licensed physician who also served on the Wyoming Board of Medicine until April of this year.

2.  On February 28, 2024, as a private citizen, Dr. Cubin sent an email to the entire Wyoming House of Representatives, in which he expressed his personal views in support of a proposed bill (known as "Chloe's Law") and criticized the Wyoming Medical Society's public position against the bill.

3.  Chloe's Law regulates certain gender-affirming surgeries for minors. Chloe's Law—for which Dr. Cubin expressed his personal support—eventually passed and became law.

4.  In his February 28 email to the legislators, Dr. Cubin stated: "I feel the need to advocate on my own behalf by coming to you directly with this information," and

App.009

that he was speaking "[f]rom the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born."

5.   On April 22, 2024, in response to Dr. Cubin's email to legislators—and despite signing Chloe's Law after it passed—Defendant Mark Gordon, the Governor of Wyoming, removed Dr. Cubin from the Wyoming Board of Medicine. Governor Gordon explicitly cited Dr. Cubin's email to the House of Representatives in support of Chloe's Law as the reason for his removal.

6.   In removing Dr. Cubin from the Wyoming Board of Medicine for expressing his personal views to the House of Representatives on a matter of public concern—Chloe's Law—Governor Gordon unlawfully retaliated against Dr. Cubin in violation of his First Amendment free speech rights and right to petition.

7.   This lawsuit seeks to vindicate Dr. Cubin's free speech rights and right to petition under the First Amendment of the U.S. Constitution, 42 U.S.C. § 1983, and the Wyoming State constitution.

## **PARTIES**

8.   Plaintiff Frederick William "Eric" Cubin III, M.D. is a citizen of Wyoming and resides in Casper, Wyoming. He is a licensed physician in the state of Wyoming and was a member of the Wyoming Board of Medicine from early 2024 until his removal on April 22, 2024.

9.   Defendant Mark Gordon is the Governor of Wyoming. Governor Gordon's office is located in Cheyenne, the capital and seat of government for the State of Wyoming. Dr. Cubin is suing Governor Gordon in both his personal and official

App.010

capacities. At all relevant times, Governor Gordon was acting under color of State law as the Governor of Wyoming.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this case raises federal claims in Counts I and II arising under 42 U.S.C. § 1983 and the First Amendment of the United States Constitution. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the Wyoming State constitutional claim in Count III because it is so related to the other federal claims that form part of the same case or controversy under Article III of the Constitution.

11. Plaintiff brings his claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, *Ex parte Young*, 209 U.S. 123 (1908), and the general legal and equitable powers of this Court. Plaintiff also seeks monetary damages as relief.

12. Venue is proper in this Court because Defendant's State government office is located in the District of Wyoming, Cheyenne Division, 28 U.S.C. § 1391(b)(1), and a substantial part of the events giving rise to Plaintiff's claims occurred in this district, 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. The Wyoming Board of Medicine

13. The Wyoming Board of Medicine (the "Board") is responsible for issuing and renewing licenses for physicians and other medical practitioners in Wyoming. Wyo. Stat. Ann. § 33-26-202.

3

14.  The Board oversees medical regulation, compliance, and discipline. Its duties include ensuring that physicians adhere to state laws governing medical practice, investigating complaints against medical professionals, conducting hearings, and taking disciplinary actions such as revoking or suspending medical licenses. *Id.*

15.  The Board typically consists of eight members, including five physicians.

16.  Members of the Board receive compensation for their service and are paid in the same manner and amount as members of the Wyoming legislature in accordance with State law. Wyo. Stat. Ann. § 33-26-203.

17.  The members of the Board are appointed by the Governor of Wyoming, with the advice and consent of the State senate. Wyo. Stat. Ann. § 33-26-201.

18.  Board members "shall serve at the pleasure of the governor." *Id.*

19.  "Board members shall serve four (4) year terms. No board member shall serve more than three (3) consecutive terms." Wyo. Stat Ann. § 33-26-201(b).

20.  Governor Gordon appointed Dr. Cubin to the Board in or around February of 2024.

21.  Dr. Cubin's term on the Board was to run through 2028 in accordance with Wyoming law.

**B. Chloe's Law**

22.  In early 2024, the Wyoming legislature was considering Senate File 99, also known as "Chloe's Law," which would prohibit certain gender-affirming procedures for minors in Wyoming.

23. Chloe's Law was named after Chloe Cole, an 18-year-old who began taking cross-sex hormones at 13 and underwent a double mastectomy at 15 in an attempt to transition from female to male.[1]

24. Chloe has since detransitioned and is deeply regretful of the gender-affirming care that medical professionals recommended to her family.[2]

25. Chloe testified before the Wyoming legislature, urging Wyoming to take a stand against gender-affirming surgeries, stating, "I didn't deserve this," and "No child in Wyoming deserves to be put through these cruelties or hardships."[3]

26. Additionally, a second detransitioner, Luka Hein, testified in support of Chloe's Law. At 16, Luka underwent surgery and hormone treatment. She now experiences ongoing physical complications and worries about her fertility. Luka testified that medical professionals coerced her parents into irreversible procedures and advocated for protecting minors from hasty and potentially harmful medical interventions.[4]

---

[1] Leo Wolfson, *National Activist Chloe Cole Testifies Against Transgender Treatments For Minors In Wyoming*, Cowboy State Daily (Feb. 21, 2024), *available* at https://cowboystatedaily.com/2024/02/21/chloes-law-namesake-testifies-for-a-wyoming-ban-on-transgender-treatments-for-minors/ (last visited Aug. 27, 2024).

[2] *Id.*

[3] *Id.*

[4] Clair McFarland, '*Groomed and Preyed Upon:' Detransitioner Who Had Double Mastectomy At 16 Shares Regret,* Cowboy State Daily (Feb. 3, 2023), *available* at https://cowboystatedaily.com/2023/02/03/groomed-and-preyed-upon-detransitioner-who-had-double-masectomy-at-16-shares-regret/ (last visited Aug. 27, 2024).

App.013

27. The Wyoming Medical Society ("WMS") publicly opposed Chloe's Law.

28. WMS is a voluntary organization that physicians are not required to join.

29. WMS publicly touts itself as a professional organization that serves the interests of medical practitioners in Wyoming.[5]

**C. Dr. Cubin's Email to the Wyoming House of Representatives**

30. Dr. Cubin, himself a member of WMS, disagreed with the organization's public opposition to Chloe's Law.

31. On February 21, 2024, Dr. Cubin emailed Sheila Bush, Executive Director of WMS, expressing his concerns about WMS's position on Chloe's Law.

32. Dr. Cubin thought it unlikely that WMS's stance reflected views of the vast majority of its members, and asked whether WMS could present physicians' views on both sides of the issue regarding Chloe's Law.

33. The day after Dr. Cubin sent his email, Ms. Bush responded to him, explaining WMS's position, but did not address his request for a more balanced presentation on Chloe's Law.

34. The following day, Dr. Kristopher Schamber, President of the WMS Board of Trustees, emailed Dr. Cubin, reiterating WMS's position but also failing to respond to Dr. Cubin's concerns that WMS did not fairly represent Wyoming's physicians.

---

[5] *See* https://www.wyomed.org/about/ (last visited Aug. 15, 2024).

App.014

35. On February 25, Dr. Cubin sent a detailed email to Dr. Schamber and the WMS Board, expressing his disagreement with WMS's position on Chloe's Law and once again requesting that WMS poll its physician members on the issue.

36. In further email exchanges with WMS leadership, Dr. Cubin again requested that WMS adjust its position to a more neutral stance.

37. On February 28, 2024, after receiving no satisfactory response from WMS leadership, Dr. Cubin sent an email from his personal email account to the entire Wyoming House of Representatives expressing his personal views in support of Chloe's Law and criticizing WMS's position against it. A true and accurate copy of that email is attached as **Exhibit 1**.

38. Dr. Cubin made very clear in his email that he was representing himself, and not WMS or the Wyoming Board of Medicine; he wrote that he was writing "from the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born."

39. In his email, Dr. Cubin stated that he believed WMS was not accurately representing the views of most Wyoming physicians.

40. Dr. Cubin did not claim in his email to be speaking on behalf of the Board.

41. As part of his official duties as a member of the Board, Dr. Cubin is not required to communicate by email, or otherwise, with the Wyoming House of Representatives.

App.015

42. Dr. Cubin's email to the Wyoming House of Representatives as a private citizen did not cause any disruption to the normal functioning of the Board in carrying out its official duties and obligations under Wyoming law.

43. Chloe's Law, Senate File 99, overwhelmingly passed, was signed by Governor Gordon, and enacted into law. *See* S.F. 99, 67th Leg., Budget Sess. (2024) (enacted).

**D. Governor Gordon's Response to Dr. Cubin's Speech**

44. On April 22, 2024, Governor Gordon sent a letter to Dr. Cubin stating that Gordon was removing Cubin from the Wyoming Board of Medicine. Attached as **Exhibit 2** is a true and correct copy of Governor Gordon's letter.

45. In his letter, Governor Gordon explicitly cited Dr. Cubin's "email to the members of the House of Representatives during this last legislative session regarding SF0099" as the reason for Dr. Cubin's removal from the Board.

46. Governor Gordon stated that Dr. Cubin's comments "could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice."

47. Governor Gordon wrote that "as an individual member of the Board, you would not be entitled to speak for the Board unilaterally."

48. Again, contrary to Governor Gordon's email, Dr. Cubin had not claimed to speak for the Board in his email to the Wyoming House of Representatives.

App.016

49. Governor Gordon stated in his letter that he was removing Dr. Cubin from the Board of Medicine, claiming that he "elected to relieve that member of the constraints board membership requires."

50. Governor Gordon's removal of Dr. Cubin from the Board for his email to the House of Representatives was unjustified and wholly without merit because his email to the House advocating for Chloe's Law did not result in the inefficient operation of the Board.

51. For example, previous Board members have actually testified before the Wyoming legislature on controversial medical issues—far more direct advocacy than Dr. Cubin's mere email to members of the House of Representatives—and never received similar retribution from the Governor.

52. Indeed, former Board member, Rene Hinkle, testified before the Wyoming legislature against giving life-saving care to infants born alive, and she was reappointed by the Governor to the Board after her testimony.[6]

53. But for his email to the House of Representatives expressing his personal views on Chloe's Law, Dr. Cubin would still be a member of the Wyoming Board of Medicine.

---

[6] Jonathan Lange, *The Board Of Medicine Exists To Protect Patients, Not Practitioners*, Cowboy State Daily (May 31, 2024), *available* at https://cowboystatedaily.com/2024/05/31/jonathan-lange-the-board-of-medicine-exists-to-protect-patients-not-practitioners/ (last visited Aug. 28, 2024).

54. As a member of the Board, Dr. Cubin always fulfilled his duties and obligations of overseeing medical professionals' licensure in a professional, unbiased, and clinical manner based on the merits alone.

55. Governor Gordon's removal of Dr. Cubin from the Board of Medicine has caused Dr. Cubin economic injury and harm to his professional reputation.

56. After being forced by Governor Gordon to resign from the Board, Dr. Cubin verbally resigned, which Governor Gordon accepted and made effective as of April 22, 2024, the same day as Gordon's letter to Dr. Cubin removing him from the Board.  Attached as **Exhibit 3** is a copy of Governor Gordon's acceptance letter.

## CLAIMS FOR RELIEF

### COUNT ONE
**42 U.S.C. § 1983 – First Amendment Retaliation**
**(Against Governor Gordon in his personal and official capacities)**

**Governor Gordon retaliated against Dr. Cubin because he exercised his First Amendment Free Speech Rights in communicating with the Wyoming House of Representatives and advocating for Chloe's Law**

57. Dr. Cubin incorporates the preceding paragraphs by reference.

58. The First Amendment states, "Congress shall make no law . . . abridging the freedom of speech." U. S. Const. amend. I.

59. In *Garcetti v. Ceballos*, the United States Supreme Court held that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." 547 U.S. 410, 417 (2006).

60. The Tenth Circuit has affirmed that "[w]hen government employees speak on matters of public concern, 'they must face only those speech restrictions that are

necessary for their employers to operate efficiently and effectively.'" *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 411).

61. While Dr. Cubin was appointed, and served at the pleasure and will of the Governor, the Tenth Circuit has held that the fact the "employment position was terminable at will does not diminish [a] First Amendment claim." *Andersen v. McCotter,* 100 F.3d 723, 726 (10th Cir. 1996).

62. The Supreme Court has also emphasized that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *see also Andersen,* 100 F.3d at 726.

63. To determine whether a government employee's speech is protected by the First Amendment, courts in the Tenth Circuit apply the *Garcetti/Pickering* five-step framework. *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014).

64. The first three steps of that framework consider: (1) whether the individual's speech occurred within the scope of employment; (2) whether the speech was about a matter of public concern; and (3) whether the government's interests in promoting efficiency outweigh the plaintiff's free speech rights. *Id*., at 1165.

65. The "ultimate question" in determining whether an individual's speech was within the scope of his employment is "whether the employee speaks as a citizen or

11

instead as a government employee—an individual acting 'in his or her professional capacity.'" *Brammer-Hoelter*, 492 F.3d at 1203 (quoting *Garcetti*, 574 U.S. at 422).

66. Political speech "undoubtedly" does "touch upon a matter of public concern." *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002).

67. And Chloe's Law was a matter of public concern.

68. In his email to Wyoming legislators, Dr. Cubin made clear that he was speaking as a private citizen—*not* in his professional role as a member of the Board.

69. Dr. Cubin's speech (and email) was political in nature because it touched upon a pending piece of legislation.

70. Dr. Cubin's email did not in any way impair the efficiency or functioning of the Wyoming Board of Medicine.

71. The final two *Garcetti/Pickering* factors are about causation: (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Trant*, 754 F.3d at 1165.

72. As stated above, Governor Gordon explicitly wrote to Dr. Cubin that Dr. Cubin's "email to the members of the House of Representatives during this last legislative session regarding SF0099" was the reason why he removed Dr. Cubin from the Board of Medicine.

73. But for Dr. Cubin exercising his First Amendment right to engage in political speech as a private citizen, Governor Gordon would not have removed Dr. Cubin from his position on the Board.

App.020

74. Governor Gordon's act of sending his **Exhibit 2** letter to Dr. Cubin would cause a person on the Board of ordinary firmness to refrain from further speaking out in the future to the Wyoming House of Representatives as a private citizen on a matter of public concern, such as pending legislation like Chloe's Law.

75. Because Governor Gordon deprived Dr. Cubin of his First Amendment right to free speech, Dr. Cubin is entitled to a preliminary and permanent injunction ordering Governor Gordon in his official capacity to restore Dr. Cubin to his position on the Board.

76. Dr. Cubin is further entitled to a declaratory judgment declaring that Governor Gordon in his official capacity violated Dr. Cubin's First Amendment free speech rights under the *Garcetti/Pickering* framework.

77. Dr. Cubin is also entitled to monetary damages against Governor Gordon in his personal capacity for the deprivation of Dr. Cubin's First Amendment free speech rights.

78. The Tenth Circuit has stated that "[t]he law has been clearly established since 1968 that public employees may not be discharged in retaliation for speaking on matters of public concern, absent a showing that the government employer's interest in the efficiency of its operations outweighs the employee's interest in the speech." *Andersen,* 100 F.3d at 729.

79. Therefore, at the time of Governor Gordon's letter to Dr. Cubin, it was clearly established law under the Tenth Circuit's application of the *Garcetti/Pickering* framework that Governor Gordon could not take any adverse action against Dr.

App.021

Cubin for his email and protected speech that he expressed to the Wyoming House of Representatives in advocating for Chloe's Law.

### COUNT TWO
### 42 U.S.C. § 1983 – First Amendment Retaliation
### (Against Governor Gordon in his personal and official capacities)

**Governor Gordon retaliated against Dr. Cubin because he exercised his First Amendment right to petition the Wyoming House of Representatives by expressing his ideas, hopes, and concerns about Chloe's Law**

80. Dr. Cubin incorporates the preceding paragraphs by reference.

81. The Supreme Court has affirmed that the "right to petition [is] one of the most precious of the liberties safeguarded by the Bill of Rights." *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (internal quotation marks omitted).

82. To establish a claim of unlawful retaliation for exercising their First Amendment right to petition, a government employee must show "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir.2000)).

83. The right to petition "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). This fundamental right is "not limited to petitions lodged under formal procedures." *Id.* at 393.

14

84. Therefore, Dr. Cubin's email to the Wyoming House of Representatives expressing his ideas and hopes about Chloe's Law and concerns about testimony opposing Chloe's Law is constitutionally protected activity.

85. Serving on the Board provided Dr. Cubin with a leadership position in medical ethics, recognition within the medical community, and compensation in the same manner as members of the Wyoming House.

86. By being removed from the Board, Dr. Cubin suffered injury, including the loss of personal, professional, and financial benefits associated with a Board position.

87. Governor Gordon's act of sending the **<u>Exhibit 2</u>** letter to Dr. Cubin would cause a person on the Board of ordinary firmness to refrain from further exercising their right in the future to petition the Wyoming House of Representatives as a private citizen on a matter of public concern, such as pending legislation like Chloe's Law.

88. As described above, Governor Gordon explicitly stated in his **<u>Exhibit 2</u>** letter that his adverse action removing Dr. Cubin from the Board was motivated by his email petitioning the House of Representatives to vote in favor of Chloe's Law.

89. Because Governor Gordon deprived Dr. Cubin of his First Amendment right to petition, Dr. Cubin is entitled to a preliminary and permanent injunction ordering Governor Gordon in his official capacity to restore Dr. Cubin to his position on the Wyoming Medical Board.

90. Dr. Cubin is further entitled to a declaratory judgment declaring that Governor Gordon in his official capacity violated Dr. Cubin's First Amendment right to petition.

91. Dr. Cubin is also entitled to monetary damages against Governor Gordon in his individual capacity for the deprivation of his First Amendment right to petition.

92. At the time of Governor Gordon's **Exhibit 2** letter to Dr. Cubin, it was clearly established law under Supreme Court precedent that the First Amendment right to petition "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives[.]" *Borough*, 564 U.S. at 388.

93. Therefore, Governor Gordon could not take any adverse action against Dr. Cubin for exercising his right to petition the Wyoming House of Representatives about Chloe's Law.

## COUNT THREE
### (Against Governor Gordon in his official capacity)
### Wyoming State Constitution, Article I, Sections 20 & 21

### Governor Gordon violated Dr. Cubin's free speech rights and right to petition under the Wyoming State constitution

94. Dr. Cubin incorporates the preceding paragraphs by reference.

95. Article 1, Section 20 of the Wyoming constitution provides that "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court."

16

96. Article 1, Section 21 of the Wyoming constitution provides that, "The right of petition, and of the people peaceably to assemble to consult for the common good, and to make known their opinions, shall never be denied or abridged."

97. The Wyoming State constitution "is broader than that found in the First Amendment to the United States Constitution in that it also guarantees the right to publish which includes the right not only to speak and to write but also to make the same known." *Tate v. Akers*, 409 F. Supp. 978, 981–82 (D. Wyo. 1976) (citing *South Holland v. Stein*, 373 Ill. 472, 26 N.E.2d 868 (1940)).

98. By removing Dr. Cubin from the Board in retaliation for engaging in protected free speech and his right to petition, Governor Gordon violated Dr. Cubin's rights under Article 1, Sections 20 and 21 of the Wyoming constitution.

99. Dr. Cubin has suffered reputational and professional harm as a licensed Wyoming physician formerly in good standing as a member on the Board, arising from Governor Gordon's adverse actions.

100. Therefore, Dr. Cubin is entitled to declaratory and injunctive relief against Governor Gordon for violating his free speech rights and right to petition under the Wyoming State constitution.

## **PRAYER FOR RELIEF**

Plaintiff Dr. Eric Cubin respectfully requests that this Court provide the following relief:

A.     Under Counts I, II, and III a preliminary and permanent injunction ordering Governor Gordon to restore Dr. Cubin to his position on the Wyoming Board of Medicine;

B.     Under Counts I, II, and III a declaratory judgment declaring that Governor Gordon violated Dr. Cubin's free speech rights and right to petition under the First Amendment and Article I, Sections 20 & 21 of the Wyoming constitution;

C.     Under Counts I and II, monetary damages against Governor Gordon in his personal capacity in an amount to be determined at trial;

D.     A jury to be empaneled;

E.     Attorney's fees and costs as a prevailing party under Counts I and II pursuant to 42 U.S.C. § 1988; and

F.     All further relief that the Court deems just, proper, or equitable.


Dated: August 29, 2024                    Respectfully submitted,


                                          s/ D. Stephen Melchior
                                          D. Stephen Melchior
                                          Melchior Law Firm, P.C.
                                          2010 Warren Avenue
                                          Cheyenne, WY 82001
                                          (307) 637-2323 - telephone
                                          steve@melchlaw.com

18

M.E. Buck Dougherty III*
LIBERTY JUSTICE CENTER
13341 W. U.S. Highway 290
Building 2
Austin, TX 78737
(512) 481-4400 - telephone
bdoughherty@libertyjusticecenter.com

*Pro hac vice admission forthcoming*

*Attorneys for Plaintiff Dr. Eric Cubin*

App.027

# Exhibit 1

**From:** Eric Cubin <ecubin@gmail.com>
**Subject: Chloe's Law and WMS**
**Date:** February 28, 2024 at 10:01:25 PM MST
**To:** Lane.Allred@wyoleg.gov, Ocean.Andrew@wyoleg.gov, Bill.Allemand@wyoleg.gov, Abby.Angelos@wyoleg.gov, Dalton.Banks@wyoleg.gov, John.Bear@wyoleg.gov, Ryan.Berger@wyoleg.gov, Landon.Brown@wyoleg.gov, Donald.Burkhart@wyoleg.gov, Andrew.Byron@wyoleg.gov, Forrest.Chadwick@wyoleg.gov, Ken.Chestek@wyoleg.gov, Ken.Clouston@wyoleg.gov, Jon.Conrad@wyoleg.gov, Barry.Crago@wyoleg.gov, Bill.Henderson@wyoleg.gov, Bob.Davis@wyoleg.gov, John.Eklund@wyoleg.gov, Jeremy.Haroldson@wyoleg.gov, steve.harshman@wyoleg.gov, Scott.Heiner@wyoleg.gov, Ben.Hornok@wyoleg.gov, Mark.Jennings@wyoleg.gov, Chris.Knapp@wyoleg.gov, Lloyd.Larsen@wyoleg.gov, JT.Larson@wyoleg.gov, Martha.Lawley@wyoleg.gov, Tony.Locke@wyoleg.gov, Chip.Neiman@wyoleg.gov, Sandy.Newsome@wyoleg.gov, Bob.Nicholas@wyoleg.gov, Tony.Niemiec@wyoleg.gov, Ember.Oakley@wyoleg.gov, Jared.Olsen@wyoleg.gov, Pepper.Ottman@wyoleg.gov, Jerry.Obermueller@wyoleg.gov, David.Northrup@wyoleg.gov, kevin.ohearn@wyoleg.gov, Trey.Sherwood@wyoleg.gov, Rachel.Rodriguez-Williams@wyoleg.gov, Sarah.Penn@wyoleg.gov, Ken.Pendergraft@wyoleg.gov, Daniel.Singh@wyoleg.gov, Karlee.Provenza@wyoleg.gov, Allen.Slagle@wyoleg.gov, Scott.Smith@wyoleg.gov, Albert.Sommers@wyoleg.gov, Clark.Stith@wyoleg.gov, Liz.Storer@wyoleg.gov, Tomi.Strock@wyoleg.gov, Clarence.Styvar@wyoleg.gov, Reuben.Tarver@wyoleg.gov, Tamara.Trujillo@wyoleg.gov, Tom.Walters@wyoleg.gov, Jeanette.Ward@wyoleg.gov, Art.Washut@wyoleg.gov, Cyrus.Western@wyoleg.gov, John.Winter@wyoleg.gov, Cody.Wylie@wyoleg.gov, Mike.Yin@wyoleg.gov, dan.zwonitzer@wyoleg.gov, Dave.Zwonitzer@wyoleg.gov

My name is Eric Cubin.  I am a physician in Casper.  I am writing you today for a couple reasons.  This email was originally written with the intent of sending it to the cosponsors of SF 99, Chloe's law.  After considering it for some time, I've decided to expand the audience to the entire House of Representatives because I think you all need to know what is happening.

First and foremost, I want to say thank you.  Thank you for spending your time and energy in an effort to keep Wyoming the last great place!

Second, I'm writing you because of SF 99, Chloe's Law.  There is a situation that has arisen that I want to make you aware of.  In addition, I would like to present each of you with some information that you may not otherwise be provided.

It saddens me very much to have to report that, under their current leadership, the Wyoming Medical Society has been essentially hijacked by the far left.  It seems that they have decided to prioritize politics over their stated mission of physician advocacy.  In my opinion, they have adopted and embraced "woke" positions that are not congruent with the thoughts and opinions of the majority of their physician members.  In essence, I have lost all confidence in their ability or desire to faithfully represent the physicians in this state.

Please allow me to give you an example.  WMS seems to have teamed up with the American Association of Pediatricians in opposing SF 99.  Quite frankly, I refuse to believe that the majority of physicians in this very conservative state agree with this position - and we were never polled.  This position was established by several very vocal, extremely liberal members of the Board.  The position was then made public as though it actually represents the thoughts and beliefs of physicians in Wyoming when, in fact, that is probably not true.

In their opposition to Chloe's Law, the WMS has partnered with Dr. Sanderson, a pediatrician from Sheridan, who is the President of the WyAAP.  Dr. Sanderson has effectively delivered the position of his organization but he has failed to tell you that there is another pediatric professional society that has taken an opposite position, the American College of Pediatricians (ACP).  It turns out, the ACP put out a position statement that was revised February 5th, 2024, which reads in part:

"The ACPeds cannot condone the social affirmation, medical intervention, or surgical mutilation of children and adolescents identifying as transgender or gender nonconforming."

You can find the full text to their position statement at:

https://acpeds.org/position-statements/mental-health-in-adolescents-with-incongruence-of-gender-identity-and-biological-sex

The ACP created another germane position statement in 2018 which is worth reviewing and can be found at:

https://acpeds.org/position-statements/gender-dysphoria-in-children

You need to know that Dr. Sanderson (and presumably the WMS leadership) were aware of these ACP positions and yet they were ignored and suppressed when the WMS position was established.  Further, I presume that you have only been provided with the WMS/AAP position and not the ACP position statements.  As I have communicated to the entire WMS Board, it is not acceptable to only present one side of an issue in an effort to effect change in social policy.

For further illustration of the WMS's embracing of the woke transgender movement, I would also invite you to look at their Spring 2023 issue of "Wyoming Medicine" magazine.  In this particular issue they feature "Gender Affirming Care" on the cover and in a feature article.  I have no idea why the WMS has elected to take this unnecessary position that is so clearly contrary to the viewpoint of the majority of their members.

You can find the Spring 2023 edition of "Wyoming Medicine" here:

https://www.wyomed.org/wp-content/uploads/2023/05/23-WMS-0012_Spring2023_digital.pdf

I want to be very clear that the WMS membership was never polled on their opinions of "Gender Affirming Care" even though I have implored the leadership to do so.  It feels very much like the leadership at WMS has inserted their opinions in hopes that the WMS membership would not notice or speak up.

At this point, the strongest argument that I've heard in favor of killing this bill, as Dr. Sanderson referred to in his Senate testimony, is that the legislature should not do anything to interfere with the doctor patient relationship.  At face value, I agree with that wholeheartedly.   That being said, there are some instances in which, for the safety of the public, it would be completely appropriate and reasonable for the legislature to make rules governing what is and is not acceptable in our society.  For example, if a physician moved into our state and started performing physician-assisted suicide, should that be allowed because it falls under the doctor-patient relationship?

Another example that I would offer for your consideration is that of child abuse.  All physicians are legally and morally required to report any instance in which we suspect child abuse.  Why?  Is that government overreach?  Does that violate the doctor patient relationship?  Obviously, we all do that to protect our youth.  "Gender affirming care" with the use of puberty blockers and hormones in a patient with normal physiology takes a patient who is normal and makes them abnormal.  How can that be viewed as anything but harmful?  This is particularly true in young people who are impressionable and whose brains have not developed sufficiently to make decisions such as these - and it will likely have negative effects on them later in life.  When it comes to gender affirming care in children, we can protect them by not allowing them to engage in it.

I think it is important for you to know that I have aggressively tried to address this situation with the WMS Board over the last couple days.  I was given an assurance earlier today that the WMS Board will be holding an executive session of some kind to determine if they will be changing their position from opposing this bill to a neutral position.  At this time, I have not been given any assurance that the WMS will be changing their position, so I feel the need to advocate on my own behalf by coming to you directly with this information.  It is entirely possible that when this bill is considered in committee and on the floor that the WMS position may have been changed to neutral.  Up to this point, however, they have not changed their position to neutral.

From the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born, I can tell you that this is a good bill.  Please do not kill it, combine it, or amend it into oblivion.  This is very clearly an instance where it is completely appropriate and reasonable for all of you to stand up and say "we don't do that here".

Thank you again for all that you are doing for the citizens of Wyoming and for considering my concerns.  I hope that you find the information presented above helpful in promoting and passing SF 99.  Please feel free to reach out to me if you have any questions or concerns.

God Bless,
Eric Cubin MD, MS

# Exhibit 2

Page: 32    Date Filed: 03/26/2025    Document: 26-1    Appellate Case: 24-8084



April 22, 2024

Dr. Frederick Cubin III
Casper, WY

*Delivered via email*

Dear Dr. Cubin,

I have been made aware of your email to the members of the House of Representatives during this last legislative session regarding SF0099 in which you strongly encouraged the members to pass this legislation and criticized the Wyoming Medical Society's opposition to the bill. I certainly appreciate your position on this issue and respect your right to impart it to the Legislature. Nonetheless, no matter what anyone's personal expressed beliefs may be, it is important that the professionals governed by the Board of Medicine have confidence that board members prosecute their responsibilities on the board in an objective and unbiased way. I believe your comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice. Medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone. Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality.

I am certain you would understand that while you certainly are entitled to your First Amendment right to free speech, as an individual member of the Board, you would not be entitled to speak for the Board unilaterally. Nevertheless, some may not appreciate that your personal comments might not necessarily be those of the Board as a whole. It has never been my intention to inhibit your own ability to express your views unabashedly or to confuse anyone's personal opinions and beliefs with those of any of our boards. Therefore, as I have done before, when a member of a board chooses to express personal beliefs in a way that can be construed as speaking for the body, I have elected to relieve that member of the constraints board membership requires.

Therefore, in this instance, sadly, I believe it is best to remove you from the Board of Medicine. I wish you all the best in your future endeavors and urge you to continue to advocate for your beliefs.

Sincerely,

*Thank you for your service on this board.*

Mark Gordon
Governor

cc:    Kevin Bohnenblust, Executive Director of Wyoming Board of Medicine
       Valerie Mockensturm, President of Wyoming Board of Medicine

# Exhibit 3



Page: 34

Date Filed: 03/26/2025

Document: 26-1

Appellate Case: 24-8084

April 29, 2024

Dr. Frederick Cubin III
2441 Fairwood Common Avenue
Casper, WY  82609

Dr. Cubin,

I am writing to formally acknowledge receipt of your resignation from the Wyoming Board of
Medicine, which you communicated verbally on Monday, April 22, 2024 and confirmed in
writing on Friday, April 26, 2024.  Your resignation is effective April 22, 2024.

Thank you for your service to the State of Wyoming.  I wish you well with your future
endeavors.

Sincerely,

Mark Gordon
Governor

MG:gf

cc:     Kevin Bohnenblust, Executive Director of Wyoming Board of Medicine

Timothy W. Miller, Bar No. 5-2704
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-5820
(307) 777-8920 Facsimile
tim.miller@wyo.gov

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

DR. FREDERICK WILLIAM "ERIC"       )
CUBIN III,                          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Case No. 24-CV-00164
                                    )
MARK GORDON, in both his personal and )
official capacities as Governor of Wyoming, )
                                    )
            Defendants.             )

---

## ANSWER

---

Defendant Governor Mark Gordon, in his individual and official capacities, hereby answers

the Complaint and states as follows:

## <u>INTRODUCTION</u>

1.        Defendant admits that plaintiff was a member of the Wyoming Board of Medicine

until his resignation therefrom on April 22, 2024.  Defendant lacks knowledge or information

sufficient to form a belief about the truth of the remaining allegations of paragraph 1 and, therefore,

denies those allegations.

2.        The referenced email, attached as Exhibit "1" to the complaint, speaks for itself.

Defendant admits that plaintiff made allegations against the other physicians in the referenced

email.  Defendant denies that paragraph 2 accurately or completely set forth the terms of the email.

3.     The first sentence of paragraph 3 sets forth a legal conclusion to which no response is required.  Defendant admits that Senate File 99 passed, was signed by defendant and became law effective July 1, 2024.  Defendant otherwise denies the allegations of paragraph 3.

4.     The referenced email speaks for itself.  Defendant denies that paragraph 4 accurately or completely sets forth its terms.

5-7.     Defendant denies the allegations of paragraphs 5 through 7.

## PARTIES

8.     Defendant denies plaintiff was removed from the Wyoming Board of Medicine. Defendant admits that plaintiff served on the Board of Medicine, including during the period alleged in paragraph 8, until his resignation on April 22, 2024.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 8 and, therefore, denies those allegations.

9.     Defendant admits the allegations of paragraph 9.

## JURISDICTION AND VENUE

10-11.     Paragraphs 10 and 11 state legal conclusions to which no response is required. To the extent any allegations are made therein against defendant, they are denied.  Defendant denies that the Court has subject matter jurisdiction under the Eleventh Amendment to the United States Constitution.

12.     Defendant admits the allegations of paragraph 12.

## FACTUAL ALLEGATIONS

### A. The Wyoming Board of Medicine

13-17.     Defendant admits the allegations of paragraphs 13 through 17 to the extent they are consistent with the cited statutes.  Defendant denies those allegations to the extent they are

2

inconsistent with the cited statutes.

18-20.    Defendant admits the allegations of paragraphs 18 through 20.

21.    Defendant denies the allegations of paragraph 21.

**B. Chloe's Law**

22.    Defendant admits the allegations of paragraph 22 to the extent they are consistent with Senate File 99.  Defendant denies the allegations of paragraph 22 to the extent they are not stated in, or consistent with, the referenced bill.

23-29.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraphs 23 through 29 and, therefore, denies those allegations.

**C. Dr. Cubin's Email to the Wyoming House of Representatives**

30.    Defendant admits the allegations of paragraph 30.

31-36.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraphs 31 through 36 and, therefore, denies those allegations.

37.    Defendant admits that plaintiff sent the referenced email after receiving no response from other physicians that satisfied him.  Defendant admits that plaintiff sent an email to members of the Wyoming House of Representatives on February 28, 2024, a copy of which is attached to the complaint as Exhibit "1".  Defendant denies paragraph 37 accurately or completely sets forth its terms.

38-40.    The referenced email speaks for itself.  Defendant denies that paragraphs 38 through 40 accurately or completely set forth its terms.

41.    Defendant admits the allegations of paragraph 41.

42.    Defendant denies the allegations of paragraph 42.

43.    Defendant admits that Senate File 99 passed, was signed by the Governor and

App.037

enacted into law effective July 1, 2024.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of paragraph 43 and, therefore, denies those allegations.

**D. Governor Gordon's Response to Dr. Cubin's Speech**

44.      Defendant admits that a copy of the referenced letter is attached to the complaint as Exhibit "2".  The referenced letter speaks for itself.  Defendant denies that paragraph 44 accurately or completely sets forth its terms.

45.      Defendant denies the allegations of paragraph 45.

46.      Defendant admits the allegations of paragraph 46.

47.      The referenced letter speaks for itself.  Defendant denies that paragraph 47 accurately or completely sets forth its terms.

48.      The referenced email speaks for itself.  Defendant denies that paragraph 48 accurately or completely sets forth its terms.

49.      The referenced letter speaks for itself.  Defendant denies that paragraph 49 accurately or completely sets forth its terms.

50-51.    Defendant denies the allegations of paragraphs 50 and 51.

52.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 52 and, therefore, denies those allegations.

53.      Defendant denies the allegations of paragraph 53.

54.      Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 54 and, therefore, denies those allegations.

55.      Defendant denies the allegations of paragraph 55.

56.      Defendant admits that plaintiff resigned from the Wyoming Board of Medicine

4

on April 22, 2024.  Defendant admits that plaintiff communicated his resignation again on April 26, 2024 by e-mail, a true and correct copy of which is submitted herewith as Exhibit "A".  Defendant admits that Exhibit "3" is a copy of a letter to plaintiff, which speaks for itself.  Defendant denies that paragraph 56 accurately or completely sets forth the terms of the letter.  Defendant denies that plaintiff was forced to resign and denies any remaining allegations of paragraph 56.

## CLAIMS FOR RELIEF

### COUNT ONE
### 42 U.S.C. § 1983 – First Amendment Retaliation
### (Against Governor Gordon in his personal and official capacities)

**Governor Gordon retaliated against Dr. Cubin because he exercised his First Amendment Free Speech Rights in communicating with the Wyoming House of Representatives and advocating for Chloe's Law**

57.      Defendant repeats and incorporates by this reference the responses set forth above.

58.      Defendant admits that paragraph 58 accurately quotes a portion of the First Amendment.

59-67.    Paragraphs 59 through 67 state legal conclusions to which no response is required.  To the extent any allegations are made therein against defendant, they are denied.

68.      Defendant denies the allegations of paragraph 68.

69.      Defendant admits that the referenced email refers to a pending piece of legislation.  Defendant denies the remaining allegations of paragraph 69.

70.      Defendant denies the allegations of paragraph 70.

71.      Paragraph 71 states legal conclusions to which no response is required.  To the extent any allegations are made therein against defendant, they are denied.

72-77.    Defendant denies the allegations of paragraphs 72 through 77.

78-79.    Paragraphs 78 and 79 state legal conclusions to which no response is required. To the extent any allegations are made therein against defendant, they are denied.

## COUNT TWO
### 42 U.S.C. § 1983 – First Amendment Retaliation
### (Against Governor Gordon in his personal and official capacities)

**Governor Gordon retaliated against Dr. Cubin because he exercised his First Amendment Free Speech right to petition the Wyoming House of Representatives by expressing his ideas, hopes, and concerns about Chloe's Law**

80.    Defendant repeats and incorporates by this reference the responses set forth above.

81-84.    Paragraphs 81 through 84 state legal conclusions to which no response is required.  To the extent any allegations are made therein against defendant, they are denied.

85.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations of paragraph 85 and, therefore, denies those allegations.

86.    Defendant denies that plaintiff was removed from the Wyoming Board of Medicine. As admitted by plaintiff in this lawsuit, he resigned from the Wyoming Board of Medicine.  Defendant denies the remaining allegations of paragraph 86.

87-91.    Defendant denies the allegations of paragraphs 87 through 91.

92-93.    Paragraphs 92 and 93 state legal conclusions to which no response is required. To the extent any allegations are made therein against defendant, they are denied.

App.040

**COUNT THREE**
**(Against Governor Gordon in his official capacity)**

**Governor Gordon violated Dr. Cubin's free speech rights and right to petition under the Wyoming State Constitution**

94.       Defendant repeats and incorporates by this reference the responses set forth above.

95-96.    Defendant admits the allegations of paragraphs 95 and 96.

97.       Paragraph 97 states legal conclusions to which no response is required.  To the extent any allegations are made therein against defendant, they are denied.

98.       Defendant denies that he removed plaintiff from the Wyoming Board of Medicine, in retaliation or otherwise.  As admitted by plaintiff in this lawsuit, he resigned from the Wyoming Board of Medicine.  Defendant denies the remaining allegations of paragraph 98.

99-100.   Defendant denies the allegations of paragraphs 99 and 100.

**PRAYER FOR RELIEF**

Defendant denies that plaintiff is entitled to any relief herein.  Defendant acted lawfully, properly and appropriately in this matter.

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

Qualified immunity bars plaintiff's 42 U.S.C. § 1983 claims against defendant in his individual capacity.

**THIRD AFFIRMATIVE DEFENSE**

The Court should abstain from taking or exercising jurisdiction over this matter.

## <u>FOURTH AFFIRMATIVE DEFENSE</u>

This action is barred by the Eleventh Amendment immunity.

WHEREFORE, defendant requests that the Court dismiss this matter with prejudice, plaintiff taking nothing hereby, award defendant his costs incurred herein and grant defendant such other and further relief as the Court deems proper.

DATED this 19th day of September, 2024.

> */s/Timothy W. Miller*
> Timothy W. Miller, Bar No. 5-2704
> Senior Assistant Attorney General
> Wyoming Attorney General's Office
> 109 State Capitol
> Cheyenne, Wyoming 82002
> (307) 777-5820
> (307) 777-8920 Facsimile
> tim.miller@wyo.gov
>
> Attorney for Defendant

App.042

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that on this 19th day of September, 2024, a true and correct copy of the foregoing **Answer** was served as indicated below:

D. Stephen Melchior                              [✓] CM/ECF
Melchior Law Firm, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
steve@melchlaw.com


                                             /s/Kailie D. Harris
                                             Kailie D. Harris, Paralegal
                                             Office of the Wyoming Attorney General

App.043

I hereby resign from the Wyoming State Board of Medicine effective immediately.

Eric Cubin

Sent from my iPhone

On Apr 23, 2024, at 2:27 PM, Betsy Anderson <betsy.anderson@wyo.gov> wrote:

[Quoted text hidden]
E-Mail to and from me, in connection with the transaction
of public business, is subject to the Wyoming Public Records
Act and may be disclosed to third parties.

EXHIBIT A

D. Stephen Melchior (WY Bar No. #5-2885)
MELCHIOR LAW FIRM, P.C.
2010 Warren Avenue
Cheyenne, WY  82001
Phone: (307) 637-2323
Fax: (307) 637-2313
steve@melchlaw.com

M.E. Buck Dougherty III *
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
Phone: (512) 481-4400
bdougherty@libertyjusticecenter.org

*Pro hac vice forthcoming

*Attorney for Plaintiff Dr. Eric Cubin*

**UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING
CHEYENNE DIVISION
No. 1:24-cv-164**

| | |
|---|---|
| DR. FREDERICK WILLIAM "ERIC" CUBIN III, | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| *Plaintiff,* | |
| v. | |
| MARK GORDON, in both his personal and official capacities as Governor of Wyoming, | **\*REQUEST FOR ORAL ARGUMENT AT THE COURT'S DISCRETION PURSUANT TO LOCAL RULE 7.1(a)** |
| *Defendant.* | |

1

Plaintiff Dr. Eric Cubin files this motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) and Local Rule 7.1(b)(2), against Defendant Governor Mark Gordon.

In support of this Motion, Dr. Cubin relies upon the: (1) Complaint, ECF No. 1, and supporting exhibits (ECF No.'s 1-1 through 1-3); (2) Brief pursuant to Local Rule 7.1(b)(2)(A) filed contemporaneously herewith; (3) Declaration of Dr. Cubin filed with this Motion; and the entire record in this case.

As more fully set forth in his Brief, Plaintiff Dr. Eric Cubin states as follows:

1. Dr. Cubin is an accomplished Wyoming-licensed physician who also served on the Wyoming Board of Medicine until April of this year. In February, Dr. Cubin sent an email as a private citizen to all members of the Wyoming House of Representatives, in which he expressed his personal views in support of a proposed bill known as "Chloe's Law."

2. In his email to the legislators, Dr. Cubin criticized the Wyoming Medical Society's public position against Chloe's Law. And the Wyoming legislature agreed with Dr. Cubin's position on the proposed bill: Chloe's Law overwhelmingly passed, and the Governor signed it into law.

3. But then shortly thereafter, Defendant Governor Mark Gordon—despite signing Chloe's Law after it passed—removed Dr. Cubin from the Wyoming Board of Medicine because of his email that he sent to the House of Representatives in support of Chloe's Law.

4. In removing Dr. Cubin from the Wyoming Board of Medicine for expressing

his personal views to the House of Representatives on a matter of public concern—
Chloe's Law—Governor Gordon unlawfully retaliated against Dr. Cubin in violation
of his First Amendment free speech rights and right to petition the government.
*Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014); *Garcetti v. Ceballos*, 547
U.S. 422 (2006); *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Van Deelen v.
Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007).

5. Governor Gordon's unconstitutional actions injured Dr. Cubin in ways that
are continuous and ongoing.

6. Dr. Cubin suffered irreparable injury as a result of his removal from the
Board, including the loss of his First Amendment rights.

7. A preliminary injunction is warranted to restore Dr. Cubin to the Wyoming
Board of Medicine before the Governor's unconstitutional actions, which was the
"last peaceable uncontested status existing between the parties before the dispute
developed." *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005).

8. And the Court should exercise its discretion and waive the bond requirement
under Fed. R. Civ. P. 65(c). *See Winnebago Tribe v. Stovall*, 341 F.3d 1202, 1206
(10th Cir. 2003). Moreover, pursuant to Local Rule 7.1(a) at the Court's discretion,
Dr. Cubin requests leave to present oral argument in support of his Motion.

## **REQUEST FOR RELIEF**

WHEREFORE, Dr. Cubin respectfully requests that the Court issue a
preliminary injunction ordering Governor Gordon to restore him to his position on
the Wyoming Board of Medicine pending the outcome of trial.

App.047

Dated: October 1, 2024                     Respectfully submitted,

                                           /s/ D. Stephen Melchior
                                           D. Stephen Melchior
                                           Melchior Law Firm, P.C.
                                           2010 Warren Avenue
                                           Cheyenne, WY 82001
                                           (307) 637-2323 - telephone
                                           steve@melchlaw.com

                                           M.E. Buck Dougherty III*
                                           LIBERTY JUSTICE CENTER
                                           7500 Rialto Blvd.
                                           Suite 1-250
                                           Austin, TX 78735
                                           (512) 481-4400 – telephone
                                           bdougherty@libertyjusticecenter.org

                                           *Pro hac vice admission forthcoming*

                                           *Attorneys for Plaintiff Dr. Eric Cubin*

## CERTIFICATE OF SERVICE

I certify that the foregoing document and attachment were filed electronically with the Court's Case Management/Electronic Case Filing (CM/ECF) system. The Court and/or Clerk of Court may serve and give notice to Defendant's counsel by CM/ECF electronic transmission.

The 1st day of October 2024.

                                           /s/ D. Stephen Melchior
                                           D. Stephen Melchior

4

App.048

D. Stephen Melchior (WY Bar No. #5-2885)
MELCHIOR LAW FIRM, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
Phone: (307) 637-2323
Fax: (307) 637-2313
steve@melchlaw.com

M.E. Buck Dougherty III *
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
Phone: (512) 481-4400
bdougherty@libertyjusticecenter.org

*Pro hac vice forthcoming

*Attorney for Plaintiff Dr. Eric Cubin*

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING
## CHEYENNE DIVISION
### No. 1:24-cv-164

| | |
|---|---|
| DR. FREDERICK WILLIAM "ERIC" CUBIN III, <br><br> *Plaintiff,* <br><br> v. <br><br> MARK GORDON, in both his personal and official capacities as Governor of Wyoming, <br><br> *Defendant.* | **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iv

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

LEGAL STANDARD ..................................................................................................... 9

ARGUMENT .................................................................................................................. 9

   A. This Court should issue a preliminary injunction and order the Governor to restore Dr. Cubin to his position on the Wyoming Board of Medicine pending the outcome of trial. ........................................................................................................................ 9

   1. Dr. Cubin is likely to succeed on the merits of his federal Constitutional claims. ......... 12

     a. The Governor retaliated against Dr. Cubin and deprived him of his free speech rights under the First Amendment. ..................................................................... 13

       i. Dr. Cubin expressed only his personal opinions in his email about Chloe's Law for the legislators' consideration, and his email was not part of any official Board duties. ......................................................................................... 15

       ii. Dr. Cubin's comments on Chloe's Law addressed a matter of obvious public concern. ................................................................................................. 15

       iii. Dr. Cubin's speech did not interfere with the Board's work or its ability to function efficiently. ................................................................................... 18

       iv. Governor Gordon's letter explicitly stated he was removing Dr. Cubin from the Board because of his email to the House of Representatives about Chloe's Law. ....................................................................................... 19

       v. But for Dr. Cubin's speech and email to the Wyoming legislature, he would still have his position on the Board. ..................................................... 20

     b. Governor Gordon unlawfully retaliated against Dr. Cubin for exercising his First Amendment right to petition the government .................................................. 20

       i. Dr. Cubin expressed to the state legislature his ideas, hopes, and concerns about Chloe's Law ........................................................................................ 20

       ii. Governor Gordon's letter in response to Dr. Cubin reasonably chilled him from continuing to engage in such speech. ....................................................... 21

       iii. Governor Gordon's removal of Dr. Cubin was motivated by his email to the Wyoming House of Representatives. ........................................................... 22

   2. Dr. Cubin will be irreparably harmed absent a preliminary Injunction because he has lost his First Amendment rights. ................................................................ 23

   3. A preliminary injunction serves the public interest ....................................................... 23

   B. It is appropriate to waive the bond requirement under Rule 65(c). ................................. 24

App.050

CONCLUSION..................................................................................................... 24

CERTIFICATE OF COMPLIANCE .................................................................. 26

CERTIFICATE OF SERVICE ............................................................................ 27

App.051

## TABLE OF AUTHORITIES

**Cases**

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F. 3d 355 (4th Cir. 2012) ............... 10, 11

*Bass v. Richards*, 308 F.3d 1081 (10th Cir. 2002) ...................................... 19

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ............................... 21

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192
   (10th Cir. 2007) ................................................................. 14, 16

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) .................................... 17

*Connick v. Myers*, 461 U.S. 138  (1983) ............................................. 16

*Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780 (10th Cir. 1964) ........... 13

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ................................ 10

*Dixon v. Kirkpatrick*, 553 F.3d 1294 (10th Cir. 2009) ........................... 16, 17

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149
   (10th Cir. 2001) ..................................................................... 10

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................ 23

*Garcetti v. Ceballos*, 547 U.S. 422 (2006) .....................................passim

*Garcia v. Bd. of Educ.*, 777 F.2d 1403 (10th Cir. 1985) ............................. 23

*Gardetto v. Mason*, 100 F.3d 803 (10th Cir. 1996) ................................. 19

*Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953) ............ 13

*Holzemer v. City of Memphis*, 621 F.3d 512  (6th Cir. 2010) ...................... 21

*Lighton v. Univ. of Utah*, 209 F.3d 1213 (10th Cir. 2000) ...................... 16, 17

*Lundgrin v. Claytor*, 619 F.2d  61 (10th Cir. 1980) ................................ 13

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .......................... 21

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ....................... 23

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................ 9, 23

*Otero Sav. & Loan Asso. v. Fed. Res. Bank*, 665 F.2d 275 (10th Cir. 1981) ............ 13

*Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181 (10th Cir. 1975) ................... 10

*Pickering v. Board of Education*, 391 U.S. 563 (1968) ........................passim

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ...................... 24

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ............................................ 23

*Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005) ...................... 9, 10

*Snyder v. Phelps*, 562 U.S. 443 (2011)..................................................................... 16

*Trant v. Oklahoma*, 754 F.3d 1158 (10th Cir. 2014) ..........................................passim

*Tri-State Generation & Transmission Asso. v. Shoshone River Power, Inc.*,
    805 F.2d 351 (10th Cir. 1986) ................................................................. 10

*Van Deelen v. Johnson*, 497 F.3d 1151 10th Cir. 2007)................................. 20, 21, 22

*Virginia v. Hicks*, 539 U.S. 113 (2003) ........................................................ 13

*Winnebago Tribe v. Stovall*, 341 F.3d 1202 (10th Cir. 2003) ..................................... 24

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................ 9, 12

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir.2000)............................................ 20, 21, 22

**Statutes**

48 U.S.C. § 1983 ................................................................................... 12

Wyo. Stat Ann. § 33-26-201(b) .................................................................. 3

Wyo. Stat. Ann. § 33-26-201 .................................................................... 3

Wyo. Stat. Ann. § 33-26-202 .................................................................... 3

**Rules**

Fed. R. Civ. P. 65 .................................................................................. 9

**Other Authorities**

Leo Wolfson, *National Activist Chloe Cole Testifies Against Transgender
    Treatments For Minors In Wyoming*, Cowboy State Daily (Feb. 21, 2024),
    *available* at https://cowboystatedaily.com/2024/02/21/chloes-law-namesake-
    testifies-for-a-wyoming-ban-on-transgender-treatments-for-minors/...................... 4

Wyoming Medical Society, *About Wyoming Medical Society*,
    https://www.wyomed.org/about/ ................................................................. 5

## PRELIMINARY STATEMENT

Plaintiff Dr. Eric Cubin is an accomplished Wyoming-licensed physician who also served on the Wyoming Board of Medicine until April of this year. In February, Dr. Cubin sent an email as a private citizen to all members of the Wyoming House of Representatives, in which he expressed his personal views in support of a proposed bill known as "Chloe's Law." In his email to the legislators, Dr. Cubin criticized the Wyoming Medical Society's public position against Chloe's Law. And the Wyoming legislature agreed with Dr. Cubin's position on the proposed bill: Chloe's Law overwhelmingly passed, and the Governor signed it into law.

But then shortly thereafter, Defendant Governor Mark Gordon—despite signing Chloe's Law after it passed—had his Chief of Staff telephone Dr. Cubin informing him the Governor was removing him from the Board. The Governor then sent Dr. Cubin a letter. In his letter, Governor Gordon reiterated he was removing Dr. Cubin from the Board because he emailed the legislature to support Chloe's Law.

In removing Dr. Cubin from the Wyoming Board of Medicine for expressing his personal views to the House of Representatives on a matter of public concern—Chloe's Law—Governor Gordon unlawfully retaliated against Dr. Cubin in violation of his First Amendment free-speech rights and right to petition. This lawsuit seeks to vindicate Dr. Cubin's free speech rights and right to petition the government under the First Amendment of the U.S. Constitution. Governor Gordon's retaliatory actions violated Dr. Cubin's fundamental Constitutional rights in at least two ways.

App.054

*First*, Governor Gordon deprived Dr. Cubin of his free speech rights under the First Amendment. Dr. Cubin simply expressed his personal opinions as a private citizen on Chloe's Law to the members of the Wyoming House of Representatives. Doing so was not part of his official duties on the Board. Nor did his email to the legislature disrupt the Board's work. Thus, the Governor's actions violated well-settled Supreme Court precedent under the First Amendment protecting a public employee's right to speak as a private citizen on matters of public concern.

*Second*, Governor Gordon retaliated against Dr. Cubin because he exercised his First Amendment right to petition the Wyoming House of Representatives by expressing his ideas, hopes, and concerns about Chloe's Law. The right of citizens to petition the government is a basic fundamental right under the First Amendment. Indeed, citizens freely expressing their ideas, hopes, and concerns to their government and elected representatives is the cornerstone of our Constitutional Republic. Governor Gordon's actions are particularly egregious because he himself was elected to office by Wyoming citizens. But he punished Dr. Cubin for speaking as a Wyoming citizen about a bill to the Wyoming House of Representatives.

Governor Gordon's actions injured Dr. Cubin in ways that are continuous and ongoing. Dr. Cubin suffered irreparable injury as a result of his removal from the Board, including the loss of his First Amendment rights. A preliminary injunction is warranted to restore Dr. Cubin to the Wyoming Board of Medicine and the parties to their respective positions before the Governor's unconstitutional actions.

Therefore, Dr. Cubin respectfully requests that the Court issue a preliminary injunction.

## **STATEMENT OF FACTS**

### ***Wyoming Board of Medicine***

The Wyoming Board of Medicine ("Board") is comprised of 8 members, including 5 physicians, and is responsible for issuing and renewing licenses for physicians and other medical practitioners in Wyoming. Wyo. Stat. Ann. § 33-26-202. The Board oversees medical regulation, compliance, and discipline of physicians. *See* Declaration of Dr. Cubin ("Cubin Decl.") at ¶¶ 5, 6. The Board is responsible for ensuring that physicians adhere to state laws governing medical practice, investigating complaints against medical professionals, conducting hearings, and taking disciplinary actions such as revoking or suspending medical licenses. *Id*.

Board members are compensated for their service and are appointed by the Governor of Wyoming with the advice and consent of the State senate. Wyo. Stat. Ann. § 33-26-201; Cubin Decl. at ¶ 8. Board members "shall serve at the pleasure of the governor." Wyo. Stat. Ann. § 33-26-201. Governor Gordon appointed Dr. Cubin to the Board for a second term in or around February of 2024, and he was unanimously confirmed by the Wyoming Senate for both of his appointments. Cubin Decl. at ¶ 3. "Board members shall serve four (4) year terms. No board member shall serve more than three (3) consecutive terms." Wyo. Stat Ann. § 33-26-201(b). Dr. Cubin's second term on the Board was to run through 2028 in accordance with Wyoming law. Cubin Decl. at ¶ 3.

3

### *Chloe's Law*

In early 2024, the Wyoming legislature was considering Senate File 99, also known as "Chloe's Law," which would prohibit certain gender-affirming procedures for minors in Wyoming. *See* Complaint ("Compl."), ECF No. 1 at ¶ 22; Cubin Decl. at ¶ 11. Chloe's Law was named after Chloe Cole, an 18-year-old who began taking cross-sex hormones at 13 and underwent a double mastectomy at 15 in an attempt to transition from female to male.[1] Compl., ECF No. 1 at ¶ 23. Chloe has since detransitioned and is deeply regretful of the "gender-affirming" care that medical professionals recommended to her family.[2] Compl., ECF No. 1 at ¶ 24. Chloe testified before the Wyoming legislature, urging Wyoming to take a stand against such surgeries, stating, "I didn't deserve this," and "No child in Wyoming deserves to be put through these cruelties or hardships."[3] Compl., ECF No. 1 at ¶ 25.

The Wyoming Medical Society ("WMS"), a voluntary organization that physicians are not required to join, publicly opposed Chloe's Law, and WMS representatives testified before the legislature. Compl., ECF No. 1 at ¶¶ 27, 28; Cubin Decl. at ¶ 12. WMS publicly touts itself as a professional organization that

---

[1] Leo Wolfson, *National Activist Chloe Cole Testifies Against Transgender Treatments For Minors In Wyoming*, Cowboy State Daily (Feb. 21, 2024), *available* at https://cowboystatedaily.com/2024/02/21/chloes-law-namesake-testifies-for-a-wyoming-ban-on-transgender-treatments-for-minors/ (last visited Oct. 1, 2024). Compl., ECF No. 1 n. 1.

[2] *Id*. n. 2.

[3] *Id*. n. 3.

4

serves the interests of Wyoming medical practitioners and lobbies at the state and national level.[4] Compl., ECF No. 1 at ¶ 29; Cubin Decl. at ¶ 10.

### *Dr. Cubin's Email to the Wyoming House of Representatives*

Dr. Cubin, himself a member of WMS, disagreed with the organization's public opposition to Chloe's Law. Cubin Decl. at ¶¶ 9, 13. In a series of email exchanges, Dr. Cubin emailed WMS officials expressing his concerns about WMS's position and testimony before the legislature on Chloe's Law, including that WMS did not fairly represent Wyoming's physicians. Cubin Decl. at ¶¶ 13-15. Dr. Cubin thought it unlikely that WMS's stance reflected the views of the vast majority of its members, and asked whether WMS could present physicians' views on both sides of the issue but did not receive a satisfactory response. Cubin Decl. at ¶ 15.

On February 28, 2024, after receiving no satisfactory response from WMS leadership, Dr. Cubin sent an email from his personal email account to the entire Wyoming House of Representatives expressing his personal views in support of Chloe's Law and criticizing WMS's public position against it. Cubin Decl. at ¶¶ 16-17. A true and accurate copy of Dr. Cubin's email to the Wyoming House of Representatives is attached to the Complaint as **<u>Exhibit 1</u>**. Cubin Decl. at ¶ 17; Compl., ECF No. 1-1.

Dr. Cubin made clear in his email that he was representing himself, not WMS or the Wyoming Board of Medicine. Cubin Decl. at ¶ 17; Compl., ECF No. 1-1.

---

[4]   *See* Wyoming Medical Society, *About Wyoming Medical Society*, https://www.wyomed.org/about/ (last visited Oct. 1, 2024). Compl., ECF No. 1 n. 5.

5

Dr. Cubin stated in his email that he was writing "from the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born." Cubin Decl. at ¶ 17; Compl., ECF No. 1-1. In his email, Dr. Cubin stated that he believed WMS did not accurately represent the views of most Wyoming physicians. Cubin Decl. at ¶ 16; Compl., ECF No. 1-1. Dr. Cubin did not claim in his email to be speaking on behalf of the Wyoming Board of Medicine. Cubin Decl. at ¶ 17; Compl., ECF No. 1-1. Chloe's Law, Senate File 99, overwhelmingly passed, was signed by Governor Gordon, and became law. *See* S.F. 99, 67th Leg., Budget Sess. (2024) (enacted).

### *Governor Gordon's Response to Dr. Cubin's Speech*

On April 22, 2024, Dr. Cubin received a phone call from the Governor's Chief of Staff, Drew Perkins. Cubin Decl. at ¶ 20. Mr. Perkins informed Dr. Cubin that, because of the email he sent to members of the House of Representatives and the positions he had taken, the Governor had decided to remove Dr. Cubin from the Board. Cubin Decl. at ¶ 20. Dr. Cubin was not given an opportunity to explain his actions or his email that he sent to the legislature. Cubin Decl. at ¶ 20.

Immediately after Perkins's phone call to Dr. Cubin, Governor Gordon sent a letter to Dr. Cubin via email stating that Gordon was removing Cubin from the Wyoming Board of Medicine. Cubin Decl. at ¶ 20. Attached as **Exhibit 2** to the Complaint is a true and correct copy of Governor Gordon's letter to Dr. Cubin. Cubin Decl. at ¶ 20; Compl., ECF No. 1-2.

In his letter, Governor Gordon explicitly cited Dr. Cubin's "email to the members of the House of Representatives during this last legislative session regarding SF0099" as the reason for Dr. Cubin's removal from the Board. Compl., ECF No. 1-2. Governor Gordon stated that Dr. Cubin's comments "could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice." Cubin Decl. at ¶ 20; Compl., ECF No. 1-2. Governor Gordon wrote that "as an individual member of the Board, you would not be entitled to speak for the Board unilaterally." Compl., ECF No. 1-2.

### *Dr. Cubin Spoke as a Private Citizen on Chloe's Law*

Contrary to Governor Gordon's letter's suggestion, Dr. Cubin had not claimed to speak for the Board in his email to the Wyoming House of Representatives. Cubin Decl. at ¶ 17; Compl., ECF No. 1-1. As part of his official duties as a member of the Board, Dr. Cubin is not required to, and does not, communicate by email, or otherwise, with the Wyoming House of Representatives. Cubin Decl. at ¶ 7. Dr. Cubin's email to the Wyoming House of Representatives as a private citizen did not cause any disruption to the normal functioning of the Board in carrying out its official duties and obligations under Wyoming law. Cubin Decl. at ¶ 18. And Dr. Cubin's email to the House advocating for Chloe's Law did not result in the inefficient operation of the Board. Cubin Decl. at ¶ 18.

Past Board members have gone so far as to testify before the Wyoming legislature on controversial medical issues, and the Governor did not remove these Board members for their personal advocacy activities. Compl., ECF No. 1 at ¶¶ 51-52. Indeed, former Board member Rene Hinkle testified before the Wyoming legislature against giving life-saving care to infants born alive, and was afterward reappointed by the Governor to the Board. Compl., ECF No. 1 at ¶ 52.

### *Dr. Cubin's Removal from the Board*

But for his email to the House of Representatives expressing his personal views on Chloe's Law, Dr. Cubin would still be a member of the Wyoming Board of Medicine. Compl., ECF No. 1-1; Cubin Decl. at ¶¶ 20-21. As a member of the Board, Dr. Cubin always fulfilled his duties and obligations of overseeing medical professionals' licensure in a professional, unbiased, and clinical manner based on the merits alone. Cubin Decl. at ¶ 4. Governor Gordon's removal of Dr. Cubin from the Board of Medicine has caused Dr. Cubin economic injury and harm to his professional reputation. Cubin Decl. at ¶ 22.

After being forced by Governor Gordon to resign from the Board, Dr. Cubin verbally resigned, which Governor Gordon accepted and made effective as of April 22, 2024, the same day as Gordon's letter to Dr. Cubin removing him from the Board. Cubin Decl. at ¶ 21. Attached as **Exhibit 3** to the Complaint is a copy of Governor Gordon's acceptance letter. Cubin Decl. at ¶ 21; Compl., ECF No. 1-3. Dr. Cubin would never have resigned if he had not received the Governor's binding

8

letter in hand stating that he had been removed from the Board of Medicine because of his email to the House of Representatives. Cubin Decl. at ¶ 21.

## LEGAL STANDARD

To obtain a preliminary injunction pursuant to Fed. R. Civ. P. 65, a plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Schrier v. Univ. of Colo.*, 427 F.3d 1253 (10th Cir. 2005). The third and fourth factors—balance of equities and the public interest—merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### A. This Court should issue a preliminary injunction and order the Governor to restore Dr. Cubin to his position on the Wyoming Board of Medicine pending the outcome of trial.

Dr. Cubin has made a clear showing that he is entitled to a preliminary injunction, and this Court should issue one ordering Governor Gordon to restore him to his position on the Board. The record shows that Dr. Cubin spoke as a private citizen on Chloe's Law, that his speech did not interfere with the Board's work, and that the Governor's motivation for his removal from the Board was to retaliate against Dr. Cubin for his protected speech and email to the Wyoming House of Representatives.

App.062

"The main purpose of a preliminary injunction is simply to preserve the status quo pending the outcome of the case." *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975). "In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits." *Tri-State Generation & Transmission Asso. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).

The status quo is "the last uncontested status between the parties which preceded the controversy" or the "last peaceable uncontested status existing between the parties before the dispute developed." *Schrier*, 427 F.3d at 1260 (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties." *Schrier*, 427 F.3d at 1260.

"[A] preliminary injunction can [ ] act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231 (4th Cir. 2017). And sometimes it is necessary "to require a party who has recently disturbed the status quo to reverse its actions" to restore the status quo ante. *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F. 3d 355, 378 (4th Cir. 2012) (cleaned up).

That is precisely what this Court should do: order the Governor "to reverse [his] actions" after he "disturbed the status quo" and wrongfully removed Dr. Cubin from the Board for his protected speech that he expressed to the Wyoming House of

Representatives. *See id*. Governor Gordon injured Dr. Cubin when he deprived him of his rights under the U.S. Constitution by infringing upon his free speech and right to petition the government. The Governor retaliated against Dr. Cubin for his reasonable exercise of his fundamental federal Constitutional rights. And his injuries are ongoing: Dr. Cubin suffers ongoing harm arising from the loss of his First Amendment rights and reputational harm as a result of the Governor's debacle and unjustified retaliation.

The Governor failed to provide a reasonable alternative justification for Dr. Cubin's removal from the Board other than his email to the Wyoming legislature. And the Governor's actions were not motivated by concerns about Dr. Cubin's fitness to serve on the Board. Governor Gordon's letter failed to cite any examples of specific Wyoming physicians who reasonably believed Dr. Cubin would be biased performing his duties on the Board based on his email. Compl., ECF No. 1-2.

The Governor has put forth no evidence that Dr. Cubin would be biased in his duties on the Board because he supported Chloe's Law. If anything, the fact that he supported Chloe's Law, which was later codified into law by the legislature and Governor Gordon simply makes Dr. Cubin well-qualified to uphold the laws of the State of Wyoming as a member of the Board.

This Court can and should issue a preliminary injunction and restore the parties to their respective positions before Governor Gordon removed Dr. Cubin from the Board. Ordering the Governor to reinstate Dr. Cubin to the Board protects Dr. Cubin from the irreparable harm he has suffered and will continue to suffer from

the loss of his First Amendment rights, and preserving federal Constitutional rights serves the public interest.

Dr. Cubin has shown that he has met the standard for the Court to issue a preliminary injunction: he is likely to succeed on the merits of his Section 1983 claims pursuant to the First Amendment, he will be irreparably harmed absent an injunction due to the loss of his First Amendment rights, the balance of equities tip in his favor warranting an injunction, and an injunction serves the public interest.

Critically, the Governor's decision to remove Dr. Cubin from the Board in retaliation for expressing his personal opinions to legislators was plainly wrong as a matter of law under the First Amendment. And that egregious decision to suspend a dedicated physician from the Board of Medicine for expressing his opinions to the lawmakers of his home state on Chloe's Law, which the Governor eventually signed into law, defies all logic and common sense.

1. **Dr. Cubin is likely to succeed on the merits of his federal Constitutional claims.**

Under the first preliminary injunction factor, Dr. Cubin is likely to succeed on the merits of both his First Amendment (a) free speech, and (b) right to petition claims. *See Winter*, 555 U.S. at 20.

The Tenth Circuit subscribes to the liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to

App.065

make them a fair ground for litigation and thus for more deliberate investigation."

*Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964)

(citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953));

*see Lundgrin v. Claytor*, 619 F.2d  61, 63 (10th Cir. 1980); *Otero Sav. & Loan Asso.*

*v. Fed. Res. Bank*, 665 F.2d 275, 278-279 (10th Cir. 1981).

### a. The Governor retaliated against Dr. Cubin and deprived him of his free speech rights under the First Amendment.

Dr. Cubin is likely to succeed on the merits of his free speech claim because

Governor Gordon retaliated against him for expressing his views on Chloe's Law to

the Wyoming House of Representatives.

The First Amendment states, "Congress shall make no law . . . abridging the

freedom of speech." U. S. Const. amend. I. This fundamental right means that the

government cannot "chill" citizens' constitutionally protected speech. *Virginia v.*

*Hicks*, 539 U.S. 113, 119 (2003).

To determine whether a government employee's speech is protected by the First

Amendment, courts in the Tenth Circuit apply the *Garcetti/Pickering* five-step

framework. *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014); *Garcetti v.*

*Ceballos*, 547 U.S. 422 (2006); *Pickering v. Board of Education*, 391 U.S. 563 (1968).

This framework analyzes 1) whether the speech occurred within the scope of

employment and 2) was about a matter of public concern, 3) the government's

interest in efficiency weighed against the employee's free speech rights, 4) whether

the plaintiff's speech was a motivating factor in the adverse employment action. and

5) whether the same employment decision would have been reached absent the protected speech. *Trant*, 754 F.3d at 1165.

The "ultimate question" in determining whether an individual's speech was within the scope of his employment is "whether the employee speaks as a citizen or instead as a government employee—an individual acting 'in his or her professional capacity.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1198 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422). A government employer cannot "restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 422. And public employees "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.*

Here, Dr. Cubin's email to the Wyoming House of Representatives was protected speech under the First Amendment. Dr. Cubin's speech that he expressed in his email did not occur within the scope of his Board duties and was made in his capacity as a private citizen. It was about a matter of public concern—Chloe's Law. The Board's interest in efficiency did not weigh against Dr. Cubin's free speech rights because there was no disruption to the Board's work as a result of his email. And his speech was a motivating factor in the Governor's adverse employment action removing Dr. Cubin from the Board; Governor Gordon would not have removed Dr. Cubin from the Board absent his email to the Wyoming House of Representatives. *See Trant*, 754 F.3d at 1165.

14

> **i.   Dr. Cubin expressed only his personal opinions in his email about Chloe's Law for the legislators' consideration, and his email was not part of any official Board duties.**

The first step of the *Garcetti/Pickering* framework is to consider whether the individual's speech occurred within the scope of employment. *Id.* at 1165. In his communication to the House of Representatives, Dr. Cubin repeatedly identified himself as a Wyoming physician and WMS member. His email did not relate to Board specific duties or opinions, nor his responsibilities as a Board member. As a member of the Board, Dr. Cubin's duties did not include advising the Board on pending legislation such as Chloe's Law.

Furthermore, Dr. Cubin's email did not purport to represent the Board's official position on Chloe's Law, nor did it provide guidance to the legislature on this pending legislation on behalf of the Board. Dr. Cubin explicitly stated that he was speaking "on his own behalf" and "from the perspective of a Wyoming doctor." His criticism was directed specifically at the stance taken by WMS, a voluntary organization that is entirely separate from the Board.

Therefore, Dr. Cubin's email to the Wyoming House of Representatives was speech made as a private citizen, wholly separate from any official duties that he undertakes as a member of the Board of Medicine.

> **ii.   Dr. Cubin's comments on Chloe's Law addressed a matter of obvious public concern.**

The second step of the *Garcetti/Pickering* framework considers whether the speech addressed a matter of public concern. *Trant*, 754 F.3d at 1165; *Brammer-*

App.068

*Hoelter*, 492 F.3d at 1192 ("If the speech is not a matter of public concern, then the speech is unprotected, and the inquiry ends."). Speech regarding "matters of public concern" receives strong First Amendment protection. *Connick v. Myers*, 461 U.S. 138, 146 (1983). Matters of public concern include "those of interest to the community, whether for social, political, or other reasons." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 (10th Cir. 2000).

The Supreme Court, the Tenth Circuit, and other circuits have consistently recognized a First Amendment right of government employees to speak on matters of public concern and a right to express concerns to elected government officials. This includes speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community," or that addresses "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and quotations omitted).

In *Dixon v. Kirkpatrick*, the court held that the subject of dogfighting qualified as a matter of public concern because a "dogfighting investigation was the subject of extensive reporting in a major local daily newspaper." 553 F.3d 1294, 1303-04 (10th Cir. 2009). The state employee's sharing of her concerns about the dogfighting investigation was deemed a matter of public concern where the comments were directed to a veterinarian who was 1) "a member of the legislative committee ... which engaged in public advocacy on the subject of veterinary regulation" and 2) later discussed the information at a legislative committee meeting. *Id.* at 1303. The

16

court contrasted this with the employee's other comments concerning interpersonal complaints about coworkers and noted that personnel issues were "trivial in nature" as they concerned issues that did not generate any press coverage and were unrelated to any legislative concerns. *Id.* at 1303.

Here, the "gender-affirming care" for minors addressed in Chloe's Law generates far more press coverage than dogfighting and is a matter of legislative concern. Countless articles, op-eds, and public discussions have explored the implications of transgender care. *See generally* Compl, ECF No. 1. As the Tenth Circuit suggested in *Dixon*, issues that are the subject of "legislative concern" and public policy debates are matters of public concern. 553 F.3d at 1304. The widespread public discourse, legal battles, medical considerations, and social and cultural impact of transgender care for minors, undoubtedly make this "interest to the community, whether for social, political, or other reasons." *Lighton*, 209 F.3d at 1224.

Dr. Cubin's email expressed his views on Chloe's Law, a piece of legislation regulating gender-affirming surgeries for minors, which is of significant concern to physicians, parents, and citizens across Wyoming. The Tenth Circuit has clarified that "Courts have focused on the motive of the speaker in analyzing whether the speech qualifies as a matter of public concern, i.e., whether the speech was calculated to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interests." *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988). Dr. Cubin's email evidences a genuine concern for the policies espoused by the WMS on Chloe's law. Compl. ECF No. 1-1. Considering the

17

political, social, and legislative interests in the topic of gender-affirming care at the heart of Chloe's Law, Dr. Cubin's email communication to the House of Representatives concerning Chloe's Law falls squarely within the concept of a "matter of public concern."

### iii. Dr. Cubin's speech did not interfere with the Board's work or its ability to function efficiently.

The third step of the *Garcetti/Pickering* framework is to consider whether the government's interests in promoting efficiency outweigh the plaintiff's free speech rights. *Trant*, 754 F.3d at 1165. Again, Dr. Cubin's email repeatedly identified him as a Wyoming physician and WMS member, and the communication did not relate to Board-specific duties or opinions, nor to his responsibilities as a Board member.

Further, the Governor put forth no reasonable evidence suggesting that Dr. Cubin's opinions on medical policy set forth in his email would negatively impact the Board's performance or ability to investigate and discipline physicians. To hold otherwise would be to suggest that Board physicians must be completely silent about all medical policy matters that go before the Wyoming legislature in order for the Board to operate efficiently; an assertion that would be inconsistent with the legislative activities of past Board members who faced no reprisal from the Governor. And again, the fact that Chloe's Law has been codified into law underscores that there is no Board inefficiency here arising from Dr. Cubin's email because his views that he previously articulated in his email to the Wyoming House

App.071

of Representatives align with the policy and law that Board members are now duty-bound to enforce when regulating physician conduct.

> ### iv. Governor Gordon's letter explicitly stated he was removing Dr. Cubin from the Board because of his email to the House of Representatives about Chloe's Law.

The fourth *Garcetti/Pickering* factor concerns causation: whether the protected speech was a motivating factor in the adverse employment action. *Trant*, 754 F.3d at 1165. The Governor's letter explicitly cites Dr. Cubin's "comments" to the House as the reason for the disciplinary action. Compl, ECF No. 1-2.

Dr. Cubin's removal from the Board in retaliation for engaging in protected political speech on Chloe's Law violates his free speech rights under the First Amendment. In *Bass v. Richards*, the Tenth Circuit held that removing an individual from a government position due to political speech or affiliation violates the First Amendment. 308 F.3d 1081, 1091 (10th Cir. 2002). The court emphasized that a person's "expression of his preference for one philosophy over another is the type of pure political opinion that has been long protected." *Id*. at 1090. Similarly, in *Gardetto v. Mason*, the Tenth Circuit reaffirmed that political speech, including advocacy related to candidates or public officials, lies at the core of First Amendment protection. 100 F.3d 803, 812 (10th Cir. 1996).

       **v.    But for Dr. Cubin's speech and email to the Wyoming legislature, he would still have his position on the Board.**

The final *Garcetti/Pickering* factor is whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Trant*, 754 F.3d at 1165. There is no indication here that Dr. Cubin was being disciplined for any other actions other than his email. Rather, the Governor's letter clearly states that his comments were the sole reason for the employment decision. Compl, ECF No. 1-2.

       **b. Governor Gordon unlawfully retaliated against Dr. Cubin for exercising his First Amendment right to petition the government.**

To establish a claim of unlawful retaliation for exercising their First Amendment right to petition, a government employee must first show that "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir.2000)).

       **i.    Dr. Cubin expressed to the state legislature his ideas, hopes, and concerns about Chloe's Law.**

The Supreme Court has stated that "Both speech and petition are integral to the democratic process, although not necessarily in the same way. The right to petition

allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea v. Guarnieri,* 564 U.S. 379, 388 (2011). Petitions are protected when directed to local, state, or national government. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 889 (1982) (petition to county officials); *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2010) (oral request to city councilperson); *Van Deelen,* 497 F.3d at 1158 (appeal of county property tax assessment).

Dr. Cubin's email to the Wyoming House of Representatives expressing his ideas and hopes about Chloe's Law and concerns about testimony opposing the bill is constitutionally protected activity. See Guarnieri, 564 U.S. at 388; Compl, ECF No. 1-1.

> ### ii.   Governor Gordon's letter in response to Dr. Cubin reasonably chilled him from continuing to engage in such speech.

The second requirement for a government employee to establish a claim of unlawful retaliation for exercising their First Amendment right to petition is a showing that "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Van Deelen*, 497 F.3d at 1155-56 (citing *Worrell*, 219 F.3d at 1212.)

Dr. Cubin received a phone call from the Governor's Chief of Staff, Drew Perkins, informing him that he was being removed from the Board because of his

email to the House of Representatives. Cubin Decl. at ¶ 20. Then immediately thereafter, Governor Gordon explicitly stated in his Exhibit 2 letter that his adverse action of removing Dr. Cubin from the Board was motivated by Dr. Cubin's email petitioning the House of Representatives to vote in favor of Chloe's Law. Compl., ECF No. 1-2. Governor Gordon's act of having his Chief of Staff telephone Dr. Cubin to inform him he was being removed from the Board, and then sending his Exhibit 2 letter immediately thereafter to Dr. Cubin would cause a person on the Board of ordinary firmness to refrain from further speaking out in the future to the Wyoming House of Representatives as a private citizen on a matter of public concern, such as pending legislation like Chloe's Law.

### iii. Governor Gordon's removal of Dr. Cubin was motivated by his email to the Wyoming House of Representatives.

The final requirement for a government employee to establish a claim of unlawful retaliation for exercising their First Amendment right to petition, is a showing that "the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen*, 497 F.3d at 1155-56 (citing *Worrell*, 219 F.3d at 1212).

Again, in his letter, Governor Gordon explicitly wrote to Dr. Cubin that his "email to the members of the House of Representatives during this last legislative session regarding SF0099" was the reason why he removed Dr. Cubin from the Board of Medicine. No other plausible motivation has been offered by the Governor.

**2. Dr. Cubin will be irreparably harmed absent a preliminary Injunction because he has lost his First Amendment rights.**

Dr. Cubin suffered irreparable injury as a result of his removal from the Board, including the loss of his First Amendment rights. These harms are ongoing and continuous absent a preliminary injunction.

Because Dr. Cubin has established that he is likely to prevail on the merits of his First Amendment claims set forth above, he has thus also shown that his injury is irreparable without an injunction because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (plurality opinion) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)).

**3. A preliminary injunction serves the public interest.**

The third and fourth merged factors—balance of equities and the public interest—favor a preliminary injunction restoring Dr. Cubin to the Board. *See Nken*, 556 U.S. at 435.

Speech about public policy is at the core of the First Amendment's protection. There is "a strong interest in debate on public issues," *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966), and  "the law should encourage the private individual to become involved in and express his or her views on the conduct of government affairs," *Garcia v. Bd. of Educ.*, 777 F.2d 1403, 1410 (10th Cir. 1985).

**B. It is appropriate to waive the bond requirement under Rule 65(c).**

Courts have "wide discretion under Rule 65(c) in determining whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009) (citing *Winnebago Tribe v. Stovall*, 341 F.3d 1202 (10th Cir. 2003)).

Because Dr. Cubin seeks injunctive relief for the loss of his First Amendment rights, and Governor Gordon has no risk of monetary injury or likelihood of harm if this Court issues a preliminary injunction, the Court may waive Rule 65(c)'s bond requirement. *See Winnebago Tribe*, 341 F.3d at 1206 (district court waived the bond requirement because there was "an absence of proof showing a likelihood of harm.").

## <u>CONCLUSION</u>

For these reasons, Dr. Cubin respectfully requests that the Court issue a preliminary injunction ordering Governor Gordon to restore Dr. Cubin to his position on the Board pending the outcome of trial.

[SIGNATURE OF COUNSEL ON FOLLOWING PAGE]

App.077

Dated: October 1, 2024                    Respectfully submitted,

                                           /s/ D. Stephen Melchior
                                          D. Stephen Melchior
                                          Melchior Law Firm, P.C.
                                          2010 Warren Avenue
                                          Cheyenne, WY 82001
                                          (307) 637-2323 - telephone
                                          steve@melchlaw.com

                                          M.E. Buck Dougherty III*
                                          LIBERTY JUSTICE CENTER
                                          7500 Rialto Blvd.
                                          Suite 1-250
                                          Austin, TX 78735
                                          (512) 481-4400 - telephone
                                          bdougherty@libertyjusticecenter.org

                                          *Pro hac vice admission forthcoming*

                                          *Attorneys for Plaintiff Dr. Eric Cubin*

App.078

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with Wyoming Local Civil Rule 7.1(b)(2)(B) because it

contains 25 pages, not including the cover page, table of contents, table of

authorities, certificate of service, and this certificate.

Dated: October 1, 2024

<div align="center">

/s/ D. Stephen Melchior
D. Stephen Melchior

</div>

App.079

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was filed electronically with the Court's Case Management/Electronic Case Filing (CM/ECF) system. The Court and/or Clerk of Court may serve and give notice to Defendant's counsel by CM/ECF electronic transmission.

The 1st day of October 2024.

<u>/s/ D. Stephen Melchior</u>
D. Stephen Melchior

**UNITED STATES DISTRICT COURT**
**DISTRICT OF WYOMING**
**CHEYENNE DIVISION**

| | |
|---|---|
| DR. FREDERICK WILLIAM "ERIC" CUBIN III, | |
| Plaintiff, | Case No. 1:24-cv-164 |
| v. | |
| MARK GORDON, IN BOTH HIS PERSONAL AND OFFICIAL CAPACITIES AS GOVERNOR OF WYOMING, | |
| Defendant. | |

## DECLARATION OF DR. ERIC CUBIN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, Dr. Frederick William "Eric" Cubin III, hereby declare as follows:

1. I am a resident of Casper, Wyoming. I have personal knowledge of the facts herein and, if called to give testimony, would testify as follows:

2. I am a physician practicing in Wyoming. I have been licensed since June 4, 2010. My medical practice specialty is Radiology.

3. I was appointed to the Wyoming Board of Medicine and served from March 1, 2023, thru April 22, 2024. I was initially nominated to the Board of Medicine by Governor Mark Gordon. I was nominated again by Governor Gordon for a full 4-year term in February 2024. Both times I was nominated, I was unanimously confirmed by the Wyoming Senate.

App.081

4. During my initial term on the Board, I received no complaints or disciplinary action regarding my official actions or performance of Board duties. I always fulfilled my duties and obligations of overseeing medical professionals' licensure in a professional, unbiased, and clinical manner based on the merits alone.  If there was ever a situation in which I had a conflict of interest, or even a potential/perceived conflict of interest, I recused myself from that particular case.  I recused myself on multiple cases during my time on the Board.

5. The Wyoming Board of Medicine is a state regulatory agency responsible for issuing and renewing licenses for physicians and other medical practitioners. Board members are appointed by the Governor. The Board consists of eight members including five physicians.

6. The Board also oversees medical regulation, compliance, and discipline of physicians. Board member duties include ensuring that physicians adhere to the Wyoming Medical Practice Act and any other state laws governing medical practice, investigating complaints against medical professionals, conducting hearings, and taking disciplinary actions such as fines, requiring additional education, and revoking or suspending medical licenses.

7. Board member duties do not include communication with the Wyoming House of Representatives.

8. Board members receive compensation for their service and are paid in the same manner and amount as members of the Wyoming Legislature.

App.082

9.  I have been a member of the Wyoming Medical Society("WMS") since before I returned to the State of Wyoming to practice in 2010.

10.  The WMS publicly touts itself as a professional organization that serves the interests of medical practitioners in Wyoming. Its functions include representing physicians and advocating for their interests at the state and national levels including lobbying for or against legislation that benefits the medical community and public health. Membership is voluntary, physicians are not required to join.

11.  Chloe's Law is a bill that regulates gender-affirming care for minors in Wyoming.

12.  WMS representatives testified in opposition to Chloe's Law.

13.  On February 21, 2024, I emailed WMS representatives to express that I disagreed with the organization's opposition to Chloe's Law and felt they were misrepresenting the position of physicians and the medical evidence against gender-affirming care for minors. I requested that WMS present physician' views on both sides of this issue.

14.  The following day, Dr. Kristopher Schamber, President of the WMS Board of Trustees emailed me reiterating WMS's position but failed to respond to my concerns that WMS did not fairly represent Wyoming's physicians.

15.  On February 25, 2024, I emailed Dr. Schamber and the WMS Board to express my disagreement and request that WMS poll its physician members on the

3

issue. In further email exchanges I requested that WMS adjust its position to a more neutral stance. I did not receive a satisfactory response.

16.  On February 28, 2024, I sent an email to members of the Wyoming House of Representatives expressing my support for Chloe's Law. In the email I detailed my concerns regarding gender-affirming care and the misrepresentation of physicians by WMS. I expressed that I had lost confidence in WMS's ability to faithfully represent the physicians of Wyoming. The email was sent from my personal email account.

17.  In my email to the Wyoming House of Representatives I identified myself as "a physician in Casper" and "a Wyoming doctor who actually practices medicine at the very hospital where he was born." I did not claim to speak for the Board. A true and correct copy of the email I sent is attached to the Complaint as **<u>Exhibit 1</u>**.

18.  To my knowledge, my email to the Wyoming House of Representatives did not result in any complaints from other members of the Board or impact the Board's functioning in any way.

19.  Chloe's Law was passed by a vote of the Wyoming House of Representatives and signed into law by Governor Gordon.

20.  On April 22, 2024, I received a phone call from the Governor's Chief of Staff, Drew Perkins.  Mr. Perkins informed me that, because of the email I sent to the Members of the House of Representatives and the positions I had taken, the Governor had decided to remove me from the Board.  I was not given an opportunity to explain actions.  Immediately after that phone call, I received a signed, binding

4

letter from Governor Gordon in the form of an email attachment which was sent from Gabi Farmer, a member of the Governor's staff.   Governor Gordon's letter notified me that he was removing me from my position on the Board of Medicine. His letter stated that my "comments" to the House of Representatives regarding Chloe's Law "could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that [I] might use [my] position to advocate for a particular position" and "even the appearance of bias can be disquieting." The letter went on to state: "I believe it is best to remove you from the Board of Medicine." A true and correct copy of the letter is attached to the Complaint as **Exhibit 2**.

21. Several hours after receiving the letter notifying me of my removal, I reached back out to Mr. Perkins and asked if the Governor would allow me to resign from the Board.  I would never have resigned if I did not have a binding letter in hand stating that I had been removed.  The following day, Mr. Perkins notified me that he and the Governor would accept my resignation.  On April 26, 2024, I sent a one-line email to Mr. Perkins stating, "I hereby resign from the Wyoming State Board of Medicine effective immediately".  My email was accepted by the Governor and made effective as of April 22, 2024. This effective date was established retroactively by the Governor because I did not submit a written letter of resignation until April 26, 2024.   A true and correct copy of the acceptance letter is attached to the Complaint as **Exhibit 3**.

22. Since my removal I feel I have suffered reputational harm as news articles reporting on my removal have created the impression that I am biased

App.085

against the transgender community.  The articles, and the Governor's own words call in to question my professionalism and ability to be objective.  As a physician, objectivity and professionalism are critical.

23. I reviewed the Complaint that was filed in this case and verify that it is true and accurate to the best of my knowledge.


Under penalty of perjury, I certify that the foregoing is true and correct to the best of my knowledge.


Executed on September 28, 2024

Casper, Wyoming


Dr. Frederick William "Eric" Cubin III

App.086

Brandi Monger, WSB #6-3731
Deputy Attorney General
Timothy W. Miller, WSB #5-2704
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7886
(307) 777-8920 Facsimile
brandi.monger@wyo.gov
tim.miller@wyo.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | | |
|---|---|---|
| DR. FREDERICK WILLIAM "ERIC" CUBIN III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 24-CV-164 -SWS |
| | ) | |
| MARK GORDON, in both his personal and official capacities as Governor of Wyoming, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant Wyoming Governor Mark Gordon, in his individual and official capacity, submits this brief in response to Plaintiff's Motion for Preliminary Injunction.

### I.    Background

Plaintiff Dr. Frederick Cubin was a member of the Wyoming Board of Medicine (Board) from March 1, 2023 to April 22, 2024. (ECF 12-1, Cubin Dec. at ¶ 3). The Board is a statutorily created entity, established as part of the Medical Practice Act (Act). Wyo. Stat. Ann. §§ 33-26-101 *et seq*. The Board is composed of eight (8) members, of which

five (5) must be physicians with varying qualifications, one (1) physician assistant, and two (2) lay members. *Id.* § 33-26-201(a). Board members are appointed by the Governor, but with the consent of the Senate. *Id.* "Board members appointed by the governor shall serve at the pleasure of the governor." *Id.*

On February 28, 2024, while serving as a member of the Board, Dr. Cubin sent an email to the entire Wyoming House of Representatives (House). (ECF 1-1). The genesis of the email was a private dispute between Dr. Cubin and the Wyoming Medical Society (WMS), a voluntary physician's organization. (*Id.*; ECF 1, Compl. ¶¶ 28-29). WMS opposed Senate File 99 (S.F. 99) (2024), a bill prohibiting certain gender-affirming procedures for minors in Wyoming. (ECF 1 ¶¶ 27, 43). Dr. Cubin criticized WMS for opposing the bill and demanded that the organization change its position to "neutral." (ECF 1-1; ECF 1, ¶¶ 22, 27, 30-36; Exs A, A-1). His email to the House followed a flurry of communications between Dr. Cubin, the WMS Board, and Dr. Michael Sanderson.[1] (ECF 1, ¶¶ 31-36; Ex. A, A-1). In those emails, Dr. Cubin expressed the following concern:

> If there are members who are using their position on the [WMS] Board to advance their own political agenda without respect to what's best for the doctors in the state, then I would respectfully ask that WMS remove and replace those Board members with others who can maintain their focus on the true mission of WMS.

(Ex. A-1, Cubin e-mail to Dr. Schamber, February 25, 2024 (fifth page of exhibit)).

In his subsequent email to the House, Dr. Cubin stated that:

> It saddens me very much to have to report that, under their current leadership, the Wyoming Medical Society has been essentially hijacked by the far left.

---

[1] Dr. Cubin forwarded those emails to the President of the Wyoming Board of Medicine shortly before sending his email to the House. (Ex. A ¶¶ 4-5; ECF 1-1).

App.088

> It seems that they have decided to prioritize politics over their stated mission of physician advocacy. In my opinion, they have adopted and embraced "woke" positions that are not congruent with the thoughts and opinions of the majority of their physician members. In essence, I have lost all confidence in their ability or desire to faithfully represent the physicians in this state.

(ECF 1-1 at p. 2). Dr. Cubin also stated "[i]n their opposition to Chloe's Law, the WMS has partnered with Dr. Sanderson, a pediatrician from Sheridan, who is the President of the WyAAP [the Wyoming chapter of the American Academy of Pediatricians]." (*Id.*). Dr. Cubin accused Dr. Sanderson of suppressing the position of another pediatrician organization. (*Id.* at p. 3). Importantly, as licensed practitioners in Wyoming, Dr. Sanderson and the members of the WMS are subject to the licensing, disciplinary and other regulatory authority of the Board. Wyo. Stat. Ann. § 33-26-101 *et seq*.

On April 22, 2024, Governor Gordon sent a letter to Dr. Cubin explaining that Dr. Cubin's email to the House "could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent agenda or prejudice." (ECF 1-2, Compl. Exhibit 2). Governor Gordon noted that "Medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone." (*Id.*). Governor Gordon also explained that "[e]ven the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality." (*Id.*). Based on these stated concerns, the Governor explained that he believed it was necessary to remove Dr. Cubin from the Board. (*Id.*). On April 23, 2024, Dr. Cubin sent Governor Gordon an email in which he stated in part:

App.089

It was with some sadness that I received a phone call from Drew [Perkins, the Governor's Chief of Staff] today explaining that my services are no longer needed on the Wyoming Board of [M]edicine. I have to say that this phone call was not totally unexpected. However, before anything is made final, I would very much like to make sure that my voice is heard and my side of the story is told.

\*     \*     \*

I want you to know that my intent was never to get involved in any particular piece of legislation. I simply wanted to make sure that physicians were being appropriately represented by the Wyoming Medical Society.

(Ex. B – Email from Dr. Cubin). After conversations with the Governor's Office, Dr. Cubin resigned from the Board. (ECF 1-1, Compl., ¶ 56).

On August 29, 2024, Dr. Cubin filed suit against Governor Gordon in both his official and individual capacity claiming First Amendment retaliation in violation of his right to freedom of speech and his freedom to petition the Wyoming Legislature. (*See generally* Compl.). He also asserted a corresponding claim under the Wyoming State Constitution. (ECF 1, ¶¶ 94-100).

Then on October 1, 2024, more than five months from his departure from the Board, Dr. Cubin filed his motion for preliminary injunction asking the Court to order the Governor to place Dr. Cubin back on the Board. (ECF 11, 12).

## II.     Legal Standard for Preliminary Injunction

A preliminary injunction is an "extraordinary remedy that is granted only when the movant's right to relief [is] clear and unequivocal." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1145 (10th Cir. 2017) (internal citation and quotation marks omitted). A party seeking preliminary relief must demonstrate: "(1) a substantial likelihood

of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted).[2]

The Tenth Circuit recognizes three types of specifically disfavored preliminary injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (*O'Centro*). If a plaintiff seeks one of these disfavored categories of injunctions, the plaintiff's claims "must be more closely scrutinized to assure that the exigencies of the case support granting of a remedy that is extraordinary even in the normal course." *Id.* In these cases, the plaintiff must "make a strong showing both with respect to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at 976.

---

[2] In his motion, Dr. Cubin asserts that the third and fourth factors are merged when the government is a party. (ECF 12 at 9) (citing *Nken v. Holders*, 556 U.S. 418, 435 (2009)). However, *Nken* discussed the relevant factors for a stay of agency action. *Nken*, 556 U.S. at 425-26. As the Supreme Court explained, a stay temporarily suspends "judicial alteration of the status quo," while an injunction alters the legal status quo. *Turner Broad. Sys., Inc. v. F.C.C.*, 507 U.S. 1301, 1301 (1993) (citation omitted). Given the different purposes of a stay compared to injunctive relief, this Court should use the injunction standard as set out in *Diné*, rather than standard espoused by Dr. Cubin.

App.091

### III.    Argument

Dr. Cubin's requested relief meets all the disfavored categories of injunctive relief. Dr. Cubin asks a federal district court to direct the Governor of the State of Wyoming to put him back into a politically-appointed position on a state licensing board – a board whose members are appointed by, and serve at, the pleasure of the Governor.

First, the requested relief would alter the status quo. Dr. Cubin asserts this Court should consider the last peaceable status quo as the time prior to the Governor removing him from the Board. (ECF 12 at 10). "The status quo is not defined by the parties['] existing *legal rights*; it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991) (emphasis in original) (overruled on other grounds by *O Centro*, 389 F.3d 973).

Recently the Tenth Circuit discussed injunctions that restore parties to the most recent peaceable status quo. *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1255 (10th Cir. 2024). In *Pryor*, a volunteer coach sought to enjoin the school district from restricting his ability to coach football or accessing facilities at the school district. *Id.* Pryor contested the restrictions and filed for injunctive relief during the pendency of his appeal. *Id.* at 1249. Thus, because the matter was still being contested when plaintiff filed suit, the last peaceable status quo was prior to the restrictions and the injunction was to prohibit the continued enforcement of the restrictions. *Id.* at 1255.

In this case, Dr. Cubin left the Board in late April and then waited until late August to file this suit. (ECF 1, ¶ 56). For more than four months, the peaceable status quo was that Dr. Cubin was not a member of the Board and he did not dispute his departure from the Board. Compelling the Governor to put him back on the Board alters the last peaceable status quo.

Even the requested relief does not alter the status quo, the requested relief is mandatory, rather than prohibitory. Dr. Cubin is asking this Court to direct the Governor to place Dr. Cubin back on Board. (ECF 1 at 18). If this Court granted this relief, it would affirmatively require the Governor to act, making this a disfavored mandatory injunction. *Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1275 (10th Cir. 2022) (recognizing district court injunction was mandatory in nature, requiring application of heightened standard). Finally, it appears that at least to the claims against Governor Gordon in his official capacity, the requested injunction would provide Dr. Cubin all relief he would receive after a trial on the merits.

Because Dr. Cubin requests disfavored relief, Dr. Cubin must not only demonstrate he meets all of the preliminary injunction factors, but he must make a "strong showing both with respect to the likelihood of success on the merits and with regard to the balance of harms." *O Centro*, 389 F.3d at 976. Because Dr. Cubin cannot make the required showing, this Court should deny his motion for preliminary injunction.

**A.    Substantial likelihood of success on the merits**

Dr. Cubin asserts three separate claims against Governor Gordon in both his official and individual capacity. First, he alleges that Governor Gordon's removal constituted

App.093

retaliation in violation of his right to free speech. (ECF 1, Compl. ¶¶ 57-79). Second, he alleges that this action also constituted retaliation in violation of his right to petition the Legislature. (Compl. ¶¶ 80-93). Third, he raises substantially similar claims under the Wyoming Constitution. (Compl. ¶¶ 94-100). As explained above, given that Dr. Cubin's request is for disfavored injunctive relief, he must make a "strong showing" on the likelihood of success on the merits. *O Centro*, 389 F.3d at 976.

In his motion, Dr. Cubin argues the Tenth Circuit's modified success on the merits test applies. (ECF 12 at 12 13). The modified test provides that if the other three factors for preliminary injunction are met, then plaintiff may satisfy the success on the merits requirement by showing questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation. However, this modified test was expressly rejected by the Tenth Circuit as being inconsistent with *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008). *Diné Citizens*, 839 F.3d at 1282. The Tenth Circuit recognized that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Id*. Thus, Dr. Cubin is required to show a substantial likelihood of success on the merits.

### 1.    *Governor Gordon did not violate Dr. Cubin's free speech or petition rights.*

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. "The First Amendment prohibits the government from punishing a person for exercising the right to free speech." *Deutsch v. Jordan*, 618 F.3d 1093, 1097 (10th Cir. 2010). "When the government is the person's

App.094

employer, however, the right to free speech is limited in ways that would otherwise be unconstitutional." *Id.* The State has interests in regulating speech as an employer that are significantly different than regulating the general public. *Id.*

"To balance the public employee's right to speak as a citizen on matters of public concern against the government employer's interests in ensuring efficient public service, we use a five-step approach derived from *Garcetti* [*v. Ceballos*, 547 U.S. 410 (2006)] and *Pickering v. Board of Education*, 391 U.S. 563 (1968)." *Fields v. City of Tulsa*, 753 F.3d 1000, 1013 (10th Cir. 2014).

> The applicable test comprises five elements:
>
> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* (citation omitted). "The first three inquiries are ordinarily matters of law for the court to decide, while the last two are for the factfinder." *Id.* "Under this analysis, a public employee's speech is unprotected if it was made pursuant to official duties, if it was not on a matter of public concern, or if the balance of interests favors the employer." *Id.*

In his Motion, Dr. Cubin asserts a different test than the *Garcetti/Pinkering* balancing test for his claim that Governor Gordon retaliated against him for exercising his right to petition government. (ECF 12 at 20). Dr. Cubin claims that he must show that "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from

App.095

continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." (ECF 12 at 20) (quoting *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).

This is the appropriate standard for government action against the general public. However, the Supreme Court has recognized that claims for retaliation for exercising the right to petition by employees follows the same *Garcetti/Pinkering* state-interest balancing test as free speech claims. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 390-91 (2011). "The considerations that shape the application of the Speech Clause to public employees apply with equal force to claims by those employees under the Petition Clause." *Id.* at 390. "Petitions, no less than speech, can interfere with the efficient and effective operation of government. A petition may seek to achieve results that contravene governmental policies or impair the proper performance of governmental functions." *Id.* (citation and quotation marks omitted). The Supreme Court noted that "[u]nrestrained application of the Petition Clause in the context of government employment would subject a wide range of government operations to invasive judicial superintendence." *Id.* "The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right." *Id.* at 398. Thus, "[w]hen a public employee petitions as a citizen on a matter of public concern, the employee's First Amendment interest must be balanced against the countervailing interest of the government in the effective and efficient management of its internal affairs." *Id.* (citation omitted). "If that balance favors the public employee, the

employee's First Amendment claim will be sustained. If the interference with the government's operations is such that the balance favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern." *Id.*

For these reasons, the Court should apply the same *Garcetti*/*Pickering* test for both Dr. Cubin's free speech and right to petition claims. In applying this test, the only element that is contested at this time is the third element, the balancing of Dr. Cubin's speech and petition interests against Governor Gordon's interest in executive management and ensuring that members of State licensing boards are not perceived to have any bias or prejudice in the performance of their duties. As noted, this element presents an issue of law. *Fields,* 753 F.3d at 1013.

> **a.** **The State's interests outweigh Dr. Cubin's right to free speech and petition interests in this matter.**

The only issue at this time is the balancing of Dr. Cubin's speech and petition interests against Governor Gordon's interest in executive management, including ensuring that members of State licensing boards are not perceived to have any bias or prejudice in the performance of their duties.

The third element of the *Pickering* test "can be paraphrased as 'whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Rock v. Levinski,* 791 F.3d 1215, 1219 (10th Cir. 2015) (quoting *Lane v. Franks,* 573 U.S. 228, 242 (2014)). "In performing this balancing, the court should not consider the statement in a vacuum; the manner, time, and place of the employee's expression are relevant, as well as

App.097

the context in which the statement arose." *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1996) (citing *Connick v. Myers*, 461 U.S. 138, 152-53 (1983)). "Relevant considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Rock,* 791 F.3d at 1219-20 (quoting *Rankin v. McPherson,* 483 U.S. 378, 388 (1987)). "The employer need not await the detrimental impact before taking action. Preemptive steps to avoid such an impact can be acceptable, and we 'will generally defer to a public employer's reasonable predictions of disruption, as long as the predictions are supported by specific evidence.'" *Id.* at 1220 (quoting *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22,* 473 F.3d 1271, 1279 (10th Cir. 2007)).

     i.     **The Governor has a significant State interest in assuring members of State licensing boards perform their functions without perceived or actual bias or prejudice.**

This case involves the determination of the State's interest as asserted by the Governor of the State of Wyoming. The Governor in vested with the executive power of the State of Wyoming. Wyo. Const. art. 4, § 1. The Governor "shall formulate and administer the policies of, and shall exercise general supervision, direction and control over the executive branch of state government." Wyo. Stat. Ann. § 9-1-201. One of the duties that the Governor performs in exercising direction and supervision of the executive branch is appointing citizen members to serve on state boards and commissions, including the Board of Medicine.

The Board plays an important role in overseeing the Medical Practice Act. Board members "pass upon the qualifications and determine the fitness of all persons desiring to practice medicine in this state." *Id.* § 33-26-202(a). To that end, the Board is authorized to "[g]rant, refuse to grant, suspend, restrict, revoke, reinstate or renew licenses to practice medicine." *Id.* § 33-26-202(b)(i). The Board also has the authority to investigate allegations and take disciplinary action if a licensee is impaired or has violated the applicable provisions of the Act. *Id.* 33-26-202(b)(ii). The Board has authority to adopt rules to implement the Act, to publish nonbinding advisory opinions or other guidance on the application and interpretation of the Act, and investigate and evaluate complaints against licensees. *Id.* § 33-26-202(b).

The Wyoming Supreme Court has recognized that when the Board sits as a decision maker in discipline matters, licensees are entitled to a fair, unbiased hearing. *Painter v. Abels*, 998 P.2d 931, 938 (Wyo. 2000). Specifically, the Wyoming Supreme Court has provided that "[d]ue process requires that an agency provide a fair trial **without the appearance of bias or prejudice**." *Id.* (emphasis added). Additionally, the Wyoming Supreme Court has noted that in licensing matters, "[f]undamental considerations require not just fairness in fact but also fairness in appearance." *Dorr v. Wyo. Bd. of Certified Pub. Accts.*, 2001 WY 37, ¶ 20, 21 P.3d 735, 745 (Wyo. 2001). While these cases specifically address the need to keep separate prosecutorial and advisory attorneys roles, the importance of providing licensing proceedings free from the appearance of bias or prejudice necessarily apply equally to the Board members who are the ultimate decision makers in contested case proceedings.

This need for board members to avoid even the appearance of bias or prejudice is also contained in Executive Order 1997-4, Executive Branch Code of Conduct. (Ex. C, ¶ 1). The Executive Order applies to public officials, elected officials, appointees, and employees of the Executive Branch. (*Id.* ¶ 2). Specifically, the Code of Ethics prohibits conduct that compromises the integrity of the public office or creates the appearance of impropriety. (*Id.* ¶ 5H). Given the important role of the Board, including its authority to take action on medical licenses, as well as to create rules related to the practice of medicine in the State of Wyoming, it is imperative that Board members are not only free of bias and prejudice, but the appearance of bias or prejudice.

> ii.   **The Governor appropriately determined that Dr. Cubin's email to the House potentially created the appearance of bias or prejudice.**

In considering the Governor's interest in ensuring licensing boards operate without perceived or actual bias or prejudice, we then turn the Dr. Cubin's conduct in this case. In reviewing Dr. Cubin's email to the House, it is important to recognize what is contained in that email. Significantly, Dr. Cubin's email was not a statement of how he felt the bill would impact his patients or his practice. Additionally, the email did not simply seek to provide the legislature with additional information Dr. Cubin believed was relevant in considering the bill or provide a statement of his support for the bill. Rather, Dr. Cubin's letter asserted his frustrations with the WMS. (ECF 1-1). Dr. Cubin expressed his sadness that the "Wyoming Medical Society has been essentially hijacked by the far left." (*Id.*). He opined that, "they have adopted and embraced 'woke' positions that are not congruent with the thoughts and opinions of the majority of their physician members." (*Id.*). He provided

examples of positions "established by several very vocal, extremely liberal members of the [WMS] Board." (*Id.*). He speculated that the WMS partnered with Dr. Sanderson, a pediatrician in Sheridan, in presenting its position. (*Id.*). He then accused Dr. Sanderson (and potentially WMS leadership) of ignoring and suppressing other positions in the formation of their opinion. (*Id.*).

Dr. Cubin also stated that while at "face value" he agreed that the Legislature should not do anything to interfere with the doctor-patient relationship, he asserted that there were some instances where public safety would make it appropriate for the Legislature to make rules governing what is and is not acceptable in society. (*Id.*). He then gave examples including physician-assisted suicide. (*Id.*).

In removing Dr. Cubin from the Board, the Governor was not focused on Dr. Cubin's support of S.F. 99. Rather, the Governor focused on the State's interest in ensuring "that the professionals governed by the Board of Medicine have confidence that the board members prosecute their responsibilities on the board in an objective and unbiased way." (ECF 1-2). The Governor explained that Dr. Cubin's "comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering mattes that should be considered absent agenda or prejudice." (*Id.*). The letter went on to explain, that "[m]edical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone." (*Id.*). The Governor noted that "[e]ven the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality." (*Id.*). The Governor,

although recognizing that Dr. Cubin did not speak on behalf of the Board, further explained that "some may not appreciate that your personal comments might not necessarily be those of the Board as a whole." (*Id.*).

While Dr. Cubin may have been providing his own opinion, his role as a member of the Board requires him to be unbiased, fair, and impartial to all Wyoming medical licensees. Given his statements related to specific doctors, including members of the WMS, the Governor acted in good faith in concluding that Dr. Cubin's statements could cause certain medical professionals to be concerned that Dr. Cubin could not be an impartial Board member. The Governor must be able to remove Board members, who by statute serve at his pleasure, when he believes their actions call into question their ability to serve as fair and unbiased decision makers. *See* Wyo. Stat. Ann. § 33-26-201(a).

In his motion, Dr. Cubin asserts that the Governor put forth no reasonable evidence suggesting the Dr. Cubin's letter would negatively impact the Board's performance or ability to investigate and discipline its licensees. (ECF 12 at 18). Dr. Cubin suggests that if the Court does not required this evidence, then the Board physicians must be completely silent about all medical policy matters that go before the Wyoming Legislature. (*Id.*). This argument attempts to restate Dr. Cubin's email. Additionally, this argument attempts to misconstrue the language in the Governor's letter. If Dr. Cubin had simply sent an email asserting his support for the bill and passing on information that he thought was relevant for the Legislature's consideration, then this might be a different case. However, as previously noted that was not the extent of his email.

Dr. Cubin's attacks against Dr. Sanderson and certain members of the WMS appropriately concerned the Governor that "comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent agenda or prejudice." (ECF 1-2). Requiring actual evidence of prejudice or bias does not comport with the expectation that Board members act without even the appearance of bias or prejudice. It was not unreasonable for the Governor to determine that Dr. Cubin's negative statements directed at Wyoming medical practitioners could create the appearance of bias or prejudice affecting his role on the Board.

Dr. Cubin is aware of the impact of his statements on at least Dr. Sanderson, who sent him an email on February 29, 2024. In that email, Dr. Sanderson stated that Dr. Cubin had moved from cooperative communication to an attack. (Ex. D – Email from Dr. Michael Sanderson to Dr. Cubin). Dr. Sanderson asserted that Dr. Cubin potentially committed libel for his statements that Dr. Sanderson was involved in forming WMS's position and that neither Dr. Sanderson, nor the WMS cooperatively or intentionally suppressed the position of a separate organization. (*Id.*). Although unnecessary, this email provides additional evidence that Dr. Cubin's email compromised his ability to be perceived as fair and impartial as a member of the Board.

Finally, it is not unreasonable to expect that the Board, responsible for overseeing Wyoming medical practitioners, would want to maintain at least a professional and cordial working relationship with the WMS, the professional organization for Wyoming medical practitioners. Dr. Cubin's email attacking the WMS would have certainly created tension

between the Board and the WMS. The Board's relationship with the WMS is a legitimate State interest that weighs against Dr. Cubin's (and the many similarly situated board members) right to speech and petition.

2.    *Dr. Cubin is a policy making official and the Governor is entitled to political loyalty.*

Dr. Cubin does not appear to be claiming that the Governor removed him from the Board based on differing policy opinions as it relates to S.F. 99. As Cubin noted, the Governor signed S.F. 99 into law. (ECF 1, ¶ 43). However, to the extent that Dr. Cubin is asserting such a basis for his retaliation claims, the Governor also did not violate Dr. Cubin's free speech or petition rights.

The Tenth Circuit recognizes that some government positions are subject to requirements of political loyalty. *Poindexter v. Bd. of Cnty. Comm'rs of Cnty. of Sequoyah*, 548 F.3d 916, 919 (10th Cir. 2008). "To defend against a First Amendment claim on this ground, a public employer has the burden of proving that political loyalty is an appropriate requirement for the effective performance of the public office involved." *Id.* (citations and quotation marks omitted). "The question is not whether any particular political superior . . . actually takes political loyalty into account, but whether the nature of the position would appropriately permit him to do so." *Id.* "In determining whether a position appropriately requires political allegiance, we focus on the inherent powers of the position and the actual duties performed." *Id.* at 920. While this determination is generally a question of fact, "if the job description and duties performed are undisputed, then the district court may resolve the issue as a matter of law." *Id.*; see also *Van Schuyver v. Stitt*,

No. CIV-22-0663-HE, 2023 WL 11763162, at *3 (W.D. Okla. Jan. 18, 2023) (where state official's duties and powers were set by statute, interpretation of the pertinent statutes presents a question of law rather than a question of fact.).

In considering the statutory provisions related to Board members, they are political appointments, appointed by the Governor, but requiring Senate approval. Wyo. Stat. Ann. § 33-26-201(a). Board members "shall serve at the pleasure of the governor." *Id.* A vacancy occurs on the Board if a member "[i]s removed by the governor." *Id.* § 33-26-201(d)(iv). This statutory framework suggests the Governor's authority to implement his policy preferences and initiatives through the appointment and removal process.

As mentioned above, the Board has statutory authority over the practice of medicine in the State. *Id.* § 33-26-202. In addition to granting new licenses and investigating and taking action against existing licensees, the Board also has rulemaking authority for several areas of the Act. *See e.g.*, *id.* § 33-26-202(b)(v). Given the authority of the Board, Board members are policymakers, politically appointed by the Governor, serving at the Governor's pleasure, and subject to removal by the Governor.

As noted by the district court in *Van Schuyver*, "[i]n the context of the operation of the executive branch of state government, there is a substantial interest in the Governor in having the executive branch speak with a single voice to the extent state statutes contemplate that." 2023 WL 11763162, at *4. "Further and more specifically, the Governor has a substantial interest in assuring that appointees of his to state policymaking positions, and who serve at his pleasure, perform their functions in a way consistent with his policy initiatives and agenda." *Id.*

Given the nature of a position on the Board, Dr. Cubin was a policymaking appointee. As such, the Governor had the right to remove him from that position. *Mitchell v. King*, 537 F.2d 385, 391 (10th Cir. 1976) ("[W]e hold that the governor of New Mexico may remove a policymaking appointee such as Mitchell for political reasons, without notice or hearing, and that this power encompasses removal for expressions made by the appointee in contravention of the policy goals of the governor."). For these reasons, even if Dr. Cubin asserts that his departure from the Board was based on a policy disagreement with the Governor, he still cannot prevail on his claims.

Finally, considering that Governor Gordon could remove Dr. Cubin from the Board if he disagreed with his political position, it defies logic that he could not remove Dr. Cubin from the Board for statements that Governor Gordon believed impaired Dr. Cubin's ability to effectively perform as a Board member. The Governor's ability to effectively manage his executive branch functions requires him to make these determinations. This line of cases is instructive of the type of deference that should be provided the Governor in weighing the State's interest when the Governor makes determinations about removal of certain types of employees, including appointed board members. For these reasons, Dr. Cubin fails to establish substantial likelihood of success on the merits and his motion for preliminary injunction should be denied.

**B.    Dr. Cubin fails to establish irreparable harm.**

Dr. Cubin's motion for preliminary injunction should also be denied because he cannot establish irreparable harm. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182,

1189 (10th Cir. 2003) (citations and quotation marks omitted). "[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation and quotation marks omitted) (alteration and emphasis in original).

Dr. Cubin asserts that he suffered irreparable harm as a result of his removal from the Board, including the loss of his First Amendment rights. (ECF 12 at 11-12, 23). He provides no other basis or explanation for the irreparable harm, other than "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (ECF 12 at 23) (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)).

While courts have generally considered the loss of First Amendments rights to constitute irreparable injury, this Court should consider this standard in context of Dr. Cubin's requested relief. The Tenth Circuit explained that:

> The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages.

*Schrier v. Univ. of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (citations, quotations marks, and brackets omitted). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Id.*

In this instance Dr. Cubin is complaining of his removal from the Board, which occurred in April of 2024. Dr. Cubin failed to provide any information as to why he will be irreparably harmed by continuing to be off the Board during the pendency of this matter.

Additionally, Dr. Cubin's speech is not currently being limited by his continued exclusion from the Board. Rather, his free speech claim is related to the past conduct of removing him from the Board. In his Complaint, Dr. Cubin suggests that his removal, and presumably his continued exclusion, from the Board has caused him to suffer reputational harm, but he fails to assert the exact nature of the harm and how it would not be remedied with monetary damages. (ECF 1, ¶ 99). For these reasons, Dr. Cubin fails to assert irreparable harm that can only be prevented by putting him back on the Board.

**C.    The balance of harms weighs in favor of the Governor's state interests.**

"The third preliminary-injunction factor involves balancing the irreparable harms identified above against the harm that the preliminary injunction causes the [defendant]." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). "Under the heightened disfavored-injunction standard, the Plaintiffs need to make a strong showing that the balance of harms tips in their favor." *Id.* Here, the balance of harms weighs in favor of the Governor.

**1.    *Granting the injunction will harm the Governor's ability to take action against certain appointed officials.***

As noted by the above discussion, Dr. Cubin's free speech and petition rights in this case must be weighed against Governor Gordon's interest in managing executive functions and ensuring citizen licensing boards operate free of the appearance of bias or impropriety. While Dr. Cubin's email may have been in his personal capacity and on a matter of public concern, his statements were directed at his frustration and disagreement with specific doctors, including members of the WMS. (ECF 1-1). Even though Dr. Cubin did not

mention that he was a member of the Board, the Wyoming medical community is small and members of the WMS and Dr. Sanderson are presumably aware of who is appointed to the Board.

In this case, while the alleged irreparable harm to Dr. Cubin is the infringement of his free speech, the actual harm he points to is not the ability to engage in speech, but the fact that he was removed from the Board for his speech and presumably the fact he continues to be excluded from the Board. That harm must be weighed against the harm of his perceived bias or prejudice in sitting on the Board that is responsible for prosecuting and adjudicating license matters and engaging in rule making and other functions of the Board. The balancing these interests weighs in favor of the Governor's interest in maintaining medical practitioner trust in the impartiality of all members of the Board.

> ### 2.    *Granting the injunction would interfere with Governor's ability to manage his executive branch functions.*

Granting the injunction would allow a federal district court to substitute its judgment for that of the Governor in determining whether Dr. Cubin's speech could be perceived as creating bias or prejudice in his service to the Board or otherwise disrupt executive branch functions. Board members serve at the pleasure of the Governor, and the Governor should be able to expect the highest level of professional behavior from his appointed board members. This is especially true in areas where board member behavior may negatively reflect on their board duties and responsibilities. The Governor is best suited to determine what conduct thwarts the State's interest in maintaining unbiased and fair state licensing boards, including the need for appointed members who are free of perceived bias and

prejudice. Unlike other instances of state licensing board members speaking on matters related to their enabling statutes, Dr. Cubin did not just speak to the Legislature about his support for S.F. 99. Rather, Dr. Cubin used his letter to vilify specific Wyoming doctors, who are subject to the Board's authority. Additionally, Dr. Cubin's statements were specifically critical of the WMS, potentially damaging the relationship between the Board and the WMS. It these actions, not his support for S.F. 99 (which the Governor signed), that prompted his removal from the Board.

As a result, Dr. Cubin has not made the required "strong showing" that this factor weighs in his favor. *O Centro*, 389 F.3d at 975-76. For these reasons, the balance of harms weighs in Governor Gordon's favor.

**D.    Placing Dr. Cubin back on the Board would adversely affect the public interest.**

The last preliminary injunction factor requires that the injunction not be against the public interest. *Free the Nipple-Fort Collins*, 916 F.3d at 807. In this case, the Governor has a significant interest in ensuring that licensing board members are free of actual or perceived bias or prejudice in the performance of their important roles. Additionally, requiring Governor Gordon to put Dr. Cubin back on the Board could erode the confidence of not only medical licensees but all Wyoming licensees subject to the jurisdiction of State licensing boards. If the Governor is not allowed to remove Dr. Cubin in this instance, then when can he remove a licensing or other appointed board member? Most removals will come as a result of some statement or action by the board member that the governor (and not just Governor Gordon, but any subsequent governor) believes is improper. If this Court grants this injunction, then when can a governor have any confidence that he can remove

a board member (or even a cabinet-level employee) without facing not only potential money damages, but having a federal court put that person back on the applicable board or position of employment? In the face of having to explain his or her decision making to a federal district court, it is likely that a governor will be more likely to allow bad behavior than use his or her statutorily granted removal authority. Such action would have a negative effect on the general operation of the executive branch. For these reasons, the public interest weighs against granting a preliminary injunction.

## IV.   Conclusion

For all the above stated reasons, Dr. Cubin has failed to establish that he is entitled to the extraordinary relief of being reinstated to the Board. The Court should deny Dr. Cubin's Motion for Preliminary Injunction.

Dated this 25th day of October, 2024.

/s/Brandi L. Monger
Brandi Monger, WSB #6-3731
Deputy Attorney General
Timothy W. Miller, WSB #5-2704
Senior Assistant Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7886
(307) 777-8920 Facsimile
brandi.monger@wyo.gov
tim.miller@wyo.gov

Attorneys for Governor Gordon

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that on this 25th day of October, 2024, a true and correct copy of the foregoing was served as indicated below:

D. Stephen Melchior                     [✓] CM/ECF
Melchior Law Firm, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
steve@melchlaw.com


M.E. Buck Dougherty III                 [✓] CM/ECF
Liberty Justice Center
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
bdougherty@libertyjusticecenter.org


                                */s/Jessica Curless*
                                Jessica Curless, Paralegal
                                Office of the Wyoming Attorney General

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

DR. FREDERICK WILLIAM "ERIC"    )
CUBIN III,                         )
                                 )
        Plaintiff,            )
                                 )
    v.                          )   Case No. 24-CV-00164
                                 )
MARK GORDON, in both his personal and   )
official capacities as Governor of Wyoming,   )
                                 )
        Defendants.       )

---

### AFFIDAVIT OF VALERIE MOCKENSTURM, PA-C

---

Valerie Mockensturm, PA-C, being first duly sworn, hereby deposes and states as follows:

1.     I have personal knowledge of all matters set forth herein.

2.     I am a duly-licensed certified physician assistant practicing in Casper, Wyoming.

3.     I have served as a member of the Wyoming Board of Medicine since March 1, 2017.

4.     I am currently the President of the Wyoming Board of Medicine, a position I have held since April 29, 2023.

5.     At approximately 6:54 p.m. on February 28, 2024, Eric Cubin, M.D. forwarded to me an email string with the subject line "SF 99", a true and correct copy of which is attached hereto as Exhibit "A-1".

6.     At approximately 10:43 a.m. on May 29, 2024, Eric Cubin, M.D. sent an email with the subject line "My resignation", to several members of the Wyoming Board of Medicine, including me, a true and correct copy of which is attached hereto as Exhibit "A-2".

<div style="border:1px solid black; display:inline-block; padding:4px;">**EXHIBIT A**</div>

7.    At approximately 10:44 a.m. on May 29, 2024, Eric Cubin, M.D. forwarded to several members of the Wyoming Board of Medicine, including me, an email to members of the Wyoming House of Representatives with the subject line "Chloe's Law and WMS", a true and correct copy of which is attached hereto as Exhibit "A-3".

8.    At approximately 10:44 a.m. on May 29, 2024, Eric Cubin, M.D. forwarded to several members of the Wyoming Board of Medicine, including me, an email string with the subject line "Re: SF 99", a true and correct copy of which is attached hereto as Exhibit "A-4".

DATED this _10_ day of October, 2024.

_Valerie Mockensturm, PA-C_
Valerie Mockensturm, PA-C

STATE OF WYOMING     )
                     ) ss.
COUNTY OF LARAMIE    )

The foregoing Affidavit of Valerie Mockensturm, PA-C was subscribed and sworn to before me by Valerie Mockensturm, PA-C this _10th_ day of October, 2024.

Witness my hand and official seal

_Connie J Schepp_
Notary Public

CONNIE J. SCHEPP   NOTARY PUBLIC
COUNTY OF          STATE OF
LARAMIE            WYOMING
MY COMMISSION EXPIRES MAR 31, 2025

My commission expires:

2

Date: Wed, Feb 28, 2024 at 6:54 PM
Subject: Fwd: SF 99
To: <vkgoen@gmail.com>

Sent from my iPhone

Begin forwarded message:

From: Eric Cubin <ecubin@gmail.com>
Date: February 28, 2024 at 8:16:47 AM MST
To: Michael Sanderson <sanderman08@gmail.com>
Cc: Angus McAlpin <angusmcalpin@gmail.com>, Berton Toews <btoewsmd@gmail.com>, Dee Engle <dengle8@yahoo.com>, Donald Kirk <dkirk@starvalleyhealth.org>, Ghazi Ghanem <ghazighanem@gmail.com>, Giovanna Anthony <giovannina@giovmail.com>, Israel Stewart <ltstewartmed@gmail.com>, JJ Chen MD <jjchencheyenne@gmail.com>, Jim Hutchison <jimrhutchison@gmail.com>, Jonna Cubin <dubby77@gmail.com>, Kris Schamber <schambam@gmail.com>, Kristina Behringer MD <kilikinastina@gmail.com>, Luke Goddard <lukegoddard@sheridanhospital.org>, Mansell7 <mansell7@aol.com>, Matt Mitchell <matt010164@gmail.com>, Mattson Mathey <mattsonmathey@gmail.com>, Paul Johnson MD <pejohnson76@yahoo.com>, Rafael Homer <rhomer@uw.edu>, "Rinker Dr. Erica" <eldobbs@gmail.com>, Robert Kanard <rrk317@bresnan.net>, Robert Monger <robertmonger@gmail.com>, "Ronald L. Malm" <rmalm@uwyo.edu>, Sarah Durney MD <sarah_durney@hotmail.com>, Sheila Bush <sheila@wyomed.org>, Sierra Gross <sierragross@sheridanhospital.org>, Spencer Weston <swestonmd@gmail.com>, Stephen Brown <sbrownwyoming@yahoo.com>, Tracey Haas <drtraceyhaas@gmail.com>, thughfitz@aol.com, caf2941@aol.com, carsonwalkerwyo@gmail.com, ebsschubert@icloud.com, heith.waddell@gmail.com, htaggart@uw.edu, kevinhelling@gmail.com, larry lauridsen MD <larry.lauridsen@gmail.com>, nick.healey@huschblackwell.com
Subject: Re: SF 99

All,

I am sorry to continue to fill your inboxes with emails in regard to this issue.  However, time is of the essence and I think we all need to know what to expect from the WMS leadership and Executive Director in the next few days.

For those of you that may not be aware, SF 99 unanimously passed the Senate Labor Committee and subsequently passed all readings in the Senate.  The bill is now in the House of Representatives where should be considered in committee and on the floor this week.  It seems quite likely that the bill will pass the legislature.

What we all need to know right now is, specifically, what can we expect to see from WMS in regard to this bill over the next several days?  Will WMS continue to publicly oppose SF 99 or will you be presenting a neutral position?

Eric Cubin

On Feb 26, 2024, at 10:25 PM, Eric Cubin <ecubin@gmail.com> wrote:

Dr. Sanderson,

Thank you so much for sending this reply. I say thank you because I believe it is a perfect illustration of what I have been talking about and why I'm so concerned.

First, while I appreciate your assessment of the difference between these two professional societies in your specialty, I'm not convinced that the positions of the American College of Pediatrics should be discounted wholesale because they may not conform to the tremendous political pressure of the day. Is it the position of the WMS that the information and directives set forth by the AAP should be taken as gospel and the positions of the ACP should be ignored and suppressed? If so, when did the WMS adopt this stance and who was involved in that discussion? Do we have a conflict of interest among our leadership in WMS? Having briefly reviewed the information provided on the websites of both of the pediatric professional societies, my guess is that many WMS members would actually prefer the guidance provided by the ACP than the AAP - but we've never asked them. In any case, it is really bad policy to only present one side of an argument without presenting contrary opinions when trying to effect social policy.

Second, you state in your reply that the ACP formed as an alternative to the AAP. Why did that happen? Did they stray from their mission of providing optimal care for patients and advocating for their members? This is exactly what I'm concerned could happen to the WMS if the leadership continues to take unnecessary positions on controversial issues. This is particularly true when it is done without polling the WMS membership.

As for the issue of gender affirming care for children in our state, once again, I would humbly request that the WMS adjust its position to a more neutral stance.  This request applies not only to the lobbying efforts that are currently being undertaken during the legislative session, but also to the publications that you put forth on behalf of the WMS.  I have to admit that I was shocked when I saw "Gender Affirming Care" featured



prominently on the cover of the Spring 2023 edition of "Wyoming Medicine". I have to believe that I'm only one of many of your members who noticed this and felt as though we were being misrepresented my WMS and its leadership.

Once again, I want to say thank you to everyone who is receiving this email. Thank you for what you do and thank you for seriously considering these concerns.

God Bless,
Eric Cubin

On Feb 25, 2024, at 9:39 PM, Michael Sanderson <sanderman08@gmail.com> wrote:

Dr. Cubin,

Speaking as a pediatrician and not as the WyAAP president, simply to provide context to those who don't have the years of experience in pediatrics…

On the contrary, it is widely apparent to nearly everyone in the field of Pediatrics that the American College of Pediatricians is the politically motivated organization. Their clear deviation from overwhelming scientific consensus on a variety of social issues supports this, including their position in support of corporal punishment for children, their support for the barbarism of conversion therapy for homosexuality and transgenderism, their forwarding of what they claim is a connection between homosexuality and pedophilia, and their opposition to sex education on the basis that it promotes sexually promiscuity. At one point they even supported the use of blanket training. All of these positions have been thoroughly discredited or disproven by excellent science, yet they continue to advocate for them…except the blanket training. They are not taken seriously amongst the vast majority of pediatricians. Also I am not aware of any active chapter of the ACP in Wyoming.

The American College of Pediatricians formed as an alternative to the AAP. Now, speaking as the WyAAP president, admittedly , I think it is accurate to state that the National AAP membership can be quite politically and culturally liberal. We WyAAP leaders sometimes find ourselves educating AAP leadership on the conservative cultural norms from places like Wyoming. Despite this reality, speaking as a politically conservative person, I can say that I have never seen the National AAP put bias above science when it comes to patient care. They have always placed patient care and best patient outcomes as their highest priority. I understand that you are simply trying to make the point that there is room for more than one perspective here, and I agree with that. We should continue to welcome questions and deliberation on topics such as these.

Thanks for making your other points.

Mike Sanderson, M.D., F.A.A.P.
Northeast Wyoming Pediatric Associates, P.C.
Clinical Assistant Professor, University of Washington School of Medicine, Department of Pediatrics
(307) 675-5555
sanderman08@gmail.com

On Sun, Feb 25, 2024 at 8:59 PM Eric Cubin <ecubin@gmail.com> wrote:
Dr. Sanderson,

In a genuine effort to gain a better understanding of both sides of this issue, I think I have discovered the root cause of our misunderstanding. It seems that there are multiple professional societies in the field of pediatrics. While you do accurately represent the position of the American Association of Pediatricians, you have failed to mention the position of the American College of Pediatricians. It seems that these two professional societies have dramatically different positions on the topic.

For ease of access, here is a link to the ACP position statement that was updated in February 2024:

You are being redirected…
acpeds.org                          <favicon

In addition, the ACP published this article on the topic in 2018:

You are being redirected…
acpeds.org                          favicon

Why is it that the positions of these two specialty specific professional organizations are at such variance on the topic? Could the reason be that there really is no consensus based on data and available evidence? Is it possible that the AAP is more of a political organization and the ACP is more focused on science? Which society is right? Are they both wrong? If the evidence was as clear as you make it seem, then there would be consensus. I do not believe that we should only present one side of this issue to the WMS Board and ask them to make a decision based on that.

In regard to my position on the Board of Medicine… while it is true that I do sit on that Board, I want to make two things very clear. First, all of the statements and communications that I have sent to this group represent my personal beliefs and do NOT represent the positions or views of the Board of Medicine. Furthermore, these communications are solely intended to address my concerns with the WMS Board of Directors and select members of a professional organization of which I am a paid member in good standing. Second, in more general terms with regard to the Board of Medicine, it is the role of the Board of Medicine to ensure patient safety in this State through an effective licensing program and to fairly and appropriately discipline holders of medical licenses when they are found to be in violation of the Wyoming Medical Practice Act. I do not endeavor to make the rules which are to be enforced. It is much better, particularly on politically charged issues such as this, for the legislature and Governor to make the rules that are to be enforced by the Board of Medicine. If anyone has any concerns regarding the Board of Medicine I would encourage you to reach out to the Executive Director with these concerns. His name is Kevin Bohnenblust and he does a fantastic job.

As for the social inertia of this movement, I would agree with you that I haven't seen this to a huge degree in Wyoming - yet. On the national level, however, the inertia on GAC is undeniable. As a Wyomingite, I think it might be the wise for us to do what we can to stop that wave from hitting us when it does make its way toward the Continental Divide. Why would we even let it get its foot in the door when we don't fully understand the downstream consequences. I think there is significant wisdom in a wait and see approach until we get a more complete sense of the risks and benefits of these interventions.

At a minimum, based on the lack of consensus and the ACP position statements detailed above, WMS should not be taking anything but a neutral position on gender affirming care in children in Wyoming.

On another somewhat different, but very important, note... It is probably best for WMS (any organization for that matter) to avoid taking unnecessary positions on issues that are divisive amongst their membership. It is particularly bad when a vocal minority finds its way onto the Board and then creates position statements that don't reflect the opinions the majority of the members. Going forward, if WMS finds itself in a position where we must take a controversial position, once again, I implore you to poll your members before developing and coming forth with that statement.

God Bless,

Eric Cubin


On Feb 25, 2024, at 6:27 PM, Michael Sanderson <sanderman08@gmail.com> wrote:

Hello all, and Dr. Cubin,

Thanks to everyone for the dialog and to Dr. Cubin for reformatting and detailing your argument. I thought I should make my position more fully to represent the WyAAP.

To further add credibility to the Board's position on this point, as the President of the WyAAP, I can tell you that there is near unanimity amongst Wyoming pediatricians on our agreement with the position the WyAAP and the WMS holds on the issue of GAC for minors. Referring to Dr. Schamber's statement, and paraphrasing, that the Board prefers to weigh policy positions to some degree in favor of the opinions and positions of the physicians within specialties that are most involved and impacted by said policies, this context may add understanding.

As to the science in support of offering certain aspects of GAC to minors, social conservatives like me must learn to reckon with the fact that there is _enough_ evidence to support the use of "puberty blockers" and in limited circumstances, hormone replacement therapy (HRT) in minors for the purposes of GAC. For instance, a "good" quality prospective study often cited in this argument found that minors who had initiated puberty blockers or HRT were 60% less likely to experience depression and 73% less likely to experience suicidality. I very much disagree with this information being used as a coercive measure to pressure parents into consenting to GAC; I am also very cynical on the notion that Wyoming doctors are doing this. Regardless of whether or not I "like" this finding, or any feeling that I have about whether, in the long term, we will or won't find that medical GAC treatment has resulted in the best outcomes for Wyoming minors, my ethics as a physician require me to put aside my own biases and operative according to the best science available.

Specifically, on the subject of puberty blockers, I find it quite the double standard for opponents of the use of puberty blockers in minors for the purposes of GAC to cite the potential medical risks, including decreased bone mineral density and possible decreased fertility, as too significant and therefore prohibitive to/for their use, while not protesting their use in central precocious puberty. The only real "organic" risk of allowing central precocious puberty to proceed untreated, is, after all, short stature. The main reason we treat central precocious puberty is the social and emotional ramifications, and to a very limited degree, physical ramifications, that come from a person living with short stature in our society. One must admit to the similarity between the justifications for their use in both situations, while acknowledging that our conservative society seems to find one reason acceptable and the other unacceptable. The use of puberty blockers also achieves two specific goals that opponents of GAC ask us to seek - to "slow things down" by allowing for more time to explore gender identity, access psychosocial supports, and develop coping skills, and to reduce the need for surgery in the future.

I won't argue the point further, as there is already enough information at the hands of anyone who takes the time to look that there is enough science to support medical treatment for GAC and at the same time a lacking in the breadth and depth of that science that leaves many questions open. It is for this reason that the WyAAP will continue to forward the position that as the science either matures, or changes, Wyoming physicians who care for children are in the best position to operate this science, on an individualized, case by case basis, for each patient who comes to see us. However, as a member of the Wyoming Board of Medicine, who finds himself responsible for penalizing physicians for malpractice and unprofessional behavior, I would hope that you would find yourself just as well versed on the science and rationale behind the support of GAC for minors from the American Academy of Pediatrics, The American Medical Association, The American Academy Of Child and Adolescent Psychiatry, and the other professional societies involved, as you are in the science and limited professional opinion that opposes GAC for minors. If the Wyoming Legislature passes this bill, it will, by necessity, force Wyoming physicians to break the ethical standard of treating patients according to the _best_ science available at the risk of their license. Please remember this if you find yourself sitting in judgement against Wyoming physicians who may come before your Board for being put into this position by the Wyoming Legislature. I would also refer you to the policy statements from the AAP below, which will provide you with the wealth of science that supports the position I've stated.

2018 Policy Statement on Gender Affirming Care from the AAP:

https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?autologincheck=redirected

2023 Reaffirmation of Policy Statement from the AAP:

https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy


Finally, to address your concern that medicine may be overreacting to a possible social contagion of gender questioning, I would like to make the case to you that from the perspective of a Wyoming pediatrician who sees 3000-3500 patient encounters per year, this simply is not true _in our state_. The last 5 years of my practice

have resulted in exactly 2 patient encounters where a minor was interested in seeking gender affirming medical care.  The two individuals who were interested in this care had suffered years of bullying, ostracization, and physical mistreatment, as well as the collateral psychological and emotional issues that come along with all of that.  They had also already completed years of mental health counseling and medical treatment for their depression and anxiety. All Wyoming pediatricians can attest to this Wyoming reality.  I would strongly disagree with the notion that in our state, there is some kind of social inertia that pushes children and adolescents forward into gender questioning and GAC; on the contrary, my strong impression is that it is the exact opposite and that for nearly every Wyoming gender-questioning minor, they have by simple necessity overcome a great deal of social inertia against their gender-questioning to arrive at their identity.  It is for this reason that I also felt that SF 99, which was built from the experience of a single Californian minor in a Californian system within a Californian social context, cannot adequately address the situation on the ground in a state like Wyoming.

Dr Cubin - Thanks, it's been a long time since we connected, I hope you and your family are well.  Say hello to Marc for me - he's one of my favorite people and I'm thrilled he made the decision to come home...although I can't deny I was hoping Sheridan would snatch him up!

Mike Sanderson

On Sun, Feb 25, 2024 at 3:35 PM Eric Cubin <ecubin@gmail.com> wrote:

Dr. Schamber,

Thank you for taking the time to consider this issue further and for expanding the audience so I can more clearly express my position to the Board.

Before I begin I would like to say that, in my opinion, the Board has put the Executive Director in a very difficult position.  Mrs. Bush has been a personal friend of mine for decades, literally since high school.  Now she is in a position where she is given directives from the Board and is tasked with advocating for those positions.  When the positions handed to her from the Board are at variance with the opinion of majority of the members of the society for which she is the Executive Director, that puts her in a tough spot.  In this particular instance, I directed my concerns toward her and perhaps that was misguided.  To

that end, I am sorry and I humbly offer my apologies to Sheila.  That being typed, I do believe that WMS has taken a serious misstep and the fault for that falls squarely on the Board as I will discuss below.

As you all know, the topic of "gender affirming care" is extraordinarily controversial, particularly when it comes to treatment of children.  When it comes to issues such as this, it would probably be best if the WMS took a position similar to their position on abortion which, according to the WMS website, is "WMS continues to remain neutral".  If WMS is going to take a position on a hot-button issue such as this, it would be best if you actually polled your members before coming forth with "our" position.  For better or worse, I do not believe that the majority of your members are in favor of gender affirming care for children.  I believe that there is a very vocal minority who are pushing this issue, some which seem to have found their way onto your Board.  Before we go any further down this path, I would implore you to poll your membership.  If it is truly your desire to represent the physicians in this state, poll them.  Let's find out where they stand.

WMS has historically been a well respected and powerful organization in our state.  They achieved that position by actually representing the thoughts and beliefs of their members.  If the Board elects to go rogue and grind a political axe, then WMS will very likely lose members and the strength that comes with numbers.  In addition, your members tend to be active in their communities and have relationships with the legislators that ultimately make these difficult decisions.  When your members start talking about how WMS no longer represents their beliefs, that will completely undermine your credibility and ability to effectively lobby on our behalf.

Specifically related to gender affirming care in children...  The strongest argument that I've heard in favor of allowing this, as Dr. Sanderson referred to in his testimony, is that the legislature should not do anything to interfere with the doctor patient relationship.  At face value, I agree with that wholeheartedly.  That being said, there are some instances in which, for the safety of the public, it would be completely appropriate and reasonable for the legislature to make rules governing what is and is not acceptable in our society.  For example, if a physician moved into our state and started performing physician-assisted suicide, would it be the position of the WMS that that should be allowed because it falls under the doctor-patient relationship? Please also consider, for a moment, the example of child abuse.  We are all legally and morally required to report any instance in which we suspect child abuse.  Why?  Is that government overreach?  Does that violate the doctor-patient relationship? While arguably the answer is yes, the moral obligation overrides the established patient-physician relationship.

"Gender affirming care" with the use of puberty blockers and hormones in a patient with normal physiology takes a patient who is physiologically normal and makes them physiologically abnormal.  How can that be viewed as anything but harmful?  This is particularly true in young people who are impressionable

and whose frontal lobes are not completely myelinated, rendering them insufficiently developed to make decisions such as these. This may have negative effects on them later in life. When it comes to gender affirming care in children, as a society and profession, we can protect children by not allowing them to engage in it. If nothing else, perhaps we should consider waiting a few more years before we as a state permit this, to evaluate the experiences of states such as California where this is widely accepted and in some cases even promoted.

The evidence and medical data on gender affirming care is all over the board. Unfortunately, much of the data on both sides is politically charged and it is difficult to decipher exactly what is true and what is not true. It is entirely possible, at this point, that the whole transgender movement is a social contagion with roots in mental illness. It is also possible that hormone replacement and puberty blockers could have long term harmful effects on young people. By all means, as a society, we need to do everything that we can to ensure the safety and health of all children. It is my position that underlying mental illness in young people needs to be addressed completely and treated effectively. Treating mental illness does not include the use of hormone therapy. There are vocal advocates of this movement who would have citizens believe that children have mental illness due to gender dysphoria and that the proper treatment is medicine and surgery which subjects children to irreversible changes to their bodies. Wouldn't a more reasonable approach be to support youth with compassionate mental health evaluation and targeted mental health treatment until they reach the age of consent?

At the end of the day, we live in a conservative state. This is a state where people still know the difference between right and wrong, and the difference between men and women. It is completely appropriate for our elected officials who represent the citizens of our state to make rules governing what is and is not acceptable in instances where actions are being taken that could be harmful to our youth. Perhaps there are physicians who would choose not to come to Wyoming to practice because gender affirming care is not allowed for children. It's also possible that there are physicians who wouldn't come here because it is allowed. All of us who choose to live and work here do it for one reason or another. We all know what it means to live in Wyoming and be Wyomingites. I don't believe that we should promote fringe social policies that could result in harm to children in an effort to attract physicians who would participate in causing that harm.

Quite frankly, the WMS Board missed the mark with this position. Perhaps we would all be better served if the WMS Board elected to adjust its position on this issue or at least make sure that what you are representing is actually what your membership believes. If there are members who are using their position on the Board to advance their own political agenda without respect to what's best for the doctors in the state, then I would respectfully ask that WMS remove and replace those Board members with others who can maintain their focus on the true mission of WMS.

In regard to direct communication with the Board and Dr. Sanderson, I would welcome that. My cell phone is (307) 262-7148. Please feel free to reach out.

On a final note, I would like to say thank you to everyone who is on this email. Thank you for spending your time and energy trying to make a difference. Thank all of you physicians for taking care of the people of this Great State. Thank you Sheila for effectively lobbying on our behalf. While I do hold strong opinions about this issue, I believe that we can all disagree without being disagreeable. At the end of the day, we are all on the same team. I wish you all the very best!

Sincerely,

Eric Cubin

On Feb 23, 2024, at 10:00 AM, Kris Schamber <schambam@gmail.com> wrote:

Dr. Cubin,

I agree with Sheila that the WMS board discussed this in detail during our board meeting and she did not misrepresent our position. We had a great discussion and certainly there were disagreements. We did not present a supporting viewpoint, because that was not the position of the board for this particular bill. I would like to remind you that any individual, including yourself, has the right, and the ability, to testify in these hearings.

I noticed from your original email to Sheila that the video of the legislative testimony was sent to you from another source. I trust that you watched the testimony in its entirety. You will find that Sheila's remarks were exactly as stated in her follow-up email. I also found it alarming that the accusation by some in the legislature that Dr. Sanderson is actively harming patients as an agent of big pharma, and the blatant childish disrespect represented by one of the committee members plugging their ears so as to not hear Dr. Sanderson's testimony. I suppose it's fortunate then that this hearing was recorded so these details can be witnessed by all.

As I've said many times before, and to you specifically in prior emails, our positions are not made on simple, personal and party line political stances. It's actually much more difficult to debate the subtleties and nuance, and then develop a position that respects diverse member views, while adhering to our mission, vision, and tenets. If

we do not function this way, then we are nothing more than an extension of a partisan political party.

I urge you to consider for a moment, that any support, oppose, or neutral stance does not give the full perspective or context to one's stance. I don't believe that the individuals, parents, physicians, or others that support gender affirming care are willfully trying to mutilate or hurt children. Consider Dr. Sanderson for example. He is an extremely hard-working, white Christian male that cares deeply about his children, those children that he treats and refers, and his entire community. He was testifying yesterday, advocating for medicine and his patients, removing himself from any of his own personal or political beliefs.

I would love to discuss this with you in person, and Dr. Sanderson has indicated the same. You can also speak with your local representatives, Dr.'s Mitchell, Helling, and Schubert, all of whom were present during our recent board meeting. It may even be helpful for you to have the opportunity to discuss these controversial topics with our full board.  Our entire board is CC'd on this email in the name of full transparency and to limit any further misrepresentations.  As Sheila said, all members are welcome to join our board meetings, and in fact we had at least one non-board member do so during our most recent board meeting.

I look forward to further correspondence.

Kris
President, WMS Board of Trustees

--

**Kristopher Schamber, MD, FACP**
*Sheridan Memorial Hospital*
    Medical Director, Primary Care
    Medical Director, Home Health & Hospice
*University of Washington School of Medicine*
    Clinical Instructor
Clinic:    307.675.2690
Office:    307.675.5884
Cell:       307.871.2868
Email:     schambam@gmail.com
Email:     kristopherschamber@sheridanhospital.org

On February 22, 2024 at 8:01:48 AM, Sheila Bush (sheila@wyomed.org) wrote:

Dr. Cubin,

Thank you for your email. Dr. Sanderson was representing the Wyoming Chapter of the American Academy of Pediatrics as their president. I introduced myself as the director and representative of the state medical society. I separately stated that I was seated next to Dr. Sanderson who was there to speak on behalf of the WY-AAP with whom I also am contracted, through WMS, to serve as their representative and director.

I'm pleased to see you were forwarded the link to the hearing. Hopefully you heard and listened to not only my testimony but also to the comments and questions from the committee along with their tone. I am eager to hear your thoughts and to learn, specifically, what about my testimony you think so many doctors would find disagreement.

My testimony acknowledged that the clinical guidance within the specialty of pediatrics, published in October of 2018 and reaffirmed in August of 2023, is to not perform gender reassignment surgeries on minors, and that our organization recognizes and respects that our membership remains divided on other aspects of gender affirming care. I also reiterated that our members are not divided in their historic, and continued, opposition to the overreach of government into the practice of medicine. I testified that WMS would always stand staunchly in support of allowing medicine to debate and decide the best care for their patients and that the legislature lacked the education, training, and expertise to prescriptively dictate clinical practice.

I understand that you hold a different personal opinion than many of our other members on gender affirming care. WMS leadership debated many of these topics at their board meeting, which you and all other members were invited to attend. The unanimous direction I was given was to again oppose these legislative efforts in keeping with our organization's opposition to government overreach, and on the grounds of protecting autonomy in physician decision making. The board also gave weight to the expertise and positions of our members practicing in primary care and who care for these patients as it has historically been our practice to look first to the specialty or specialties most impacted by any legislative proposal. For this particular policy, those WMS members are our pediatricians and family physicians.

I'm certain you can appreciate the difficulty WMS faces in finding consensus on every policy position within an organization of more than 1,000 members. Our board is handed a great challenge in this and they work diligently to be fair, to hear all voices and to ensure they are transparent in the process. I serve at their pleasure and take my guidance directly from them. I would encourage you to employ the tools available to you through the WMS governance structure to get more involved and ensure your voice and perspective is included in the various ways WMS advocates to promote and protect medicine in Wyoming.

I am sincere in my offer to talk in more depth with you about this, or any other aspect of the state medical society that you believe could be improved. I don't actually think that WMS is as far afield as you might think we are. That said, I'm open to hearing your perspectives and insights and welcome the conversation.

Best regards,

**Sheila Bush**
Executive Director
T: 307.635.2424 | Direct: 307.263.1738
C: 307.630.8602



On Wed, Feb 21, 2024 at 9:10 PM Eric Cubin <ecubin@gmail.com> wrote:
Sheila....

Ouch!  Do you think that Dr. Sanderson's views represent the majority of your members?

Would it be out of the question to ask WMS to present physicians from both sides of an issue if you are going to take a position on a political issue such as this?

Eric


Good morning Eric.
I just wanted to keep you in the loop on testimony from WMS given this morning. The good news is the bill passed the Senate Labor Health Committee unanimously.

https://www.youtube.com/live/IztrJpvN-RI?si=4-tIbqVZu_8pCayb&t=1970



Senate Labor, Health & Social Services Committee, February 21, 2024

www.youtube.com


--
Mike Sanderson, M.D., F.A.A.P.
Northeast Wyoming Pediatric Associates, P.C.
Clinical Assistant Professor, University of Washington School of Medicine, Department of Pediatrics
(307) 675-5555
drsanderson@newpakids.com
sanderman09@gmail.com

**From:** Eric Cubin <ecubin@gmail.com>
**To:** Valerie Morris <vkgoen@gmail.com>; Michael A. Jording, MD <mike_jording@yahoo.com>; Emily McGrady <emilymcgrady@yahoo.com>; A. Dozier Tabb MD <adtabb@vcn.com>; Melinda Poyer <ladydoc31@aol.com>; Kevin Helling <kevinhelling@gmail.com>
**Sent:** Wednesday, May 29, 2024 at 10:43:13 AM MDT
**Subject:** My resignation

All,

It seems that what transpired and resulted in me being removed from the Board has finally made its way to the media.  An article was published yesterday in the Cowboy State Daily that fell a little bit short in explaining what exactly transpired.  For that reason, I wanted to reach out to each of you to let you know the truth.  I will also be sending you the background emails so you can make your own judgements on the merits of my removal.

When I was in Inuvik, NWT, hunting I received a phone call from the Governor's Chief of staff, Drew Perkins.  Drew proceeded to tell me that because of my advocacy for SF99 (Chloe's Law), the Governor had decided that I needed to be removed from the Board.  While on the phone with Drew, I received a simultaneous official email from the Governor notifying me that I had been officially removed from the Board.  When I saw that email, I replied and asked if they would at least afford me the opportunity to resign.  They agreed to let me do that.

For the record, I was never asked or given the opportunity to present my side of the story.

While I cannot prove it, I have been given a strong indication that Sheila Bush and the folks at the Wyoming Medical Society were the impetus for all of this.

If any of you have any questions about what happened, please feel free to reach out.  In the meantime, I will be forwarding you 2 emails.   One of those emails is the email that I sent to the members of the House of Representatives after WMS had tried to keep me from speaking up for nearly a week.  The second email contains a string of emails between myself, Sheila Bush,. and the WMS Board.  In it, you will see that I implore them to poll their membership before the go before the legislature and report that the doctors of this state generally are in favor of providing "gender affirming care" to children.  With that particular email, please start at the bottom and read your way to the top.  It is an interesting read and gives a good illustration of what is actually going on with WMS.

It is important for me to tell all of you that it was truly a pleasure to serve with you.  You are all wonderful people and I want to sincerely thank you for all of the time and energy that you spend ensuring that the people of Wyoming have safe, high quality health care professionals to take care of them.  I wish you all the best!

God Bless,
Eric Cubin

EXHIBIT A-2

**From:** Eric Cubin <ecubin@gmail.com>
**To:** Valerie Morris <vkgoen@gmail.com>; Michael A. Jording, MD <mike_jording@yahoo.com>; A. Dozier Tabb MD <adtabb@vcn.com>; Melinda Poyer <ladydoc31@aol.com>; Kevin Helling <kevinhelling@gmail.com>
**Sent:** Wednesday, May 29, 2024 at 10:44:02 AM MDT
**Subject:** Fwd: Chloe's Law and WMS

Begin forwarded message:

**From:** Eric Cubin <ecubin@gmail.com>
**Subject: Chloe's Law and WMS**
**Date:** February 28, 2024 at 10:01:25 PM MST
**To:** Lane.Allred@wyoleg.gov, Ocean.Andrew@wyoleg.gov, Bill.Allemand@wyoleg.gov, Abby.Angelos@wyoleg.gov, Dalton.Banks@wyoleg.gov, John.Bear@wyoleg.gov, Ryan.Berger@wyoleg.gov, Landon.Brown@wyoleg.gov, Donald.Burkhart@wyoleg.gov, Andrew.Byron@wyoleg.gov, Forrest.Chadwick@wyoleg.gov, Ken.Chestek@wyoleg.gov, Ken.Clouston@wyoleg.gov, Jon.Conrad@wyoleg.gov, Barry.Crago@wyoleg.gov, Bill.Henderson@wyoleg.gov, Bob.Davis@wyoleg.gov, John.Eklund@wyoleg.gov, Jeremy.Haroldson@wyoleg.gov, steve.harshman@wyoleg.gov, Scott.Heiner@wyoleg.gov, Ben.Hornok@wyoleg.gov, Mark.Jennings@wyoleg.gov, Chris.Knapp@wyoleg.gov, Lloyd.Larsen@wyoleg.gov, JT.Larson@wyoleg.gov, Martha.Lawley@wyoleg.gov, Tony.Locke@wyoleg.gov, Chip.Neiman@wyoleg.gov, Sandy.Newsome@wyoleg.gov, Bob.Nicholas@wyoleg.gov, Tony.Niemiec@wyoleg.gov, Ember.Oakley@wyoleg.gov, Jared.Olsen@wyoleg.gov, Pepper.Ottman@wyoleg.gov, Jerry.Obermueller@wyoleg.gov, David.Northrup@wyoleg.gov, kevin.ohearn@wyoleg.gov, Trey.Sherwood@wyoleg.gov, Rachel.Rodriguez-Williams@wyoleg.gov, Sarah.Penn@wyoleg.gov, Ken.Pendergraft@wyoleg.gov, Daniel.Singh@wyoleg.gov, Karlee.Provenza@wyoleg.gov, Allen.Slagle@wyoleg.gov, Scott.Smith@wyoleg.gov, Albert.Sommers@wyoleg.gov, Clark.Stith@wyoleg.gov, Liz.Storer@wyoleg.gov, Tomi.Strock@wyoleg.gov, Clarence.Styvar@wyoleg.gov, Reuben.Tarver@wyoleg.gov, Tamara.Trujillo@wyoleg.gov, Tom.Walters@wyoleg.gov, Jeanette.Ward@wyoleg.gov, Art.Washut@wyoleg.gov, Cyrus.Western@wyoleg.gov, John.Winter@wyoleg.gov, Cody.Wylie@wyoleg.gov, Mike.Yin@wyoleg.gov, dan.zwonitzer@wyoleg.gov, Dave.Zwonitzer@wyoleg.gov

My name is Eric Cubin. I am a physician in Casper. I am writing you today for a couple reasons. This email was originally written with the intent of sending it to the cosponsors of SF 99, Chloe's law. After considering it for some time, I've decided to expand the audience to the entire House of Representatives because I think you all need to know what is happening.

First and foremost, I want to say thank you. Thank you for spending your time and energy in an effort to keep Wyoming the last great place!

Second, I'm writing you because of SF 99, Chloe's Law. There is a situation that has arisen that I want to make you aware of. In addition, I would like to present each of you with some information that you may not otherwise be provided.

It saddens me very much to have to report that, under their current leadership, the Wyoming Medical Society has been essentially hijacked by the far left. It seems that they have decided to prioritize politics over their stated mission of physician advocacy. In my opinion, they have adopted and embraced "woke" positions that are not congruent with the thoughts and opinions of the majority of their physician members. In essence, I have lost all confidence in their ability or desire to faithfully represent the physicians in this state.

Please allow me to give you an example. WMS seems to have teamed up with the American Association of Pediatricians in opposing SF 99. Quite frankly, I refuse to believe that the majority of physicians in this very conservative state agree with this position - and we were never polled. This position was

established by several very vocal, extremely liberal members of the Board.  The position was then made public as though it actually represents the thoughts and beliefs of physicians in Wyoming when, in fact, that is probably not true.

In their opposition to Chloe's Law, the WMS has partnered with Dr. Sanderson, a pediatrician from Sheridan, who is the President of the WyAAP.  Dr. Sanderson has effectively delivered the position of his organization but he has failed to tell you that there is another pediatric professional society that has taken an opposite position, the American College of Pediatricians (ACP).  It turns out, the ACP put out a position statement that was revised February 5th, 2024, which reads in part:

"The ACPeds cannot condone the social affirmation, medical intervention, or surgical mutilation of children and adolescents identifying as transgender or gender nonconforming."

You can find the full text to their position statement at:

https://acpeds.org/position-statements/mental-health-in-adolescents-with-incongruence-of-gender-identity-and-biological-sex

The ACP created another germane position statement in 2018 which is worth reviewing and can be found at:

https://acpeds.org/position-statements/gender-dysphoria-in-children

You need to know that Dr. Sanderson (and presumably the WMS leadership) were aware of these ACP positions and yet they were ignored and suppressed when the WMS position was established.  Further, I presume that you have only been provided with the WMS/AAP position and not the ACP position statements.  As I have communicated to the entire WMS Board, it is not acceptable to only present one side of an issue in an effort to effect change in social policy.

For further illustration of the WMS's embracing of the woke transgender movement, I would also invite you to look at their Spring 2023 issue of "Wyoming Medicine" magazine.  In this particular issue they feature "Gender Affirming Care" on the cover and in a feature article.  I have no idea why the WMS has elected to take this unnecessary position that is so clearly contrary to the viewpoint of the majority of their members.

You can find the Spring 2023 edition of "Wyoming Medicine" here:

https://www.wyomed.org/wp-content/uploads/2023/05/23-WMS-0012_Spring2023_digital.pdf

I want to be very clear that the WMS membership was never polled on their opinions of "Gender Affirming Care" even though I have implored the leadership to do so.  It feels very much like the leadership at WMS has inserted their opinions in hopes that the WMS membership would not notice or speak up.

At this point, the strongest argument that I've heard in favor of killing this bill, as Dr. Sanderson referred to in his Senate testimony, is that the legislature should not do anything to interfere with the doctor patient relationship.  At face value, I agree with that wholeheartedly.  That being said, there are some instances in which, for the safety of the public, it would be completely appropriate and reasonable for the legislature to make rules governing what is and is not acceptable in our society.  For example, if a physician moved into our state and started performing physician-assisted suicide, should that be allowed because it falls under the doctor-patient relationship?

Another example that I would offer for your consideration is that of child abuse.  All physicians are legally and morally required to report any instance in which we suspect child abuse.  Why?  Is that government overreach?  Does that violate the doctor patient relationship?  Obviously, we all do that to protect our youth.  "Gender affirming care" with the use of puberty blockers and hormones in a patient with normal

physiology takes a patient who is normal and makes them abnormal.  How can that be viewed as anything but harmful?  This is particularly true in young people who are impressionable and whose brains have not developed sufficiently to make decisions such as these - and it will likely have negative effects on them later in life.  When it comes to gender affirming care in children, we can protect them by not allowing them to engage in it.

I think it is important for you to know that I have aggressively tried to address this situation with the WMS Board over the last couple days.  I was given an assurance earlier today that the WMS Board will be holding an executive session of some kind to determine if they will be changing their position from opposing this bill to a neutral position.  At this time, I have not been given any assurance that the WMS will be changing their position, so I feel the need to advocate on my own behalf by coming to you directly with this information.  It is entirely possible that when this bill is considered in committee and on the floor that the WMS position may have been changed to neutral.  Up to this point, however, they have not changed their position to neutral.

From the perspective of a Wyoming doctor who actually practices medicine at the very hospital where he was born, I can tell you that this is a good bill.  Please do not kill it, combine it, or amend it into oblivion.  This is very clearly an instance where it is completely appropriate and reasonable for all of you to stand up and say "we don't do that here".

Thank you again for all that you are doing for the citizens of Wyoming and for considering my concerns.  I hope that you find the information presented above helpful in promoting and passing SF 99.  Please feel free to reach out to me if you have any questions or concerns.

God Bless,
Eric Cubin MD, MS

**From:** Eric Cubin <ecubin@gmail.com>
**To:** Valerie Morris <vkgoen@gmail.com>; Michael A. Jording, MD <mike_jording@yahoo.com>; A. Dozier Tabb MD <adtabb@vcn.com>; Melinda Poyer <ladydoc31@aol.com>; Kevin Helling <kevinhelling@gmail.com>
**Sent:** Wednesday, May 29, 2024 at 10:44:11 AM MDT
**Subject:** Fwd: SF 99

Begin forwarded message:

**From:** Eric Cubin <ecubin@gmail.com>
**Subject: Re: SF 99**
**Date:** February 28, 2024 at 10:23:27 PM MST
**To:** Kristina Behringer MD <kilikinastina@gmail.com>
**Cc:** Michael Sanderson <sanderman08@gmail.com>, Sarah Durney MD <sarah_durney@hotmail.com>, Angus McAlpin <angusmcalpin@gmail.com>, Berton Toews <btoewsmd@gmail.com>, Dee Engle <Dengle8@yahoo.com>, Donald Kirk <dkirk@starvalleyhealth.org>, Ghazi Ghanem <ghazighanem@gmail.com>, Giovannina Anthony <giovannina@giovmail.com>, Israel Stewart <ltstewartmed@gmail.com>, JJ Chen MD <jjchencheyenne@gmail.com>, Jim Hutchison <jimrhutchison@gmail.com>, Jonna Cubin <dubby77@gmail.com>, Kris Schamber <schambam@gmail.com>, Luke Goddard <lukegoddard@sheridanhospital.org>, Mansell7 <Mansell7@aol.com>, Matt Mitchell <matt010164@gmail.com>, Mattson Mathey <mattsonmathey@gmail.com>, Paul Johnson MD <pejohnson76@yahoo.com>, Rafael Homer <homer@uw.edu>, "Rinker Dr. Erica" <eldobbs@gmail.com>, Robert Kanard <rrk317@bresnan.net>, Robert Monger <robertmonger@gmail.com>, "Ronald L. Malm" <rmalm@uwyo.edu>, Sheila Bush <sheila@wyomed.org>, Sierra Gross <sierragross@sheridanhospital.org>, Spencer Weston <swestonmd@gmail.com>, Stephen Brown <sbrownwyoming@yahoo.com>, Tracey Haas <drtraceyhaas@gmail.com>, bhughfitz@aol.com, caf2941@aol.com, carsonwalkerwyo@gmail.com, ebsschubert@icloud.com, keith.waddell@gmail.com, htaggart@uw.edu, Kevin Helling <kevinhelling@gmail.com>, larry lauridsen MD <larry.lauridsen@gmail.com>, nick.healey@huschblackwell.com

WMS Leadership.

I have to say that the silence is deafening. I very much appreciate those members who have spoken up, but I have not yet heard anything from the leadership about how this time sensitive issue is going to be addressed.

From my perspective, WMS and the leadership have lost their way. Many members have been bullied into accepting a woke social agenda that they do not agree with and this is what is being put forth as WMS positions. I can no longer stand for that. Since my voice is not being heard, I am left with no choice but to advocate for myself and my beliefs. I have so desperately implored you to poll your members if you are going to take position on these controversial issues, but that seems to have fallen on deaf ears.

I agree with Dr. Ghanem that WMS has historically been a powerful advocate for physicians in terms of insurance issues, access to health care, tort reform, and many other issues. I genuinely hope that WMS can and will continue to do that in the future. That being said, WMS would be best served if you all elect to completely abandon your socially charged "gender affirming care" agenda and focus on the things really matter to your members.

Respectfully,
Eric Cubin

> On Feb 28, 2024, at 9:52 AM, Kristina Behringer <kilikinastina@gmail.com> wrote:
>
> Good morning,
> We will make arrangements for the board members to discuss this issue further and determine our next best steps. Further details for board members to follow.
> Respectfully,
> Kristina
> Sent from my iPhone

>> On Feb 28, 2024, at 9:20 AM, Michael Sanderson <sanderman08@gmail.com> wrote:
>>
>> All,
>>
>> I would agree that from my perspective, WMS members are watching closely to see if the WMS board of trustees will demonstrate leadership on this issue despite the partisan headwinds.
>>
>> Dr. Michael Sanderson

>> On Wed, Feb 28, 2024 at 8:37 AM sarah durney <sarah_durney@hotmail.com> wrote:
>>> I think Dr. Cubin accurately expresses views and sentiments of many of our members. It would be worthwhile revisiting this issue quickly and considering an adjustment of our position stance.
>>>
>>>
>>> Sarah Durney
>>>
>>> Sent from my iPhone

>>> On Feb 28, 2024, at 8:17 AM, Eric Cubin <ecubin@gmail.com> wrote:
>>>
>>> All,
>>>
>>> I am sorry to continue to fill your inboxes with emails in regard to this issue. However, time is of the essence and I think we all need to know what to expect from the WMS leadership and Executive Director in the next few days.
>>>
>>> For those of you that may not be aware, SF 99 unanimously passed the Senate Labor Committee and subsequently passed all readings in the Senate. The bill is now in the House of Representatives where should be considered in committee and on the floor this week. It seems quite likely that the bill will pass the House.
>>>
>>> What we all need to know right now is, specifically, what can we expect to see from WMS in regard to this bill over the next several days? Will WMS continue to publicly oppose SF 99 or will you be presenting a neutral position?
>>>
>>> Eric Cubin

>>>> On Feb 26, 2024, at 10:25 PM, Eric Cubin <ecubin@gmail.com> wrote:

EXHIBIT A-4
App 126

Dr. Sanderson,

Thank you so much for sending this reply. I say thank you because I believe it is a perfect illustration of what I have been talking about and why I'm so concerned.

First, while I appreciate your assessment of the difference between these two professional societies in your specialty, I'm not convinced that the positions of the American College of Pediatrics should be discounted wholesale because they may not conform to the tremendous political pressure of the day. Is it the position of the WMS that the information and directives set forth by the AAP should be taken as gospel and the positions of the ACP should be ignored and suppressed? If so, when did the WMS adopt this stance and who was involved in that discussion? Do we have a conflict of interest among our leadership in WMS? Having briefly reviewed the information provided on the websites of both of the pediatric professional societies, my guess is that many WMS members would actually prefer the guidance provided by the ACP than the AAP - but we've never asked them. In any case, it is really bad policy to only present one side of an argument without presenting contrary opinions when trying to effect social policy.

Second, you state in your reply that the ACP formed as an alternative to the AAP. Why did that happen? Did they stray from their mission of providing optimal care for patients and advocating for their members? This is exactly what I'm concerned could happen to the WMS if the leadership continues to take unnecessary positions on controversial issues. This is particularly true when it is done without polling the WMS membership.

As for the issue of gender affirming care for children in our state, once again, I would humbly request that the WMS adjust its position to a more neutral stance. This request applies not only to the lobbying efforts that are currently being undertaking during the legislative session, but also to the publications that you put forth on behalf of the WMS. I have to admit that I was shocked when I saw "Gender Affirming Care" featured prominently on the cover of the Spring 2023 edition of "Wyoming Medicine". I have to believe that I'm only one of many of your members who noticed this and felt as though we were being misrepresented my WMS and its leadership.

Once again, I want to say thank you to everyone who is receiving this email. Thank you for what you do and thank you for seriously considering these concerns.

God Bless,
Eric Cubin


On Feb 25, 2024, at 9:39 PM, Michael Sanderson <sanderman08@gmail.com> wrote:

Dr. Cubin,

Speaking as a pediatrician and not as the WyAAP president, simply to provide context to those who don't have the years of experience in pediatrics…

On the contrary, it is widely apparent to nearly everyone in the field of Pediatrics that the American College of Pediatricians is the politically motivated organization. Their clear deviation from overwhelming scientific consensus on a variety of social issues supports this, including their position in support of corporal punishment for children, their support for the barbarism of conversion therapy for homosexuality and transgenderism, their forwarding of what they claim is a coinnection between homosexuality and pedophilia, and their opposition to sex education on the basis that it promotes sexually promiscuity. At one point they even supported the use of blanket training. All of these positions have been thoroughly discredited or disproven by excellent science, yet they continue to advocate for them…except the blanket training. They are not taken seriously amongst the vast majority of pediatricians. Also I am not aware of any active chapter of the ACP in Wyoming.

The American College of Pediatricians formed as an alternative to the AAP. Now, speaking as the WyAAP president, admittedly , I think it is accurate to state that the National AAP <u>membership</u> can be quite politically and culturally liberal. We WyAAP leaders sometimes find ourselves educating AAP leadership on the conservative cultural norms from places like Wyoming. Despite this reality, speaking as a politically conservative person, I can say that I have never seen the National AAP put bias above science when it comes to patient care. They have always placed patient care and best patient outcomes as their highest priority. I understand that you are simply trying to make the point that there is room for more than one perspective here, and I agree with that. We should continue to welcome questions and deliberation on topics such as these.

Thanks for making your other points.

Mike Sanderson, M.D., F.A.A.P.
Northeast Wyoming Pediatric Associates, P.C.
Clinical Assistant Professor, University of Washington School of Medicine, Department of Pediatrics
(307) 675-5555
sanderman08@gmail.com


On Sun, Feb 25, 2024 at 8:59 PM Eric Cubin <ecubin@gmail.com> wrote:
Dr. Sanderson,

In a genuine effort to gain a better understanding of both sides of this issue, I think I have discovered the root cause of our misunderstanding. It seems that there are multiple professional societies in the field of pediatics. While you do accurately represent the position of the American Association of Pediatricians, you have failed to mention the position of the American College of Pediatricians. It seems that these two professional societies have dramatically different positions on the topic.

For ease of access, here is a link to the ACP position statement that was updated in February 2024:

You are being redirected…
acpeds.org                              <favicon.ico>

In addition, the ACP published this article on the topic in 2018:

You are being redirected…
acpeds.org                              fav

Why is it that the positions of these two specialty specific professional organizations are at such variance on the topic? Could the reason be that there really is no consensus based on data and available evidence? Is it possible that the AAP is more of a political organization and the ACP is more focused on science? Which society is right? Are they both wrong? If the evidence was as clear as you make it seem, then there would be consensus. I do not believe that we should only present one side of this issue to the WMS Board and ask them to make a decision based on that.

In regard to my position on the Board of Medicine... while it is true that I do sit on that Board, I want to make two things very clear. First, all of the statements and communications that I have sent to this group represent my personal beliefs and do NOT represent the positions or views of the Board of Medicine. Furthermore, these communications are solely intended to address my concerns with the WMS Board of Directors and select members of a professional organization of which I am a paid member in good standing. Second, in more general terms with regard to the Board of Medicine, it is the role of the Board of Medicine to ensure patient safety in this State through an effective licensing program and to fairly and appropriately discipline holders of medical licenses when they are found to be in violation of the Wyoming Medical Practice Act. I do not endeavor to make the rules which are to be enforced. It is much better, particularly on politically charged issues such as this, for the legislature and Governor to make the rules that are to be enforced by the Board of Medicine. If anyone has any concerns regarding the Board of Medicine I would encourage you to reach out to the Executive Director with these concerns. His name is Kevin Bohnenblust and he does a fantastic job.

As for the social inertia of this movement, I would agree with you that I haven't seen this to a huge degree in Wyoming - yet. On the national level, however, the inertia on GAC is undeniable. As a Wyomingite, I think it might be the wise for us to do what we can to stop that wave from hitting us when it does make its way toward the Continental Divide. Why would we even let it get its foot in the door when we don't fully understand the downstream consequences. I think there is significant wisdom in a wait and see approach until we get a more complete sense of the risks and benefits of these interventions.

At a minimum, based on the lack of consensus and the ACP position statements detailed above, WMS should not be taking anything but a neutral position on gender affirming care in children in Wyoming.

On another somewhat different, but very important, note... It is probably best for WMS (any organization for that matter) to avoid taking unnecessary positions on issues that are divisive amongst their membership. It is particularly bad when a vocal minority finds its way onto the Board and then creates position statements that don't reflect the opinions the majority of the members. Going forward, if WMS finds itself in a position where we must take a controversial position, once again, I implore you to poll your members before developing and coming forth with that statement.

God Bless,

Eric Cubin

On Feb 25, 2024, at 6:27 PM, Michael Sanderson <sanderman08@gmail.com> wrote:

Hello all, and Dr. Cubin,

Thanks to everyone for the dialog and to Dr. Cubin for reformatting and detailing your argument. I thought I should make my position more fully to represent the WyAAP.

To further add credibility to the Board's position on this point, as the President of the WyAAP, I can tell you that there is near unanimity amongst Wyoming pediatricians on our agreement with the position the WyAAP and the WMS holds on the issue of GAC for minors. Referring to Dr. Schamber's statement, and paraphrasing, that the Board prefers to weigh policy positions to some degree in favor of the opinions and positions of the physicians within specialties that are most involved and impacted by said policies, this context may add understanding.

As to the science in support of offering certain aspects of GAC to minors, social conservatives like me must learn to reckon with the fact that there is enough evidence to support the use of "puberty blockers" and in limited circumstances, hormone replacement therapy (HRT) in minors for the purposes of GAC. For instance, a "good" quality prospective study often cited in this argument found that minors who had initiated puberty blockers or HRT were 60% less likely to experience depression and 73% less likely to experience suicidality. I very much disagree with this information being used as a coercive measure to pressure parents into consenting to GAC; I am also very cynical on the notion that Wyoming doctors are doing this. Regardless of whether or not I "like" this finding, or any feeling that I have about whether, in the long term, we will or won't find that medical GAC treatment has resulted in the best outcomes for Wyoming minors, my ethics as a physician require me to put aside my own biases and operative according to the best science available.

Specifically, on the subject of puberty blockers, I find it quite the double standard for opponents of the use of puberty blockers in minors for the purposes of GAC to cite the potential medical risks, including decreased bone mineral density and possible decreased fertility, as too significant and therefore prohibitive to/for their use, while not protesting their use in central precocious puberty. The only real "organic" risk of allowing central precocious puberty to proceed untreated, is, after all, short stature. The main reason we treat central precocious puberty is the social and emotional ramifications, and to a very limited degree, physical ramifications, that come from a person living with short stature in our society. One must admit to the similarity between the justifications for their use in both situations, while acknowledging that our conservative society seems to find one reason acceptable and the other unacceptable. The use of puberty blockers also achieves two specific goals that opponents of GAC ask us to seek - to "slow things down" by allowing for more time to explore gender identity, access psychosocial supports, and develop coping skills, and to reduce the need for surgery in the future.

I won't argue the point further, as there is already enough information at the hands of anyone who takes the time to look that there is enough science to support medical treatment for GAC and at the same time a lacking in the breadth and depth of that science that leaves many questions open. It is for this reason that the WyAAP will continue to forward the position that as the

science either matures, or changes, Wyoming physicians who care for children are in the best position to operate this science, on an individualized, case by case basis, for each patient who comes to see us. However, as a member of the Wyoming Board of Medicine, who finds himself responsible for penalizing physicians for malpractice and unprofessional behavior, I would hope that you would find yourself just as well versed on the science and rationale behind the support of GAC for minors from the American Academy of Pediatrics, The American Medical Association, The American Academy Of Child and Adolescent Psychiatry, and the other professional societies involved, as you are in the science and limited professional opinion that opposes GAC for minors. If the Wyoming Legislature passes this bill, it will, by necessity, force Wyoming physicians to break the ethical standard of treating patients according to the <u>best</u> science available at the risk of their license. Please remember this if you find yourself sitting in judgement against Wyoming physicians who may come before your Board for being put into this position by the Wyoming Legislature.  I would also refer you to the policy statements from the AAP below, which will provide you with the wealth of science that supports the position I've stated.


2018 Policy Statement on Gender Affirming Care from the AAP:

https://publications.aap.org/pediatrics/article/142/4/
e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for?
autologincheck=redirected


2023 Reaffirmation of Policy Statement from the AAP:

https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-
affirming-care-policy


Finally, to address your concern that medicine may be overreacting to a possible social contagion of gender questioning, I would like to make the case to you that from the perspective of a Wyoming pediatrician who sees 3000-3500 patient encounters per year, this simply is not true <u>in our state</u>. The last 5 years of my practice have resulted in exactly 2 patient encounters where a minor was interested in seeking gender affirming medical care.  The two individuals who were interested in this care had suffered years of bullying, ostracization, and physical mistreatment, as well as the collateral psychological and emotional issues that came along with all of that.  They had also already completed years of mental health counseling and medical treatment for their depression and anxiety. All Wyoming pediatricians can attest to this Wyoming reality.  I would strongly disagree with the notion that in our state, there is some kind of social inertia that pushes children and adolescents forward into gender questioning and GAC; on the contrary, my strong impression is that it is the exact opposite and that for nearly every Wyoming gender-questioning minor, they have by simple necessity overcome a great deal of social inertia against their gender-questioning to arrive at their identity.  It is for this reason that I also felt that SF 99, which was built from the experience of a single Californian minor in a Californian system within a Californian social context, cannot adequately address the situation on the ground in a state like Wyoming.


Dr Cubin - Thanks, it's been a long time since we connected, I hope you and your family are well.  Say hello to Marc for me - he's one of my favorite people and I'm thrilled he made the decision to come home...although I can't deny I was hoping Sheridan would snatch him up!


Mike Sanderson



On Sun, Feb 25, 2024 at 3:35 PM Eric Cubin <ecubin@gmail.com> wrote:

Dr. Schamber,


Thank you for taking the time to consider this issue further and for expanding the audience so I can more clearly express my position to the Board.

Before I begin I would like to say that, in my opinion, the Board has put the Executive Director in a very difficult position. Mrs. Bush has been a personal friend of mine for decades, literally since high school. Now she is in a position where she is given directives from the Board and is tasked with advocating for those positions. When the positions handed to her from the Board are at variance with the opinion of majority of the members of the society for which she is the Executive Director, that puts her in a tough spot.  In this particular instance, I directed my concerns toward her and perhaps that was misguided. To

that end, I am sorry and I humbly offer my apologies to Sheila. That being typed, I do believe that WMS has taken a serious

misstep and the fault for that falls squarely on the Board as I will discuss below.

As you all know, the topic of "gender affirming care" is extraordinarily controversial, particularly when it comes to treatment of children. When it comes to issues such as this, it would probably be best if the WMS took a position similar to their position on abortion which, according to the WMS website, is "WMS continues to remain neutral". If WMS is going to take a position on a hot-button issue such as this, it would be best if you actually polled your members before coming forth with "our" position. For better or worse, I do not believe that the majority of your members are in favor of gender affirming care for children. I believe that there is a very vocal minority who are pushing this issue, some which seem to have found their way onto your Board. Before we go any further down this path, I would implore you to poll your membership. If it is truly your desire to represent the physicians in this state, poll them. Let's find out where they stand.

WMS has historically been a well respected and powerful organization in our state. They achieved that position by actually representing the thoughts and beliefs of their members. If the Board elects to go rogue and grind a political axe, then WMS will very likely lose members and the strength that comes with numbers. In addition, your members tend to be active in their communities and have relationships with the legislators that ultimately make these difficult decisions. When your members start talking about how WMS no longer represents their beliefs, that will completely undermine your credibility and ability to effectively lobby on our behalf.

Specifically related to gender affirming care in children… The strongest argument that I've heard in favor of allowing this, as Dr. Sanderson referred to in his testimony, is that the legislature should not do anything to interfere with the doctor patient relationship. At face value, I agree with that wholeheartedly. That being said, there are some instances in which, for the safety of the public, it would be completely appropriate and reasonable for the legislature to make rules governing what is and is not acceptable in our society. For example, if a physician moved into our state and started performing physician-assisted suicide, would it be the position of the WMS that that should be allowed because it falls under the doctor-patient relationship? Please also consider, for a moment, the example of child abuse. We are all legally and morally required to report any instance in which we suspect child abuse. Why? Is that government overreach? Does that violate the doctor-patient relationship? While arguably the answer is yes, the moral obligation overrides the established patient-physician relationship.

"Gender affirming care" with the use of puberty blockers and hormones in a patient with normal physiology takes a patient who is physiologically normal and makes them physiologically abnormal. How can that be viewed as anything but harmful? This is particularly true in young people who are impressionable and whose frontal lobes are not completely myelinated, rendering them insufficiently developed to make decisions such as these. This may have negative effects on them later in life. When it comes to gender affirming care in children, as a society and profession, we can protect children by not allowing them to engage in it. If nothing else, perhaps we should consider waiting a few more years before we as a state permit this, to evaluate the experiences of states such as California where this is widely accepted and in some cases even promoted.

The evidence and medical data on gender affirming care is all over the board. Unfortunately, much of the data on both sides is politically charged and it is difficult to decipher exactly what is true and what is not true. It is entirely possible, at this point, that the whole transgender movement is a social contagion with roots in mental illness. It is also possible that hormone replacement and puberty blockers could have long term harmful effects on young people. By all means, as a society, we need to do everything that we can to ensure the safety and health of all children. It is my position that underlying mental illness in young people needs to be addressed completely and treated effectively. Treating mental illness does not include the use of hormone therapy. There are vocal advocates of this movement who would have citizens believe that children have mental illness due to gender dysphoria and that the proper treatment is medicine and surgery which subjects children to irreversible changes to their bodies. Wouldn't a more reasonable approach be to support youth with compassionate mental health evaluation and targeted mental health treatment until they reach the age of consent?

At the end of the day, we live in a conservative state. This is a state where people still know the difference between right and wrong, and the difference between men and women. It is completely appropriate for our elected officials who represent the citizens of our state to make rules governing what is and is not acceptable in instances where actions are being taken that could be harmful to our youth. Perhaps there are physicians who would choose not to come to Wyoming to practice because gender affirming care is not allowed for children. It's also possible that there are physicians who wouldn't come here because it is allowed. All of us who choose to live and work here do it for one reason or another. We all know what it means to live in Wyoming and be Wyomingites. I don't believe that we should promote fringe social policies that could result in harm to children in an effort to attract physicians who would participate in causing that harm.

Quite frankly, the WMS Board missed the mark with this position. Perhaps we would all be better served if the WMS Board elected to adjust its position on this issue or at least make sure that what you are representing is actually what your membership believes. If there are members who are using their position on the Board to advance their own political agenda without respect to what's best for the doctors in the state, then I would respectfully ask that WMS remove and replace those Board members with others who can maintain their focus on the true mission of WMS.

In regard to direct communication with the Board and Dr. Sanderson, I would welcome that. My cell phone is (307) 262-7148. Please feel free to reach out.

On a final note, I would like to say thank you to everyone who is on this email. Thank you for spending your time and energy trying to make a difference. Thank all of you physicians for taking care of the people of this Great State. Thank you Sheila for effectively lobbying on our behalf. While I do hold strong opinions about this issue, I believe that we can all disagree without being disagreeable. At the end of the day, we are all on the same team. I wish you all the very best!

Sincerely,

Eric Cubin

On Feb 23, 2024, at 10:00 AM, Kris Schamber <schambam@gmail.com> wrote:

Dr. Cubin,

I agree with Sheila that the WMS board discussed this in detail during our board meeting and she did not misrepresent our position. We had a great discussion and certainly there were disagreements. We did not present a supporting viewpoint, because that was not the position of the board for this particular bill. I would like to remind you that any individual, including yourself, has the right, and the ability, to testify in these hearings.

I noticed from your original email to Sheila that the video of the legislative testimony was sent to you from another source. I trust that you watched the testimony in its entirety. I also found it alarming that the accusation by some in the legislature that Dr. Sanderson is actively harming patients as an agent of big pharma, and the blatant childish disrespect represented by one of the committee members plugging their ears so as to not hear Dr. Sanderson's testimony. I suppose it's fortunate then that this hearing was recorded so these details can be witnessed by all.

As I've said many times before, and to you specifically in prior emails, our positions are not made on simple, personal and party line political stances. It's actually more difficult to debate the subtleties and nuance, and then develop a position that respects diverse member views, while adhering to our mission, vision, and tenets. If we do not function this way, then we are nothing more than an extension of a partisan political party.

I urge you to consider for a moment, that any support, oppose, or neutral stance does not give the full perspective or context to one's stance. I don't believe that the individuals, parents, physicians, or others that support gender affirming care are willfully trying to mutilate or hurt children. Consider Dr. Sanderson for example. He is an extremely hard-

working, white Christian male that cares deeply about his children, those children that he treats and refers, and his entire community. He was testifying yesterday, advocating for medicine and his patients, removing himself from any of his own personal or political beliefs.

I would love to discuss this with you in person, and Dr. Sanderson has indicated the same. You can also speak with your local representatives, Dr.'s Mitchell, Helling, and Schubert, all of whom were present during our recent board meeting. It may even be helpful for you to have the opportunity to discuss these controversial topics with our full board.  Our entire board is CC'd on this email in the name of full transparency and to limit any further misrepresentations.  As Sheila said, all members are welcome to join our board meetings, and in fact we had at least one non-board member do so during our most recent board meeting.

I look forward to further correspondence.


Kris
President, WMS Board of Trustees


--
**Kristopher Schamber, MD, FACP**
*Sheridan Memorial Hospital*
   Medical Director, Primary Care
   Medical Director, Home Health & Hospice
*University of Washington School of Medicine*
   Clinical Instructor
Clinic:   307.675.2690
Office:   307.675.5884
Cell:   307.871.2868
Email:   schambam@gmail.com
Email:   kristopherschamber@sheridanhospital.org


On February 22, 2024 at 8:01:48 AM, Sheila Bush (sheila@wyomed.org) wrote:

Dr. Cubin,

Thank you for your email. Dr. Sanderson was representing the Wyoming Chapter of the American Academy of Pediatrics as their president. I introduced myself as the director and representative of the state medical society. I separately stated that I was seated next to Dr. Sanderson who was there to speak on behalf of the WY-AAP with whom I also am connected, through WMS, to serve as their representative and director.

I'm pleased to see you were forwarded the link to the hearing. Hopefully you heard and listened to not only my testimony but also to the comments and questions from the committee along with their tone. I am eager to hear your thoughts and to learn, specifically, what about my testimony you think so many doctors would find disagreement.

My testimony acknowledged that the clinical guidance within the specialty of pediatrics, published in October of 2018 and reaffirmed in August of 2023, is to not perform gender reassignment surgeries on minors, and that our organization recognizes and respects that our membership remains divided on other aspects of gender affirming care. I also reiterated that our members are not divided in their historic, and continued, opposition to the overreach of government into the practice of medicine. I testified that WMS would always stand staunchly in support of allowing medicine to debate and decide the best care for their patients and that the legislature lacked the education, training, and expertise to prescriptively dictate clinical practice.

I understand that you hold a different personal opinion than many of our other members on gender affirming care. WMS leadership debated many of these topics at their board meeting, which you and all other members were invited to attend. The unanimous direction I was given was to again oppose these legislative efforts in keeping with our organization's opposition to government overreach, and on the grounds of protecting autonomy in physician decision making.  The board also gave weight to the expertise and positions of our members practicing in primary care and who care for these patients as it has historically been our practice to look first to the specialty or specialties most impacted by any legislative proposal. For this particular policy, those WMS members are our pediatricians and family physicians.

I'm certain you can appreciate the difficulty WMS faces in finding consensus on every policy position within an organization of more than 1,000 members. Our board is handed a great challenge in this and they work diligently to be fair, to hear all voices and to ensure they are transparent in the process. I serve at their pleasure and take my guidance directly from them. I would encourage you to employ the tools available to you through the WMS governance structure to get more involved and ensure your voice and perspective is included in the various ways WMS advocates to promote and protect medicine in Wyoming.

I am sincere in my offer to talk in more depth with you about this, or any other aspect of the state medical society that you believe could be improved. I don't actually think that WMS is as far afield as you might think we are. That said, I'm open to hearing your perspectives and insights and welcome the conversation.

Best regards,

**Sheila Bush**
**Executive Director**
T: 307.635.2424 | Direct: 307.263.1738
C: 307.630.8602



On Wed, Feb 21, 2024 at 9:10 PM Eric Cubin
<ecubin@gmail.com> wrote:
Sheila....

Ouch!  Do you think that Dr. Sanderson's views
represent the majority of your members?

Would it be out of the question to ask WMS to present
physicians from both sides of an issue if you are going
to take a position on a political issue such as this?

Eric

Good morning Eric.
I just wanted to keep you in the loop on
testimony from WMS given this
morning. The good news is the bill
passed the Senate Labor Health
Committee unanimously.

https://www.youtube.com/live/IztrjpvN-
Rl?si=4-tIbqVZu_8pCayb&t=1970



Senate Labor, Health & Social Services
February 21, 2024
www.youtube.com

--
Mike Sanderson, M.D., F.A.A.P.
Northeast Wyoming Pediatric Associates, P.C.
Clinical Assistant Professor, University of Washington School of Medicine, Department
of Pediatrics
(307) 675-5555
drsanderson@newpakids.com
sanderman08@gmail.com

--
Mike Sanderson, M.D., F.A.A.P.
Northeast Wyoming Pediatric Associates, P.C.
Clinical Assistant Professor, University of Washington School of Medicine, Department of Pediatrics
(307) 675-5555
sanderman08@gmail.com

| | |
|---|---|
| **From:** | Mark Gordon |
| **To:** | Eric Cubin; drew.perkins@wyo.gov |
| **Cc:** | Betsy.Anderson@wyo.gov |
| **Subject:** | RE: My position on WBOM |
| **Date:** | Tuesday, April 23, 2024 3:14:57 PM |

Dear Dr. Cubin,

I apologize for not being able to return your email yesterday, which was especially busy. Nevertheless, I wanted to thank you for sending along your insightful correspondence and supporting materials. Please know I appreciate and respect your perspective as well as thank you for your service. Your family knows well, as indeed you point out, the challenge of public service and the frustrations of politics. For the record, it is refreshing to see principles adhered to even in the face of difficult winds. I look forward to the opportunity to talk about this matter and others when you get back. In the meantime, I wish you a wonderful and successful hunting trip. Please give my best to Jerad. Good hunting to you both!

Sincerely,

Mark

-----Original Message-----
From: Eric Cubin <ecubin@gmail.com>
Sent: Monday, April 22, 2024 1:50 PM
To: mark.gordon@wyo.gov; drew.perkins@wyo.gov
Subject: My position on WBOM

Governor Gordon and Mr. Perkins,

It was with some sadness that I received a phone call from Drew today explaining that my services are no longer needed on the Wyoming Board of medicine. I have to say that this phone call was not totally unexpected. However, before anything is made final, I would very much like to make sure that my voice is heard and that my side of the story is told.

For what it's worth, I have gone out of my way for decades to avoid getting involved in politics. I am much better suited for the practice of medicine. In this particular case, however, there was a significant injustice and misrepresentation on behalf of the Wyoming medical Society. Specifically, the Wyoming medical Society came out with a position that did not represent the majority of the physicians in the state - without polling the physicians. They then reported to represent all of the physicians in the state. I went through all of the normal, appropriate, channels. I implored the leadership of the Wyoming Medical Society to poll its members before coming out with a position. I did not ever request that they change their position to in favor of a bill. Rather, I requested that they stay neutral until they poll their members. I would like to forward you both the emails that will very clearly illustrate what happened here.

I want you to know that my intent was never to get involved in any particular piece of legislation. I simply wanted to make sure that physicians were being appropriately represented by the Wyoming Medical Society.

Exhibit B

Unfortunately, I am currently in the only place on the planet more desolate than Carbon County, Tuktoyaktuk Northwest Territories.  My good friend, Jerad Stack, and I are here for two weeks hunting muskox and grizzly bears. Obviously, I will be off the grid and without significant communication capabilities. I am writing this email as we load snowmobiles. I am sorry that I will not be readily available for some time, but I look forward to communicating with you as soon as we get back. I also apologize that I don't have the luxury of time to make sure that my language is perfect.

Governor, I would very much appreciate the opportunity to talk to you about what has happened here. In the meantime, I will forward you the emails so that you can see that my efforts were only designed at getting the Wyoming Medical Society to appropriately represent its members.

I wish you both all the best and I look forward to further communication.

God Bless,
Eric Cubin

Sent from my iPhone



STATE OF WYOMING
OFFICE OF THE GOVERNOR

**JIM GERINGER**
GOVERNOR

STATE CAPITOL
CHEYENNE, WY 82002

December 9, 1997

# M E M O R A N D U M

**TO:**        AGENCY HEADS

**FROM:**     Steve Chadderdon

**SUBJECT:**   Executive Order on Ethics

**PRIORITY:**  High

SUMMARY:  Attached is the final Executive Order on Ethics.  It is effective as of December 15, 1997.  We anticipate that it will take until July 1st to have all employees trained.  It is important, however, to make sure that each employee receives a copy.  In order to facilitate this you should have the employees sign a document saying that they have received and read a copy of the Executive Order on Ethics.  A form for this purpose can be obtained from the Attorney General's Office.

There are several agencies working on putting together a comprehensive training program which you may want to use in training your employees.  If you are interested, you can contact Gay Woodhouse at the Attorney General's Office.

I also understand that the Attorney General's Office will have a small group to review issues relating to the Executive Order on Ethics.  The group will function to provide consistent advice regarding ethical issues as they arise and will also serve as a resource to you, so you will know how similar issues were handled by other agencies.

> **Exhibit C**



E–MAIL: governor@missc.state.wy.us
WEB PAGE: www.state.wy.us

TELEPHONE: (307) 777–7434
TDD: (307) 777–7860   FAX: (307) 632–3909



STATE OF WYOMING
OFFICE OF THE GOVERNOR

**JIM GERINGER**
GOVERNOR

# STATE OF WYOMING

STATE CAPITOL
CHEYENNE, WY 82002

# EXECUTIVE DEPARTMENT

# EXECUTIVE ORDER

# 1997- 4

Pursuant to the authority vested in the Office of the Governor of the State of Wyoming, I, Jim Geringer, Governor of the State of Wyoming, hereby issue this Executive Order adopting the following Executive Branch Code of Ethics in the interest of better serving the citizens of the State of Wyoming through the provision of ethical standards applicable to all public officials, elected officials, appointees, and employees of the Executive Branch of the State of Wyoming. This Code of Ethics does not apply to employees of the University of Wyoming or community colleges.

# STATE OF WYOMING

# EXECUTIVE BRANCH CODE OF ETHICS

**1. Purpose.** Those who serve the people of the State of Wyoming should do so with integrity. Neither impropriety nor the appearance of impropriety should occur. This Code of Ethics is intended to serve as a yardstick by which the conduct of all who serve in the Executive Branch of the State of Wyoming can be measured.

E–MAIL: governor@missc.state.wy.us
WEB PAGE: www.state.wy.us



TELEPHONE: (307) 777–7434
TDD: (307) 777–7860   FAX: (307) 632–3909

App 137

**2. Scope.** This Code of Ethics is applicable to all employment-related activities of public officials, elected officials, appointees and employees of the Executive Branch of the State of Wyoming. The term "public employees" shall be used in this Code of Ethics to include all public officials, appointees (whether or not they receive compensation) and employees of the Executive Branch. This Code of Ethics extends, but does not supersede, those duties and standards of conduct which are delineated in constitution, statute, or rule. In the event of any conflict between this Code of Ethics and any applicable constitution, statute, or rule, the constitution, statute, or rule shall prevail.

**3. Statement on Gender Pronouns.** Throughout this Code of Ethics, gender pronouns are used interchangeably. In cases where there is one individual holding a particular office, the gender pronoun applicable to the person holding that office as of the date of this writing has been used. In all other instances, the drafters have attempted to utilize each gender pronoun in equal numbers, with random distribution.

**4. Administration of this Code of Ethics.** This Code of Ethics shall be administered by each agency of the State of Wyoming in accordance with the following:

> A. No agency shall delete any part of this Code of Ethics.

> B. An agency head who receives an allegation of a violation of this Code of Ethics shall promptly investigate to determine whether the allegation is true. Allegations which are found to be *de minimis* in nature shall be handled accordingly. If the allegation is true, the agency head shall take appropriate action. For permanent employees, such actions shall be in accordance with the State of Wyoming Personnel Rules.

> C. Allegations concerning violations of this Code of Ethics by an agency head or appointee shall be investigated by the Governor or his designee. Allegations which are found to be *de minimis* in nature shall be handled accordingly. If the allegation is true, the Governor or his designee shall take appropriate action.

5. **General Responsibilities**. All public employees shall:

A. Uphold the Constitutions of the United States and of the State of Wyoming.

B. Abide by the laws of the United States and of the State of Wyoming.

C. Carry out the policies and objectives of the State of Wyoming as established by statute, executive order, or rule, while adhering to established standards for work and performance.

D. Work in cooperation with other public employees, and act within the scope of the authority delegated to them.

E. Protect and conserve all property owned, held by, or leased to the State of Wyoming, including public records. [See Wyo. Stat. §§ 16-4-201 through 205.]

F. Be honest and fair in performing public service.

G. Strive to be honorable, courteous, and dedicated to advancing the public good.

H. Avoid conduct that compromises the integrity of the public office or creates the appearance of impropriety.

6. **Prohibited Activities**. Except as provided in Section 7, no public employee shall engage in:

A. Any activity which constitutes a conflict of interest with her employment. Such prohibited conduct includes, but is not necessarily limited to:

i. Using public office or public employment for personal gain.

ii. Taking official action in a matter in which the public employee has a close personal or financial relationship to a party.

iii. Engaging in activities which conflict with the public employee's official position of employment.

iv. Except as allowed by state law or State of Wyoming Personnel Rules, giving preferential treatment to any person.

v. Except when functioning as an advocate for a client or an agency, making decisions which are not independent and impartial.

B. Conduct which constitutes an abuse of authority. [See Section 7G (Allowed Activities) of this Code of Ethics, for a discussion of activities such as fund raising for recognized organizations which take place on the public employee's own time, which generally do not constitute an abuse of authority.] Conduct which constitutes an abuse of authority includes, but is not necessarily limited to:

i. Using or allowing the use by any private party of official information obtained through or in connection with the public employee's employment by the State of Wyoming, unless such information is available to the general public or unless dissemination is permitted by law.

ii. Awarding, participating in a decision to award or participating in the administration of a State of Wyoming contract, if the employee or any person with whom the employee has a close personal or financial relationship [this includes all members of the public employee's immediate family] is a party to the contract.

iii.   Except as provided for in Sections 7A and 7B (Allowed Activities) of this Code of Ethics, acceptance or solicitation by a supervisor of contributions or gifts from subordinate employees.   A supervisor may neither solicit nor accept gifts directly or indirectly, for herself or for another person.

iv.   Accepting   meal   expense,   lodging   or reimbursement for travel or expenses incident to travel on official business from any source other than the State of Wyoming without approval of the agency head.   Under no circumstances should a state employee accept items of this nature or gifts if the employee or his agency is involved in an adversarial proceeding with the outside contributing source.

C. Outside employment or any other outside activity which is incompatible with the full and proper discharge of the public employee's duties and responsibilities to the State of Wyoming. [For this reason, all honoraria, fees for speaking engagements, and other such compensation received because of the public employee's position with the State of Wyoming must be deposited in the General Fund.] Activities incompatible with the public employee's duties include, but are not necessarily limited to:

i. Accepting any fee, compensation, gift, payment of expense or any other thing of monetary value in circumstances which create the appearance of a conflict of interest or impropriety, whether or not such conflict of interest or impropriety actually exists.

ii. Receiving a salary or any other thing of monetary value from a private source as compensation for the public employee's services to the State of Wyoming. [This section does not apply to appointees to boards and commissions who do not receive a salary from the State.]

D.  The use of or allowing the use of property owned or held by the State of Wyoming [including leased property] for any purpose other than carrying on the official business of the State of Wyoming. Prohibited activities include:

> i.  Selling or soliciting for personal gain any product or service such as cosmetics, food items, or household goods and services, during official office hours in or on property owned or held by the State of Wyoming.  The agency head may make written exceptions to this prohibition, for solicitation on behalf of non-profit organizations.

> ii.  Transacting personal business during work hours to the extent that it interferes or detracts from the employee's performance of his duties.

> iii.  Unless required for official business and previously approved by the public employee's supervisor, the use of any facility or building owned or leased by the State of Wyoming as the principal residence or address of any business other than the agency by whom the public employee is employed.

**7. Allowed Activities.**  A public employee may, notwithstanding the provisions of Section 6 above:

> A.  Solicit or accept voluntary gifts of nominal value or nominal donations.  Examples of permissible gifts include voluntary gifts made upon the occasion of marriage, illness, or retirement, or made for charitable or civic purposes.

> B.  Solicit or accept any thing of monetary value from a friend, parent, spouse, child or other close relative when it is clear from

the circumstances that the motivation for the action is a personal or familial relationship.

C.   Accept loans from banks or other financial institutions on customary terms of finance for the proper and usual activities of the public employee, such as home mortgage loans.

D.   Accept unsolicited advertising or promotional material of nominal value, such as pens, pencils, note pads, and calendars.

E.   Engage in a reasonable amount of communication with family members, day care providers, medical professionals, and similarly situated individuals during the work day.   [It is incumbent upon each public employee to learn from her supervisor what is considered reasonable in a particular situation.]

F.   Engage in teaching, lecturing, or writing for compensation, when those activities are not related to the public employee's employment by the State of Wyoming. [Each public employee should seek approval from her supervisor prior to engaging in such teaching, lecturing, or writing for compensation.]

G.   In his private capacity, solicit persons or organizations to obtain goods, services, grants, or loans on behalf of a recognized charitable or fraternal organization.

**8.  Requests for Approval of Activities.**  In all cases enumerated above where a public employee is advised to consult with his supervisor prior to engaging in an activity, and in every instance where the public employee is not certain whether a particular activity is allowed by the Code of Ethics, he should consult with his supervisor prior to engaging in the questioned activity.  If the public employee requests a written response from the supervisor, the supervisor should respond in writing.  This Code of Ethics provides that:

A.   No public employee shall be penalized for inquiring of her supervisor regarding prior approval of an activity in which she wishes to engage.

B. If a public employee inquires regarding an activity in which he wishes to engage and his supervisor informs him that engaging in such activity would violate this Code of Ethics, and the public employee then engages in such activity, his supervisor may take appropriate disciplinary action. For permanent employees, such actions shall be in accordance with the State of Wyoming Personnel Rules.

**9. Elected Officials.** Elected officials occupy their positions as a result of political election. As such, they may participate in political activities. Elected officials must disclose items or services received from outside sources[1] which have a value of $250 or more.[2] The disclosure shall be made by filing a list of the items or services received during each calendar year with the Secretary of State. The filing shall be made by February 15 of the following year. The list shall be divided into items which will be retained by the elected official as a private gift and items which will be left as property of the State of Wyoming when the elected official leaves office.

This Order shall be effective on December 15, 1997, and shall remain in effect until amended.

Given under my hand and the Executive Seal of the State of Wyoming this ___3rd___ day of December, 1997.



Jim Geringer
Governor of the State of Wyoming

---

[1]Items do not include inherited items. Outside sources do not include family members.

[2]Donations to a political campaign reported pursuant to WYO. STAT. § 22-25-106 are exempt from this reporting requirement.

State of Wyoming - Executive Branch Code of Ethics
- page 8 -

**From: Michael Sanderson** sanderman08@gmail.com
**Subject:** Re: SF 99
**Date:** February 29, 2024 at 7:21 AM
**To:** sarah durney sarah_durney@hotmail.com
**Cc:** Eric Cubin ecubin@gmail.com, Kristina Behringer MD kilikinastina@gmail.com, Angus McAlpin angusmcalpin@gmail.com, Berton Toews btoewsmd@gmail.com, Dee Engle Dengle8@yahoo.com, Donald Kirk DKirk@starvalleyhealth.org, Ghazi Ghanem ghazighanem@gmail.com, Giovannina Anthony giovannina@giovmail.com, Israel Stewart Itstewartmed@gmail.com, JJ Chen MD jjchencheyenne@gmail.com, Jim Hutchison jimrhutchison@gmail.com, Jonna Cubin dubby77@gmail.com, Kris Schamber schambam@gmail.com, Luke Goddard lukegoddard@sheridanhospital.org, Mansell7 mansell7@aol.com, Matt Mitchell matt010164@gmail.com, Mattson Mathey mattsonmathey@gmail.com, Paul Johnson MD pejohnson76@yahoo.com, Rafael Homer rhomer@uw.edu, Rinker Dr. Erica eldobbs@gmail.com, Robert Kanard rrk317@bresnan.net, Robert Monger robertmonger@gmail.com, Sheila Bush sheila@wyomed.org, Sierra Gross sierragross@sheridanhospital.org, Spencer Weston swestonmd@gmail.com, Stephen Brown sbrownwyoming@yahoo.com, Tracey Haas drtraceyhaas@gmail.com, bhughfitz@aol.com, caf2941@aol.com, carsonwalkerwyo@gmail.com, ebsschubert@icloud.com, heith.waddell@gmail.com, htaggart@uw.edu, Kevin Helling kevinhelling@gmail.com, larry lauridsen MD larry.lauridsen@gmail.com, nick.healey@huschblackwell.com

Dr. Cubin,

I have read the email you have sent to Wyoming lawmakers on this issue. The board should see as well. Your engagement on this issue has, in my opinion, moved from cooperative conversation to an attack. You have committed libel by stating that, first, I was actively involved in forming the WMS position on this, and second, that I myself and the WMS board, cooperatively and intentionally suppressed the position of a separate organization. Neither of these are true and they were shared in an effort to discredit and defame both myself and the WMS board. I cannot speak to why the American College of Pediatrician's position was or was not represented to the WMS board - I was never involved in the forming of the position for the WMS. I did not represent the American College of Pediatrician's position because I am neither a member of the ACP nor their representative.

I would recommend that the WMS board that all further communications regarding this matter move into a thread involving only the WMS board members and adjacent WMS staff. To be clear, Dr. Cubin, this would not involve me.

Dr. Michael Sanderson

On Wed, Feb 28, 2024 at 10:46 PM sarah durney <sarah_durney@hotmail.com> wrote:
Dear Dr. Cubin and Board Members,

Thank you for your thoughtful and well articulated concerns. I would recommend that the board reconvene on this issue to reconsider our official stance on this bill. Dr. Cubin has reiterated many of the concerns I hear from other physicians.

I would also encourage the members of the board to listen to the full discussion at the committee.

To speak to the data and the science and to some of the previous discussion points, I will include some thoughts below. These sentiments are my own, and also representative of other members in the Northwest Counties.

1. "Trust the doctors. They practice to the highest moral and ethical standards."
Patients/ citizens have lost faith in medicine and science over time and we do not hold the sacred keys to knowledge that we did prior to the internet/knowledge explosion. Patients and citizens are able to connect with each other, share stories, and collect their own data.

Our ability to advocate for the best interests of our patients has been called in times-and can be influenced by outside self-invested forces. One of the most glaring errors we, as physicians, fell into in the recent past was the national drive to treat pain. As we added pain as the 6th vital sign in a noble effort to ameliorate suffering, we blindly followed recommendations from our pharmacy reps and CMS and thereby became complicit in creating an opioid epidemic, which led to thousands of deaths, addictions, and great societal cost. After the disaster ensued, it became apparent that our efforts were harming patients and ultimately legislatures stepped in to create prescribing and educational boundaries to prevent ongoing deaths.

Is it possible for "medicine" to be swayed by culture or outside influences into advocating for practices which go contrary to our patients best interests-especially in a noble effort to treat suffering? Recent history supports this.

2. "We don't perform these surgeries in WY. (...so stop talking about surgery ... the implication behind this statement)." Just because we do not currently perform top and bottom surgery on minors- at this time- does not mean we should abandon the ethical discussion or anticipate a day when a qualified practitioner becomes licensed in WY and offers this procedure.

For many citizens and doctors in WY, the issue is an ethical question of consent. How can a minor who has not fully developed their frontal lobe able to consent to gender transition?

I recently spoke with a physician who practiced in a large healthcare system in a progressive state. He felt pressured into performing hysterectomy on patients with gender dysphoria even though he questioned removing healthy functioning organs. He left the practice and the state because of this issue. His hope is that WY would honor rights of conscience, and he too questions the moral ethics of sex surgeries in minors.

A quick google search reveals the price of sex change surgeries in the US around $50,000. To say there is no monetary incentive seems naive.

Ultimately, we cannot ignore the downstream ethical questions regarding sex change surgery in minors when contemplating the ramifications of gender affirming care (GAC) in minors.

3. "GAC in minors is a reasonable treatment for gender dysphoria because it improves their underlying depression and suicidal risk."

From my reading, patients with gender dysphoria have a higher incidence of adverse childhood events and are more vulnerable to depression, anxiety, and questioning their identity and gender. This cohort also demonstrates a higher rate of autism spectrum disorders which lead to very literal and concrete thought making them more likely to consider hormone blockers cross sex hormones, and surgery. A 2011 Swedish study showed that gender reassignment adults over 30 years showed a suicide rate 19 times higher than the general population 10 years out. They also had 3 times the rate of overall mortality and psychiatric care. Many physicians question the validity of GAC dogma that affirming care prevents suicide (2 year study demonstrating positive results vs 30 year study which demonstrated negative results).

GAC proponents state that mental health conditions arise from GD, but this is unproven, and many physicians question whether the opposite is indeed true.

GAC as "affirming care." There has been much discussion in psychiatric circles regarding the idea of only affirmative counseling. GAC frequently is initiated outside our exam rooms by counselors and through the educational system. If we leave children with GD alone (expectant management), 85% of patients will re-identify with their birth gender by adulthood. One study reported that 100% of adolescents patients started on puberty blockers went on to continue on to cross sex hormones. Clearly there is potential for harm. In an effort to ameliorate suffering with medications and surgery, are we subconsciously stopping back from the hardship of compassionately walking with our vulnerable patients through their hardest moments and just throwing another costly medical treatment at them which causes harm in the long term. (sterility, increased suicidality, voice change, disfigurement, overall increased morbidity and mortality). ...But it's okay because they consented... At very least, these patients should have ample time to submit malpractice suits, but to what end? Will monetary damages ever replace their lost ability to become pregnant/breast feed and reintegrate with their birth gender? The potential harms are great and the benefit is yet to be fully determined. We should learn from other countries who have reconsidered their programs and pulled back into a research only structure.

In addition, recent numbers of transgender identifying youth have climbed precipitously. Gender transition appears to have a significant component of a social contagion as we see higher trends year over year, and this was part of the reason Great Britain pulled back and continued their program only through sponsored studies.

4. "We are willing to accept the risks of puberty blockers (PB) and cross sex hormones (CSH) in patients with precocious puberty but not for gender dysphoria (GD.)"

As a family physician, I have prescribed all of these medications at different times. I have treated transgender adults. These medications do impose risk. I have personally cared for women who started estrogen when then developed breast cysts and microcalcifications, blood clots, stroke, hypertension, mood instability, and migraines... just to name a few. We also quantify overall breast cancer risk by including years of contraceptive use. I have had patients take lupron who developed depression, horrible bone pain, hair loss. Men with polycythemia, aggression, and blood clots when taking testosterone. There is significant risk.

Contrary to the above statement, I have referred several children to endocrinology with PB and congenital short stature and none of those patients were treated medically with PB. This number of children with treated precocious puberty is likely very small and that discussion pales in regard to the bigger picture of GAC, which is affecting higher and higher rates of children every year.

So many docs I have talked with lean on the Hippocratic Oath which states, "First, do no harm."

5. "Anyone who speaks out in opposition to GAC is bigoted and transphobic." This may not have been spoken overtly, but some of the docs I've talked with feel that if they speak up, they will be labeled as such, and this is contrary to their passionate desire to be the voice for the marginalized and the oppressed. Those doctors who I have spoken with are compassionate and deeply care about the wellbeing and safety of their patients. I have not heard them speak disparagingly about youth with GD. They are sincerely concerned about the lifelong ramifications of this treatment.

6. "The pediatricians in WY are in agreement and support GAC." Did a survey go out? What is the exact breakdown of this statement and what questions are asked? I know a pediatrician in WY who is not in support of PB, Cross sex hormones, and gender reassignment surgery in minors.

Additionally, this statement omits the sentiments of primary care physicians who treat a large portion of children in our state. Family physicians could offer unique perspectives in regard to the risks of hormonal therapy in children and adolescents as we are familiar with these medications in other populations and have experience with the side effects.

Exhibit D



FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2024 NOV 14   PM 12: 26

MARGARET BOTKINS, CLERK
CHEYENNE

**UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING**

DR. FREDERICK WILLIAM "ERIC" CUBIN III,

      Plaintiff,

    v.

MARK GORDON, in both his personal and
official capacities as Governor of Wyoming,

      Defendant.

Case No. 24-CV-164-SWS

---

## ORDER DENYING PRELIMINARY INJUNCTION

The Wyoming Board of Medicine (Board) is a state agency responsible for licensing and disciplining medical practitioners. *See* Wyo. Stat. §§ 33-26-201 *et seq.* Members of the Board are appointed by the Wyoming Governor with the consent of the Wyoming Senate, and they "serve at the pleasure of the governor." Wyo. Stat. § 33-26-201(a).

Wyoming Governor Mark Gordon nominated Dr. Eric Cubin to a position on the Board, and Dr. Cubin was unanimously confirmed to the position by the Wyoming Senate. Dr. Cubin is also a voluntary member of the Wyoming Medical Society (WMS), a professional organization for Wyoming doctors that advocates on behalf of Wyoming doctors through legislative lobbying, public outreach, and other methods. At the preliminary-injunction hearing, Dr. Cubin testified the WMS is the most influential and largest physician's organization in the state.

In February 2024, Dr. Cubin sent an email to the entire Wyoming House of Representatives expressing his support for a bill then under consideration. Dr. Cubin's email was not limited to voicing his position on the bill, though. It also informed the Wyoming House of his personal dispute with WMS and its current leadership because WMS had expressed

opposition to the same bill. Dr. Cubin asserted the WMS had "been essentially hijacked by the far left." Dr. Cubin continued by alleging a specific doctor, "presumably" in conjunction with WMS leadership, "ignored and suppressed" relevant information contrary to WMS' public position on the bill.

The bill eventually passed both chambers of the Wyoming Legislature and was signed into law by Governor Gordon. In late April 2024, though, Governor Gordon removed Dr. Cubin from the Board, informing Dr. Cubin that his comments in his email could cause certain doctors who may have to appear before the Board with their medical license and livelihood on the line to question the impartiality and fairness of the Board proceeding.

In late August 2024, Dr. Cubin filed this lawsuit, asserting Governor Gordon had unlawfully retaliated against him for exercising his First Amendment rights to free speech and to petition the government.[1] He seeks to be restored to his position on the Board and the recovery of monetary damages. In the instant motion, Dr. Cubin asks for a preliminary injunction ordering Governor Gordon to restore him to his position on the Board during the pendency of this proceeding. Having considered the parties' evidence and arguments on the matter, the Court finds and concludes Dr. Cubin has not carried his burden of establishing his right to the extraordinary relief of a preliminary injunction.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is intended to preserve the relative positions of the parties until their legal dispute can be resolved on its merits. *DTC Energy Group v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018). "A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple–Fort Collins v. City of Fort Collins, Colo.*, 916

---

[1] Dr. Cubin also asserted a cause of action alleging violation of the Wyoming State Constitution, but he does not rely on that claim to advance this motion for preliminary injunction. (*See* ECF 12 p. 17.)

F.3d 792, 797 (10th Cir. 2019) (quotations omitted).

> Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a
> preliminary injunction must show: (1) the movant is substantially likely to
> succeed on the merits; (2) the movant will suffer irreparable injury if the
> injunction is denied; (3) the movant's threatened injury outweighs the injury the
> opposing party will suffer under the injunction; and (4) the injunction would not
> be adverse to the public interest.

*DTC Energy Group*, 912 F.3d at 1269–70 (internal citations and quotation marks omitted). "The

first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418,

434 (2009). The movant must "show a 'clear and unequivocal' right to the requested preliminary

injunction." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 758 (10th Cir.

2024) (quoting *Shrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005)). Whether to

issue a preliminary injunction rests within the Court's discretion. *Mrs. Fields Franchising, LLC

v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019).

   In some cases, the movant seeks a "disfavored injunction." "Disfavored preliminary

injunctions don't merely preserve the parties' relative positions pending trial." *Free the Nipple-

Fort Collins*, 916 F.3d at 797. "Instead, a disfavored injunction may exhibit any of three

characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or

(3) it grants all the relief that the moving party could expect from a trial win." *Id.* A disfavored

injunction "must be more closely scrutinized to assure that the exigencies of the case support the

granting of a remedy that is extraordinary even in the normal course." *Schrier*, 427 F.3d at 1259

(quotations omitted). "To get a disfavored injunction, the moving party faces a heavier burden

on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a

'strong showing' that these tilt in her favor." *Free the Nipple-Fort Collins*, 916 F.3d at 797.

   In this case, the Court agrees with Governor Gordon that Dr. Cubin's request to reinstate

him to the Board pending these legal proceedings constitutes a disfavored mandatory injunction

that is subject to the heightened "strong showing" standard. *See Schrier*, 427 F.3d at 1260-61 (concluding the request there was a disfavored mandatory injunction because it would affirmatively require the university to restore the plaintiff to his former position as Chair of the Department of Medicine from which he had been removed, and such reinstatement was likely to place the court in a supervisory role to ensure the mandated reinstatement was done). Regardless, though, the Court finds Dr. Cubin has not carried his burden of showing a preliminary injunction is warranted even under the non-heightened, normal standard.

## **FACTUAL FINDINGS**

The material facts are largely undisputed. Plaintiff Eric Cubin is a radiologist working and residing in Wyoming. (Cubin Decl. ¶¶ 1-2.[2]) Defendant Mark Gordon is the Governor of Wyoming. The Wyoming Board of Medicine is a statutorily-created state agency empowered with several duties, including two that are particularly relevant to this case: (1) determining whether an applicant is qualified and fit to practice medicine in Wyoming, and (2) overseeing the regulation, compliance, and disciplinary proceedings (including conducting contested case proceedings) of medical practitioners. Wyo. Stat. §§ 33-26-201 and -202. Board members are paid for their services in the same manner and amounts as members of the Wyoming Legislature. Wyo. Stat. § 33-26-203(c).

In early 2023, a vacancy occurred on the Board, and Governor Gordon nominated Dr. Cubin to complete the unexpired term. (Cubin Decl. ¶ 3.) Board members are appointed for four-year terms and may not serve more than three consecutive terms. Wyo. Stat. § 33-26-201(b). After completing that partial term, Governor Gordon appointed Dr. Cubin to the Board in February 2024 for a full four-year term. (Cubin Decl. ¶ 3.) Dr. Cubin was unanimously

---

[2] ECF 12-1.

confirmed to the Board by the Wyoming Senate both times he was appointed. (*Id.*) During his time on the Board, Dr. Cubin received no complaints or disciplinary action concerning the performance of his Board duties, and he recused himself from hearing multiple cases based on conflicts of interest or perceived conflicts of interest. (*Id.* ¶ 4.)

Dr. Cubin is also a voluntary member of the Wyoming Medical Society (WMS), which is a professional organization for Wyoming doctors that advocates on behalf of Wyoming doctors through legislative lobbying, public outreach, and other methods. (Cubin Decl. ¶¶ 9-10.)

In February 2024, the Wyoming Legislature considered Senate File 0099, formerly known as "Chloe's Law"[3] (SF0099). In sum, SF0099 prohibited healthcare providers from performing certain surgeries (e.g., sterilization or mastectomies) or offering certain treatments (e.g., puberty suppressors or high doses of hormones inconsistent with the child's biological sex) related to gender transitioning or gender reassignment. SF0099 also created sanctions for violators that puts their respective healthcare provider license at risk of suspension or revocation. SF0099 ultimately passed both chambers of the Wyoming Legislature and was signed into law by Governor Gordon. *See* Wyo. Stat. § 35-4-1001.

While under consideration by the Wyoming Legislature, WMS leadership debated the topics in SF0099 at a WMS board meeting, which all WMS members were welcome to attend. (Prelim. Injunct. Hrg. Ex. 13 p. 20.) Dr. Cubin did not attend or provide input at this WMS board meeting. In the end, WMS leadership instructed WMS Executive Director Sheila Bush to testify in opposition to SF0099. (*Id.* pp. 19-20.) WMS agreed that gender reassignment surgeries should not be done on minors, and were not being done in Wyoming even without the

---

[3] This refers to Chloe Cole, an activist from California who opposes gender transition surgeries and treatments after she received transgender surgeries and treatments as a minor and thereafter "detransitioned" because she later regretted her attempts to transition from being a girl to a boy. (*See* ECF 1 ¶¶ 22-26 and footnotes therein.)

law, but WMS felt SF0099 was government overreach that allowed the Wyoming Legislature to dictate certain medical practices and restrictions to too great of a degree. (*Id.* p. 20.) Executive Director Bush testified to this position before the Wyoming Senate Labor, Health & Social Services Committee on February 21, 2024.[4]

Immediately following Executive Director Bush's testimony, Dr. Michael Sanderson, a pediatrician from Sheridan and the President of the Wyoming Chapter of the American Academy of Pediatrics, testified similarly in opposition to SF0099, presenting largely the same position as WMS.[5]

That night, Dr. Cubin was emailed a link to the video recording of the committee hearing that had occurred earlier that day from a sender unknown to the Court. (Ex. 13 p. 21.) He then forwarded the email to Executive Director Bush and questioned whether a majority of WMS members agreed with Dr. Sanderson's comments and whether WMS should present physicians from both sides of the issue. (*Id.*) This email engendered responses from both Executive Director Bush and WMS President Dr. Kristopher Schamber, a reply from Dr. Cubin, and further debate on the topic over the next several days involving several other WMS leaders and Dr. Cubin. (*Id.* pp. 14-21.) The details of this spirited debate on WMS' position on SF0099 and certain gender-affirming care are largely immaterial to the issues raised in this lawsuit. Significant to this proceeding, after several days of back-and-forth emails, Dr. Cubin requested a statement from WMS leadership on WMS' position going forward:

What we all need to know right now is, specifically, what can we expect to see

---

[4]  Video recording available at https://www.youtube.com/watch?v=IztrjpvN-RI&t=2783s.  Executive Director Bush testified at 33:50-35:43. Executive Director Bush presented the same position of the Wyoming Chapter of the American Academy of Pediatrics at the time; thus she testified on behalf of both organizations.

[5]   Available at https://www.youtube.com/watch?v=IztrjpvN-RI&t=2783s, 35:43-45:35.  In short, Dr. Sanderson repeated that gender reassignment surgeries were opposed by the American Academy of Pediatrics and were not being performed in Wyoming, but felt SF0099 imposed inappropriate limitations on medical care and the doctor-patient relationship that would negatively affect doctors' abilities to treat other medical issues.

from WMS in regard to this bill over the next several days?  Will WMS continue
to publicly oppose SF 99 or will you be presenting a neutral position?

(*Id.* p. 14.)  Within a couple of hours of this email, a WMS leader responded, "We will make
arrangements for the board members to discuss this issue further and determine our next best
steps.  Further details for board members to follow." (*Id.*)  Unsatisfied with the speed of a
response, Dr. Cubin, later that same day, sent an email to the entire Wyoming House of
Representatives that is at the center of this lawsuit.  (Ex. 3.)

In that email, Dr. Cubin set forth his personal support for SF0099. (*See id.*)  He also said
more than that, though.  Much of his email to the Wyoming House reported his disagreements
with WMS leadership and with Dr. Sanderson.  Relevant portions of his email include the
following:

> It saddens me very much to have to report that, under their current leadership, the
> Wyoming Medical Society has been essentially hijacked by the far left.  It seems
> that they have decided to prioritize politics over their stated mission of physician
> advocacy.  In my opinion, they have adopted and embraced "woke" positions that
> are not congruent with the thoughts and opinions of the majority of their
> physician members.  In essence, I have lost all confidence in their ability or desire
> to faithfully represent the physicians in this state.
>
> Please allow me to give you an example.  WMS seems to have teamed up with the
> American Association of Pediatricians in opposing SF 99.  Quite frankly, I refuse
> to believe that the majority of physicians in this very conservative state agree with
> this position - and we were never polled.  This position was established by several
> very vocal, extremely liberal members of the Board.  The position was then made
> public as though it actually represents the thoughts and beliefs of physicians in
> Wyoming when, in fact, that is probably not true.
>
> In their opposition to Chloe's Law, the WMS has partnered with Dr. Sanderson, a
> pediatrician from Sheridan, who is the President of the WyAAP.  Dr. Sanderson
> has effectively delivered the position of his organization but he has failed to tell
> you that there is another pediatric professional society that has taken an opposite
> position, the American College of Pediatricians (ACP).
>
> …
>
> You need to know that Dr. Sanderson (and presumably the WMS leadership)

were aware of these ACP positions and yet they were ignored and suppressed when the WMS position was established. Further, I presume that you have only been provided with the WMS/AAP position and not the ACP position statements. As I have communicated to the entire WMS Board, it is not acceptable to only present one side of an issue in an effort to effect change in social policy.

…

It feels very much like the leadership at WMS has inserted their opinions in hopes that the WMS membership would not notice or speak up.

…

I think it is important for you to know that I have aggressively tried to address this situation with the WMS Board over the last couple days. I was given an assurance earlier today that the WMS Board will be holding an executive session of some kind to determine if they will be changing their position from opposing this bill to a neutral position. At this time, I have not been given any assurance that the WMS will be changing their position, so I feel the need to advocate on my own behalf by coming to you directly with this information. It is entirely possible that when this bill is considered in committee and on the floor that the WMS position may have been changed to neutral. Up to this point, however, they have not changed their position to neutral.

(Ex. 3 pp. 1-2.) The next morning, Dr. Sanderson sent the following email to Dr. Cubin, WMS leadership, and others who had been involved in the email debate:

Dr. Cubin,

I have read the email you have sent to Wyoming lawmakers on this issue. The [WMS] board should see it as well. Your engagement on this issue has, in my opinion, moved from cooperative conversation to an attack. You have committed libel by stating that, first, I was actively involved in forming the WMS position on this, and second, that I myself and the WMS board, cooperatively and intentionally suppressed the position of a separate organization. Neither of these are true and they were shared in an effort to discredit and defame both myself and the WMS board. I cannot speak to why the American College of Pediatrician's position was or was not represented to the WMS board - I was never involved in the forming of the position for the WMS. I did not represent the American College of Pediatrician's position because I am neither a member of the ACP nor their representative.

I would recommend to the WMS board that all further communications regarding this matter move into a thread involving only the WMS board members and adjacent WMS staff. To be clear, Dr. Cubin, this would not involve me.

(ECF 20-4 p. 1.)

As noted, SF0099 was passed by both chambers of the Wyoming Legislature, and Governor Gordon signed the bill into law in March 2024. That is, the bill became law as Dr. Cubin desired. On April 22, 2024, Dr. Cubin received a phone call from the Governor's Chief of Staff, Drew Perkins, advising Dr. Cubin that his services on the Board were no longer needed and an emailed letter from the Governor would be sent to him shortly detailing the decision. In that removal letter, Governor Gordon wrote the following:

> I have been made aware of your email to the members of the House of Representatives during this last legislative session regarding SF0099 in which you strongly encouraged the members to pass this legislation and criticized the Wyoming Medical Society's opposition to the bill. I certainly appreciate your position on this issue and respect your right to impart it to the Legislature. Nonetheless, no matter what anyone's personal expressed beliefs may be, it is important that the professionals governed by the Board of Medicine have confidence that board members prosecute their responsibilities on the board in an objective and unbiased way. I believe your comments on this particular legislation could give doctors, who are licensed by the Board of Medicine, a reason to be concerned that you might use your position to advocate for a particular position when considering matters that should be considered absent an agenda or prejudice. Medical professionals should be confident that their licensure, which is their livelihood, will be handled professionally and clinically examined on merits alone. Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality.

> I am certain you would understand that while you certainly are entitled to your First Amendment right to free speech, as an individual member of the Board, you would not be entitled to speak for the Board unilaterally. Nevertheless, some may not appreciate that your personal comments might not necessarily be those of the Board as a whole. It has never been my intention to inhibit your own ability to express your views unabashedly or to confuse anyone's personal opinions and beliefs with those of any of our boards. Therefore, as I have done before, when a member of a board chooses to express personal beliefs in a way that can be construed as speaking for the body, I have elected to relieve that member of the constraints board membership requires.

> Therefore, in this instance, sadly, I believe it is best to remove you from the Board of Medicine. I wish you all the best in your future endeavors and urge you to continue to advocate for your beliefs.

(Ex. 9.)  It is unclear as to when the Governor became aware of Dr. Cubin's February 28, 2024 email to the Wyoming House.  At the preliminary-injunction hearing, Dr. Cubin testified he was stunned and shocked after receiving a call from the Governor's Chief of Staff and an email from the Governor.  However, in Dr. Cubin's April 22, 2024 e-mail in reply to the phone call and Governor Gordon's correspondence, he wrote in part:

> It was with some sadness that I received a phone call from Drew today explaining that my services are no longer needed on the Wyoming Board of medicine.  I have to say that this phone call was not totally unexpected.  However, before anything is made final, I would very much like to make sure that my voice is heard and that my side of the story is told.
>
> …
>
> In this particular case, however, there was a significant injustice and misrepresentation on behalf of the Wyoming medical Society.  Specifically, the Wyoming medical Society came out with a position that did not represent the majority of the physicians in the state – without polling the physicians.  They then reported to represent all of the physicians in the state.

(ECF 20-2 p. 1.)  Subsequently, Dr. Cubin requested he be permitted to instead resign from the Board, which Governor Gordon allowed and which occurred in late April 2024.  (Ex. 10, 11.)

Four months later, Dr. Cubin filed this lawsuit (ECF 1), and another month after that, he filed the instant motion for preliminary injunction (ECF 11).  He asks the Court to order Governor Gordon to restore him to the Board while this lawsuit is pending.

## DISCUSSION

Having considered the submissions from the parties (ECF 11, 12, 20) along with the evidence and testimony presented at the evidentiary hearing held on November 8, 2024 (ECF 24), the Court finds and concludes Dr. Cubin has not carried his burden of showing a likelihood of success on the merits or irreparable harm.

App.155

1.      <u>**Substantial Likelihood of Success on the Merits**</u>

"It is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434 (quotations omitted).  Dr. Cubin contends Governor Gordon unlawfully retaliated against his exercise of his First Amendment rights by removing him from the Board in response to his comments to the Wyoming House.  The First Amendment rights at issue are the right to free speech and right to petition the government.

Dr. Cubin's government service on the Board and government compensation rendered him a public employee.  "As applied to the states by the Fourteenth Amendment, the First Amendment prevents state and local governments from 'condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," but the First Amendment continues to protect "a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417, 418 (2006).  "The government employer, however, also has a 'countervailing interest in controlling the operation of its workplaces.'" *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014)).  "Thus, a public employer's legitimate needs and interests may justify some limitations on the speech of employees." *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 594 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1194-97 (10th Cir. 1998).

"The government has a substantial interest in ensuring that all of its operations are efficient and effective." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011).  When

public employees "speak out, they can express views that contravene governmental policies or impair the performance of governmental functions." *Garcetti*, 547 U.S. at 419. "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Knopf*, 884 F.3d at 944 (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). "To determine if an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment, we apply the *Garcetti/Pickering* test." *Id.* at 945. The *Garcetti/Pickering* test comprises five elements:

(1)   whether the speech was made pursuant to an employee's official duties;

(2)   whether the speech was on a matter of public concern;

(3)   whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests;

(4)   whether the protected speech was a motivating factor in the adverse employment action; and

(5)   whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)). The *Garcetti/Pickering* test applies to Dr. Cubin's free-speech claim as well as his right-to-petition claim. *See Guarnieri*, 564 U.S. at 398 ("The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right."); *Morris v. City of Colorado Springs*, 666 F.3d 654, 660-61 (10th Cir. 2012) (noting the *Garcetti/Pickering* analysis applies to both free-speech and right-to-petition claims).

For purposes of this preliminary-injunction motion, Governor Gordon disputes only the third element of the test, effectively conceding the remaining elements at this stage. (ECF 20 p. 11.) The third element of the *Garcetti/Pickering* test is a question of law to be decided by the court. *Duda*, 7 F.4th at 911 ("The first three elements concern whether the speech is protected and are 'issues of law for the court to decide.'") (quoting *Trant*, 754 F.3d at 1165). "Although the third element must weigh in favor of the plaintiff for the plaintiff to prevail on the First Amendment claim, the employer bears the [ultimate] burden on the third element." *Id.* at 912. The Court will thus focus the likelihood-of-success analysis on this disputed element.

The third element of the *Garcetti/Pickering* test asks whether the government employer's interests in promoting and ensuring efficient public service outweigh the public employee's First Amendment interests. "We have said the 'only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself,* of the public employer's internal operations and employment relationships.'" *Id.* (emphasis in original) (quoting *Trant*, 754 F.3d at 1166). "Relevant considerations include 'whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007)).

"In analyzing the employer's interest in avoiding disruption, different standards apply depending on whether the adverse employment action occurred 'long after' or 'soon after' the employee's protected speech." *Id.* If the adverse employment action occurs "long after" the public employee's speech, then the government employer must prove the speech actually

disrupted its operations in order to outweigh the employee's First Amendment interests.  *Id.* at 912-13; *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1280 (10th Cir. 2007) ("once a sufficient time has passed, the government employer may satisfy its burden only by showing specific evidence of actual disruption").   In contrast, when the adverse employment action is taken "soon after" the subject speech, there is no requirement that the government employer show the employee's speech caused an actual disruption to government operations and instead can rely on a reasonable prediction of disruption.  *Duda*, 7 F.4th at 913; *Deschenie*, 473 F.3d at 1279 (where the adverse employment action is taken "soon after" the speech, a court will generally defer to the employer's reasonable predictions of disruption that are supported by specific evidence).

Here, Governor Gordon removed Dr. Cubin from the Board slightly less than two months after Dr. Cubin's email to the Wyoming House.   The parties in this case dispute whether Governor Gordon removed Dr. Cubin from the Board "soon after" or "long after" Dr. Cubin's email to the Wyoming House.

The Tenth Circuit has not fixed a time limitation for separating "soon after" from "long after."  *Duda*, 7 F.4th at 913 n.10; *see Deschenie*, 473 F.3d at 1279 ("When the adverse employment action takes place several months after the employee's speech, however, it is no longer reasonable for the government to rely on predictions of disruption which did not materialize.").   The Tenth Circuit has determined, though, that six months with no actual disruption is "long after" the subject speech, and such a length of time precludes any "prediction" of disruption weighing in the government employer's favor.  *Id.* (citing *Kent v. Martin*, 252 F.3d 1141, 1146 (10th Cir. 2001)).   Similarly, the Tenth Circuit has said that adverse employment action taken within one month of the subject speech falls on the "soon after" side of

the line, allowing the government employer to rely on its prediction of disruption. *Deschenie*, 473 F.3d at 1280-81. But where the line actually falls between "soon after" and "long after" remains undefined.

Based on the undisputed facts in the record, and specific to this case, the Court concludes Governor Gordon's action was "soon after" Dr. Cubin's email to the Wyoming House for two reasons. First, the slightly less than two months in this case is not anywhere near the timeframes, considered by the Tenth Circuit to be clearly "long after;" it is far closer to *Deschenie's* one month (which was "soon after") than to *Kent's* six months (which was "long after"); and it is less than the "several months" referenced in *Deschenie*. Second, particular to the circumstances here, the Court considers it significant that Dr. Cubin's work on the Board was not day-to-day but rather sporadic, thus making any opportunity for his email to disrupt the Board's work rather sporadic as well. For example, Dr. Cubin's exhibits introduced at the preliminary-injunction hearing establish his receipt of three emails concerning Board business from April 8, 2024, through April 16, 2024. (Ex. 6, 7, 8.) In a more traditional employment context, the opportunity for an employee's speech to disrupt the functioning of their employment is far more frequent, and likely more immediate, than the occasional work done by the Board members. Thus, the Court considers Dr. Cubin's removal from the Board to have occurred "soon after" his subject speech.[6,7] Consequently, "we do not require a government employer to allow the disruption to

---

[6] At the preliminary-injunction hearing, Dr. Cubin relied on *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584 (10th Cir. 1994), to suggest that while the timeframe between the speech and the employment action there (about 46 days) was less than that here (about 57 days), the Tenth Circuit did not consider it to be on the "soon after" side in *Ramirez*. While the timeframe played a role in *Ramirez*, it was only concerning whether an inference of retaliatory motive could be raised to withstand summary judgment. *Id.* at 596. The timeframe was not a consideration in the Tenth Circuit's balancing the plaintiff's First Amendment rights against the government's interest in efficient operations. *Id.* at 594-95. Thus, the Court finds *Ramirez* largely inapplicable to the "soon after" versus "long after" delineation at issue here.

[7] Additionally, at the preliminary-injunction hearing, Governor Gordon highlighted the fact that it's unclear when he first learned of Dr. Cubin's email, which might suggest Governor Gordon took swift action upon learning of the

manifest before acting." *Bailey v. Indep. Sch. Dist. No. 69 of Canadian Cnty. Oklahoma*, 896 F.3d 1176, 1183 (10th Cir. 2018). "Instead, when the employer's intent in taking an adverse action is to avoid actual disruption, we will generally defer to a public employer's reasonable predictions of disruption, as long as the predictions are supported by specific evidence." *Duda*, 7 F.4th at 913 (internal citations and quotations omitted).

The real issue here is not that Dr. Cubin expressed his personal support of SF0099 to the Wyoming House. Instead, the real issue is that Dr. Cubin's comments to the Wyoming House went beyond his support for SF0099 and into his disputes with WMS and specific doctors, the same doctors who may appear before the Board to answer a complaint with their medical licenses and livelihoods in jeopardy. The Board is statutorily authorized to "[g]rant, refuse to grant, suspend, restrict, revoke, reinstate or renew licenses to practice medicine." Wyo. Stat. § 33-26-202(b)(i). The Board has the power to investigate allegations that a licensee has violated the Wyoming Medical Practice Act and to take disciplinary action against the licensee upon finding such a violation. *Id.* § 33-26-202(b)(ii).

When a Board member sits in judgment of a licensee, they of course owe the licensee a fair and impartial consideration of the matter, but they also owe the appearance of fairness and impartiality. "Due process requires that an agency provide a fair trial without the appearance of bias or prejudice." *Painter v. Abels*, 998 P.2d 931, 938 (Wyo. 2000). In an agency's action in a licensing matter, "[f]undamental considerations require not just fairness in fact but also fairness in appearance." *Dorr v. Wyo. Bd. of Certified Public Accountants*, 21 P.3d 735, 745 (Wyo.

---

subject speech. In addition to being speculative, the Court finds this to be a red herring. The "soon after" versus "long after" determination is not dependent upon when the government employer learns of the speech. If an employer learned of the employee's speech long after the speech occurred and then took immediate action based on a "prediction" of disruption with no actual disruption in the interim, it's unlikely to be considered a reasonable prediction based on evidence. *Duda*, 7 F.4th at 913.

2001). "It is clearly established law that '[m]aintaining the appearance of impartiality of the judiciary is an interest of vital importance.'" *Stengle v. Office of Dispute Resolution*, 631 F. Supp. 2d 564, 575 (M.D. Pa. 2009) (quoting *Kirchgessner v. Wilentz*, 884 F. Supp. 901, 912 (D.N.J. 1995)); *see U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers*, 413 U.S. 548, 565 (1973) ("it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent"). "[T]he maintenance of [Dr. Cubin's] impartiality, and appearance thereof, was crucial to the effective operation of" the Board, particularly because one of the primary duties of Board members is to sit as arbiters over complaints against other medical providers. *See Stengle*, 631 F. Supp. 2d at 576. Governor Gordon accurately stated in his removal letter to Dr. Cubin: "Even the appearance of bias can be disquieting as well as erode confidence in the Board's presumed impartiality." (ECF 1-2 p. 2.) The Court has little difficulty concluding that Governor Gordon has a significant interest in assuring members of the Board can perform their Board functions without perceived or actual bias or prejudice.

Dr. Cubin's email to the Wyoming House went beyond offering his personal position and thoughts on SF0099. He alleged "Dr. Sanderson (and presumably the WMS leadership)" "ignored and suppressed" the position of a different pediatric organization. (Ex. 3 p. 2.) These are charged allegations leveled by Dr. Cubin against specific medical providers, providers who could appear before the Board and whose careers and livelihood are affected by his work on the Board. Irrespective of the accuracy of the allegations, Dr. Sanderson and any of the WMS leadership appearing before Dr. Cubin in his role as a Board member could reasonably question whether they would receive fair consideration from him in light of Dr. Cubin's allegations to the

Wyoming House. Dr. Cubin testified that the WMS is the largest lobbying organization representing doctors in Wyoming and a significant percentage of Wyoming's doctors are members.

Beyond just Dr. Sanderson and WMS leadership, though, Dr. Cubin's email could also cause others, such as those on the "left" of the partisan divide, to also question whether Dr. Cubin would be a fair and impartial arbiter for them. Dr. Cubin's email expressed his sadness and lost confidence because WMS "has been essentially hijacked by the far left." (Ex. 3 p. 1.) A provider who falls in this "left" or "far left" camp could reasonably question whether they can get a fair examination should they have to appear before Dr. Cubin. And what of those many providers who remained silent and did not offer their opinion on WMS' position? It is reasonably possible they could fear that Dr. Cubin might take their silence as tacit agreement with the "far left" WMS position even if they personally disagreed. Employees in the Executive Branch of the Government or its agencies "are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof." *Nat'l Assoc. of Letter Carriers*, 413 U.S. at 564–65. Dr. Cubin's comments concerning his displeasure with WMS' position on SF0099 and WMS' "hijacking" by the "far left" draws into question his ability or willingness to execute his Board responsibilities "without bias or favoritism for or against any political party or group or the members thereof." *Id.*

To be sure, Dr. Cubin could be recused or recuse himself from particular cases or proceedings, and he recused himself from multiple cases during his time as a Board member. (Cubin Decl. ¶ 4.) However, the ability to recuse or be recused from particular proceedings does not avoid disruption of the Board's operations caused by Dr. Cubin's email comment; it in fact

would constitute such disruption.  The Middle District of Pennsylvania considered the potential

use of recusal motions in *Stengle*:

> From these facts, one can readily infer that Plaintiff's [speech in question] had the
> potential to induce recusal motions from those who came before her in her
> hearing officer capacity.  If such a motion were to be filed, either one of two
> things could happen.  Plaintiff could recuse herself, or she could elect to deny the
> motion and hear the case to its conclusion.  In either instance, governmental
> efficiency would be adversely affected.
>
> If Plaintiff denied the motion and retained the case, the losing party could appeal
> the decision on due process grounds, alleging that it was denied an impartial
> adjudication of its rights.  This would entail additional governmental resources
> being dedicated to the appeal, which would clog dockets and ultimately reduce
> governmental efficiency.  On the other hand, if Plaintiff chose to grant the motion
> and recuse herself, the case would be transferred to another hearing officer, which
> would not only serve to delay resolution of the case, but also to clog the docket of
> the newly assigned hearing officer, thereby reducing his or her ability to
> efficiently dispose of his or her load.  Accordingly, it is easy to see that an
> increased number of recusal motions would severely hamper the government's
> ability to efficiently and effectively resolve special education issues.

*Stengle*, 631 F. Supp. 2d at 577 (internal citation omitted).  The same problems exist concerning

Dr. Cubin's ability to recuse himself or be recused from particular Board proceedings.  Increased

use of recusal is not the cure to increased fears of bias and partiality resulting from Dr. Cubin's

email; rather, it is a symptom of the potential governmental inefficiencies Governor Gordon

appropriately intended to prevent by removing Dr. Cubin from the Board.

Further, the emails exchanged between Dr. Cubin and Dr. Sanderson support Governor

Gordon's reasonable prediction of disruption to the Board's functions.  Dr. Sanderson stated in

one of his responses to Dr. Cubin's emails:

> However, as a member of the Wyoming Board of Medicine, who finds himself
> responsible for penalizing physicians for malpractice and unprofessional
> behavior, I would hope that you would find yourself just as well versed on the
> science and rationale behind the support of GAC [gender affirming care] for
> minors from the American Academy of Pediatrics, The American Medical
> Association, The American Academy Of Child and Adolescent Psychiatry, and
> the other professional societies involved, as you are in the science and limited

professional opinion that opposes GAC for minors.  If the Wyoming Legislature passes this bill, it will, by necessity, force Wyoming physicians to break the ethical standard of treating patients according to the <u>best</u> science available at the risk of their license.  Please remember this if you find yourself sitting in judgement against Wyoming physicians who may come before your Board for being put into this position by the Wyoming Legislature.

(Ex. 13 p. 17 (emphasis in original).)  Dr. Cubin replied to Dr. Sanderson's statement as

follows:

In regard to my position on the Board of Medicine… while it is true that I do sit on that Board, I want to make two things very clear.  First, all of the statements and communications that I have sent to this group represent my personal beliefs and do NOT represent the positions or views of the Board of Medicine. Furthermore, these communications are solely intended to address my concerns with the WMS Board of Directors and select members of a professional organization of which I am a paid member in good standing.  Second, in more general terms with regard to the Board of Medicine, it is the role of the Board of Medicine to ensure patient safety in this State through an effective licensing program and to fairly and appropriately discipline holders of medical licenses when they are found to be in violation of the Wyoming Medical Practice Act.  I do not endeavor to make the rules which are to be enforced.  It is much better, particularly on politically charged issues such as this, for the legislature and Governor to make the rules that are to be enforced by the Board of Medicine.  If anyone has any concerns regarding the Board of Medicine I would encourage you to reach out to the Executive Director with these concerns.  His name is Kevin Bohnenblust and he does a fantastic job.

(*Id.* p. 16.)  Dr. Cubin's reply was perfectly appropriate, but the exchange shows that his role as a

Board member was a concern for at least one of the doctors who found himself a subject of Dr.

Cubin's comments, who Dr. Cubin specifically accused in his email to the Wyoming House of

suppressing counterinformation.  From this, Governor Gordon could reasonably predict that Dr.

Cubin's membership on the Board could cause the Board's impartiality to be questioned and

disrupt at least some of the Board's core functions.  And the Court must "generally defer to a

public employer's reasonable predictions of disruption, as long as the predictions are supported

by specific evidence." *Duda*, 7 F. 4th at 913 (quoting *Deschenie v. Bd. of Educ. of Cent. Consol.

Sch. Dist. No. 22*, 473 F.3d 1271, 1279 (10th Cir. 2007)).  Governor Gordon's reasonable

predictions of disruption are supported by specific evidence here.

While Dr. Cubin attempts to cast his removal from the Board to be a consequence of his support of SF0099, that is in reality not what the Court perceives to be the Governor's concern. Had Dr. Cubin cabined his comments to the Wyoming House to his support of SF0099 and the reasons for that support, he'd likely still be a member of the Board.  However, that is not what happened.  Dr. Cubin's comments to the Wyoming House went beyond SF0099, to include his dispute with WMS leadership and Dr. Sanderson, who he alleged to have colluded to suppress opposing medical viewpoints.  Even still, Dr. Cubin testified at the preliminary-injunction hearing that he continues to have significant concerns about the leadership of the WMS misrepresenting its members, noting the organization still has not taken a poll as he implored. These castigating comments, extraneous to his personal support of SF0099, reasonably raised a concern about his ability or perceived ability to fairly and impartially perform his Board duties, which could directly and indirectly affect those he identified in his email to the Wyoming House as well as other providers.  In the removal letter, Governor Gordon correctly noted the importance "that the professionals governed by the Board of Medicine have confidence that the board members prosecute their responsibilities on the board in an objective and unbiased way." (Ex. 9.)  Governor Gordon reasonably predicted that Dr. Cubin's extraneous comments could disrupt the duties of the Board, a prediction supported by the email exchange between Dr. Sanderson and Dr. Cubin.  Consequently, Governor Gordon took corrective action, by removing Dr. Cubin from the Board, to advance Wyoming's significant interest in assuring members of the Board can perform their Board functions without perceived or actual bias or prejudice.

In balancing Dr. Cubin's First Amendment interests in speaking and petitioning as a citizen on a matter of public concern against Wyoming's countervailing interests in the effective

and efficient management of its governmental affairs, the Court finds the balance favors the employer, and therefore Dr. Cubin's "First Amendment claim will fail even though the petition [and speech] is on a matter of public concern." *Guarnieri*, 564 U.S. at 398. As the matter currently stands at this early stage of the litigation, the Court finds "the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests" in this case. *Knopf*, 884 F.3d at 945. Consequently, the Court does not find Dr. Cubin has shown a substantial likelihood of success on the merits sufficient to warrant the entry of a preliminary injunction (let alone the requested mandatory injunction).

## 2. **Irreparable Injury if the Injunction is Denied**

Dr. Cubin's request for a preliminary injunction also fails to establish irreparable harm. "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Group*, 912 F.3d at 1270. "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 22 (2008) (emphasis in original). "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Economic loss generally will not constitute irreparable harm because it is compensable by money damages. *Schrier*, 427 F.3d at 1267.

Dr. Cubin asserts "his injury is irreparable without an injunction because '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (ECF 12 p. 28 (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)).) However, because Dr. Cubin "has failed to demonstrate the requisite

likelihood of success on his free speech and [right to petition] claims," "he is not entitled to a presumption of irreparable injury" based on his alleged loss of First Amendment freedoms. *Schrier*, 427 F.3d at 1266; *see Rocky Mountain Gun Owners v. Polis*, --- F.3d ---, 2024 WL 4677573, at *24 (10th Cir. 2024) (no irreparable injury where movant "point[ed] to no irreparable injury other than the violation of his Constitutional Second Amendment right, which we resolved against his position").  And "[t]he purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *DTC Energy Group*, 912 F.3d at 1270 (quoting *Schrier*, 427 F.3d at 1267).  Dr. Cubin has not established his First Amendment freedoms are currently being curtailed, and the Court does not find any reasonable threat of such during the pendency of this action.  And any monetary loss can be recovered through an award of damages at the conclusion of this litigation. Dr. Cubin "has presented no evidence that his removal as [Board member] during the time it will take to litigate this case will have an irreparable effect in the sense of making it difficult or impossible for him to resume his [Board membership] or restore the status quo ante in the event he prevails." *Schrier*, 427 F.3d at 1267.  Dr. Cubin has not shown that his removal from the Board is likely to cause him ongoing or future harm that can only be remedied by immediate injunctive relief.

## CONCLUSION AND ORDER

Dr. Cubin was required to—but did not—show that he is substantially likely to succeed on the merits and that he will suffer irreparable injury if a preliminary injunction is not issued. While the Court finds the requested injunction to be "disfavored" and therefore require a "strong showing" on the likelihood of success, Dr. Cubin has failed to carry his burden under even the normal, non-heightened standard.  A preliminary injunction cannot issue due to Dr. Cubin's

inability to establish a substantial likelihood of success on the merits or irreparable harm, and the Court need not consider the remaining preliminary-injunction factors. *See High Plains Harvest Church v. Polis*, 835 F. App'x 372, 374 (10th Cir. 2020) (denying an injunction pending appeal for lack of likelihood of success on the merits without considering remaining factors); *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 890 (10th Cir. 2021) (failure to show irreparable injury precluded a preliminary injunction without need to address remaining factors).

The Court notes the findings of fact and conclusions of law in this Order are necessarily preliminary and based on the incomplete record currently before the Court. These findings and conclusions are not binding on the parties as this matter proceeds through the later stages of litigation. *See Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981) (findings and conclusions at the preliminary-injunction stage "are not binding at trial on the merits").

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction (ECF 11) is **DENIED**.

**DATED:** November 14th, 2024.

Scott W. Skavdahl
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING
## CHEYENNE DIVISION

| | |
|---|---|
| DR. FREDERICK WILLIAM "ERIC" CUBIN III, | Case No. 1:24-cv-164 |
| *Plaintiff*, | |
| v. | |
| MARK GORDON, in both his personal and official capacities as Governor of Wyoming, | |
| *Defendant*. | |

## NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Notice is hereby given that Plaintiff Dr. Frederick William "Eric" Cubin III appeals to the United States Court of Appeals for the Tenth Circuit from the following orders, rulings, and judgements of the District Court for the District of Wyoming:

1. *Order Denying Preliminary Injunction* [ECF No. 25], dated November 14, 2024, and signed by United States District Court Judge Scott W. Skavdahl.

2. Any and all orders, rulings, and judgments underlying any of the foregoing.

3. Included herewith is payment of the filing fee and docketing fee as required by by 28 U.S.C. § 1913, 28 U.S.C. § 1917, Federal Circuit Rule 52(a)(3)(A), and Rule 3(e) of the Federal Rules of Appellate Procedure.

Dated this 9th day of December, 2024.

1

Plaintiff:  Dr. Frederick William "Eric" Cubin III

BY:    /s/ *D. Stephen Melchior*
D. Stephen Melchior (WY Bar No. 5-2885)
Melchior Law Firm, P.C.
2010 Warren Avenue
Cheyenne, WY 82001
(307) 637-2323 - telephone
steve@melchlaw.com

/s/ *M.E. Buck Dougherty III*
M.E. Buck Dougherty III (TN #022474)*
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 481-4400 - telephone
bdoughherty@libertyjusticecenter.com
*Admitted pro hac vice*

*Attorneys for Plaintiff Dr. Eric Cubin*

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically with the Court's Case Management/Electronic Case Filing (CM/ECF) system. The Court and/or Clerk of Court may serve and give notice to counsel by CM/ECF electronic transmission.

Dated this 9th day of December 2024.

/s/ *M.E. Buck Dougherty III*
M.E. Buck Dougherty III (TN #022474)*
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
(512) 481-4400 - telephone
bdoughherty@libertyjusticecenter.com
*Admitted pro hac vice*

*Attorney for Plaintiff Dr. Eric Cubin*

2